# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NAMIG BAKER,
IRINA GORODNITSKY,
GLENN BAKER,
SAMUEL BAKER,
NATIG BAKER,
JOHNNY BUTLER, JR.,
JAYLEN BUTLER,
J.B., a minor, by and through Johnny Butler, Jr., next
friend,
A.B., a minor, by and through Johnny Butler, Jr.,
next friend,
JOHNATHAN BUTLER,
MECKO JOHNSON,
ARLETHA PETTIE,
CLAUDIA PETTIE,
SHERITA SANDERS,
KEVIN DEAS, SR.,
ANNMARIE DEAS,
K.D., a minor, by and through Kevin Deas, Sr., next
friend,
A.D., a minor, by and through Kevin Deas, Sr., next
friend,
CHRISTOPHER HARDESTY,
JAMES HARDESTY,
KELLI HARDESTY,
NICHOLAS HARDESTY,
GRADY HORNER,
CAMERON HORNER,
JOHN IASIELLO,
DANIEL KERNAN,
JAMES KERNAN,
LEAANN MCCARTNEY,
DONALD MCDANIEL, JR.,
DONALD MCDANIEL, SR.
JAMES MCDANIEL,
LOGAN MCDANIEL,
SHELBY MCDANIEL,
TERESA DEFUSTO,
ARIK MILLER,
CALANDRA BAILEY,
ARIKA MILLER,
TYRESHA WILLIAMS,
MICHAEL PABON,

**COMPLAINT**

Case No.: 1:22-cv-02765

EVA CARRERA,
MARICRUZ CARRERA,
BRANDON PAREDES,
ADAM PAREDES,
GARY PAREDES,
JESSE PAREDES,
JULIE PAREDES,
Estate of NEVAEH PAREDES, by and through
Brandon Paredes, as Special Administrator,
EVAN PRONZATI,
JOSEPH SANDLIN,
SAVANNAH SANDLIN,
SCOTT SMITH,
R.S. a minor, by and through Scott Smith, next
friend,
W.S., a minor, by and through Scott Smith, next
friend,
ANDREW VEGA,
RYAN WINSTON,
AMARI WINSTON,
ARSHIANNA REECE,
COURTNEY WINSTON,
SHERMAN WINSTON,
JAZMINE WINSTON,
MERREL WINSTON
SOPHRONIA WINSTON,

                Plaintiffs,

      v.

ISLAMIC REPUBLIC OF IRAN,

                Defendant.

## COMPLAINT FOR VIOLATION OF THE
## FOREIGN SOVEREIGN IMMUNITIES ACT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 5

JURISDICTION AND VENUE ........................................................................................ 6

THE DEFENDANT ........................................................................................................... 7

FACTUAL ALLEGATIONS ............................................................................................ 8

I.    IRAN HAS LONG SUPPORTED TERRORISM THROUGHOUT THE MIDDLE EAST AND CENTRAL ASIA AS PART OF ITS FOREIGN POLICY ..................................... 8

II.    THE TALIBAN IS PART OF AN AL-QAEDA-BACKED TERRORIST SYNDICATE THAT HAS WAGED A DEADLY INSURGENCY AGAINST THE AMERICANS IN AFGHANISTAN ........................................................................................................ 12

    A.    The Taliban ............................................................................................. 13
    B.    The Haqqani Network ............................................................................. 16
    C.    Al-Qaeda .................................................................................................. 21
    D.    The Kabul Attack Network ...................................................................... 27

III.    IRAN PROVIDED MATERIAL SUPPORT TO THE TALIBAN AND AFFILIATED TERRORIST GROUPS IN AFGHANISTAN ............................................................... 28

    A.    Iran Provided Material Support For Anti-American Terrorism In Afghanistan To Undermine the U.S. Mission There ........................................................  28
    B.    Iran Provided the Taliban With Weapons, Explosives, and Lethal Substances... 35
    C.    Iran Provided the Taliban With Lodging, Training, Expert Advice or Assistance, Safehouses, Personnel, and Transportation .......................................... 39
    D.    Iran Provided the Taliban With Financial Support ............................... 42
    E.    Iran Provided Material Support to Al-Qaeda ....................................... 44

IV.    THE TALIBAN INJURED PLAINTIFFS THROUGH TERRORIST ATTACKS FOR WHICH IRAN PROVIDED MATERIAL SUPPORT OR RESOURCES ..................... 46

    The Namig Baker Family ............................................................................ 47
    The Johnny Butler, Jr. Family .................................................................... 47
    The Kevin Deas, Sr. Family ........................................................................ 49
    The Christopher Hardesty Family .............................................................. 49
    The Grady Horner Family ........................................................................... 50

John Iasiello ........................................................................................................ 51

The Daniel Kernan Family ................................................................................... 51

The Donald McDaniel, Jr. Family ....................................................................... 52

The Arik Miller Family ........................................................................................ 53

The Michael Pabon Family................................................................................... 54

The Brandon Paredes Family................................................................................ 55

Evan Pronzati....................................................................................................... 56

The Joseph Sandlin Family................................................................................... 56

The Scott Smith Family ....................................................................................... 57

Andrew Vega ....................................................................................................... 57

The Ryan Winston Family ................................................................................... 57

CLAIM FOR RELIEF .................................................................................................... 59

COUNT ONE: PERSONAL INJURY UNDER 28 U.S.C. §1605A(C) .................................... 59

PRAYER FOR RELIEF .................................................................................................. 60

# I. INTRODUCTION

1.      This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C.

§1605A (hereinafter "FSIA") brought against Defendant, Islamic Republic of Iran ("Iran") by

veterans and one current servicemember (Evan Pronzati) of the U.S. Armed Forces and their

family members (as defined in 10 U.S.C. §101), all of veterans and one current servicemember

were the gravely wounded while serving their country in the Islamic Republic of Afghanistan

("Afghanistan") between approximately 2008 to 2012.

2.      While these Plaintiffs worked to rebuild post-war Afghanistan, they were attacked

by the Taliban and the Haqqani Network. Iran sponsored those terrorist attacks in an effort to

undermine American foreign policy in Afghanistan. The material support and resources provided

by Iran to these terrorist organizations in furtherance of their terrorist attacks in Afghanistan

included, *inter alia,* weaponry, financing, safe haven, safe passage, training, and assistance in

executing attacks that injured these Plaintiffs.

3.      Iran's support for al-Qaeda was equally potent. That support dates back decades

and has included money, weapons, training, logistical assistance, and safe harbor for key al-

Qaeda leaders. In 2007, Osama bin Laden himself referred to Iran as al-Qaeda's "main artery for

funds, personnel, and communication." Iran's longstanding decision to back al-Qaeda despite

sectarian differences between the two reflected Iran's overriding desire to foment anti-American

terrorism around the world. That decision, like the one to provide material support to the Taliban,

paid dividends. Iran's support for al-Qaeda's activities in Afghanistan substantially contributed

to the terrorist violence that killed and injured Americans there.

4.      Iran's support for al-Qaeda complemented its support for the Taliban because of

the close relationship between the three terrorist groups. Although, the Haqqani Network, and the

Taliban were separate groups that retained their own identities, they also acted together as a terrorism syndicate (the "Syndicate") that planned and authorized terrorist violence throughout Afghanistan. That syndicate—which involved mafia-style meetings between leaders of the syndicate's various members—provided a superstructure that organized and facilitated the Afghan terrorist attacks carried out by its members. By funneling support to multiple members within that syndicate, Iran ensured that its policy of sponsoring anti-American terrorism in Afghanistan achieved maximum effect. The attacks perpetrated by the Syndicate include those that injured these Plaintiffs.

5.      In 1984, the U.S. Department of State officially designated Iran as a State Sponsor of Terrorism under §6(j) of the Export Administration Act, §40 of the Arms Export Control Act, and §620A of the Foreign Assistance Act. This designation has never been lifted.

6.      Iran's agents included the U.S.-designated "Foreign Terrorist Organization" ("FTO") under section 219 of the Immigration and Nationality Act (8 U.S.C. §1189), Hezbollah; the U.S.-designated FTO, the Islamic Revolutionary Guard Corps ("IRGC"), whose subdivision known as the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") is a U.S.-designated Specially Designated Global Terrorist ("SDGT") under 31 C.F.R. §594.31. As a designated State Sponsor of Terrorism—which routinely employs designated FTOs as instruments of its terrorist agenda—Iran is liable to Plaintiffs for the injuries it caused by deliberately supporting terrorist attacks in Afghanistan.

## II. JURISDICTION AND VENUE

7.      This Court has personal and subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1330(a), 1330(b), 1331, 1332(a)(2), and 1605A.

8.      Venue is proper in this District under 28 U.S.C. §1391(f)(4).

9.      28 U.S.C. §1605A(c) provides a federal right of action against a State Sponsor of Terrorism for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support and resources for such acts. The foreign state is liable for the acts of its officials, employees, and agents.

### III. THE DEFENDANT

10.      Defendant Iran is a foreign state that was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to Section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and Section 40 of the Arms Export Control Act (22 U.S.C. § 2780). Iran has remained designated continuously since then.

11.      Iran is politically and ideologically hostile to the United States and its allies. Iran has consistently provided material support and resources for acts of international terrorism targeting the United States and its overseas interests, often acting through agents like the IRGC, the Qods Force, and Hezbollah. Iran's provision of material support for anti-American terrorism commonly includes material support and resources for torture, extrajudicial killings, aircraft sabotage, hostage taking, and other related acts.

12.      Iran—including through its officials, employees, and agents acting within the scope of those relationships—provided material support and resources for the commission of the attacks acts of torture, extrajudicial killing, aircraft sabotage, and hostage taking by the Taliban and the Haqqani Network in Afghanistan, including the serious injuries in which Plaintiffs and their family members were injured. Iran's material support and resources caused Plaintiffs' injuries.

13.     Iran provided material support for these acts of terrorism against Americans for the purpose of supporting, enabling, advancing, and benefitting from them.

## IV. FACTUAL ALLEGATIONS

**I.     IRAN HAS LONG SUPPORTED TERRORISM THROUGHOUT THE MIDDLE EAST AND CENTRAL ASIA AS PART OF ITS FOREIGN POLICY**

14.     The 1979 Iranian Revolution was fueled in large part by militant anti-Americanism. Eliminating the United States' role in the geographic region surrounding Iran—including through violence—was and remains a central tenet of Iranian foreign policy. Since the Iranian Revolution, Iran has engaged in and supported acts of terrorism directed at the United States and its allies as an instrument of Iran's foreign policy.

15.     Iran's support of terrorist proxies like Hezbollah, Hamas, the Taliban, the Haqqani Network and al-Qaeda is well-documented. Iran's support for such groups is especially prevalent in areas where Iran abstains from open conflict. As a result of Iran's consistent and longstanding support of anti-American terrorism, the U.S. State Department formally designated Iran as a State Sponsor of Terrorism in 1984. It has maintained that designation at all times since. In 2007, the U.S. State Department described Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."

16.     Iran carries out its support of terrorism largely through the IRGC. The IRGC, a governmental entity of Iran, is a quasi-military state institution that operates separately from the regular Iranian military. The IRGC is organized like a traditional military and includes an army, navy, air force, militia, and special forces. The IRGC is supervised by the Iranian government, but it also "has a relatively strict command-and-control protocol and answers directly to the Supreme Leader, Ayatollah Ali Khanmenei. The Supreme Leader serves as commander-in-chief

of the armed forces, appoints the head of each military service, and declares war and peace. He also routinely employs the IRGC to further Iran's global terrorist agenda. As the U.S. Treasury Department noted in 2010 when it designated certain IRGC officials pursuant to Executive Order 13224, "Iran also uses the … IRGC … to implement its foreign policy goals, including, but not limited to, seemingly legitimate activities that provide cover for intelligence operations and support to terrorist and insurgent groups."

17.     Members of the IRGC are officials, employees, or agents of Iran. In light of the IRGC's regular support for terrorist organizations and the strict command structure tying them to Iran's central leadership, members of the IRGC act within the scope of employment when they provide material support to terrorist organizations.

18.     Iran's constitution vests in the IRGC responsibility for defending the Islamic Revolution. The IRGC runs prisons in Iran, and it controls hundreds of companies, particularly in the oil-and-gas, engineering, construction, and defense industries. Some analysts estimate that the IRGC controls up to one-third of Iran's economy—billions of dollars of business.

19.     On April 15, 2019, the U.S. State Department designated the IRGC as an FTO. Announcing the designation, President Trump explained that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft. According to the U.S. State Department's public statement explaining the designation, the IRGC "has been directly involved in terrorist plotting; its support for terrorism is foundational and institutional, and it has killed U.S. citizens." Through the IRGC's support for terrorist organizations throughout the region, "[t]he Iranian regime has made a clear choice not only to fund and equip, but also to fuel terrorism, violence, and unrest across the Middle East."

20.     The IRGC has a special foreign division called the Qods Force. The U.S. State Department has observed that "Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East. The Qods Force is Iran's primary mechanism for cultivating and supporting terrorists abroad." The Qods Force is the driving force behind Iran's activities in Afghanistan, as well as in Iraq and elsewhere in the region.

21.     The Qods Force has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing. It also regularly trains foreign terrorist proxies whose attacks promote Iran's political goals. The Qods Force, though operationally independent from the rest of the IRGC, is also responsible for and directed by the Supreme Leader of Iran. Major General Qassem Soleimani, who was the chief of the Qods Force for more than twenty years, oversaw the Qods Force's support for terrorist groups to promote Iran's policies throughout the region. Soleimani took his directions from the Khamenei, with whom he shared a close personal relationship. Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020. Khamenei then appointed General Esmail Ghaani to replace him.

22.     The Qods Force provides weapons, funding, and training for terrorist operations targeting American citizens, including by supporting terrorist organizations such as al-Qaeda, the Taliban, and the Haqqani Network. Iran's Supreme Leader and central government are aware of and encourage those acts. As the U.S. government's Joint Improvised Explosive Device Defeat Organization ("JIEDDO") concluded: "Iran's use of weapons smuggling networks is fairly predictable and meant to shape the manner in which foreign countries deal with Iran." For that reason, the Qods Force varies the quantity, rate, and types of weapons provided to its proxy terrorist organizations depending on the amount of pressure Iran wants to exert on a particular

country. Applying pressure against the United States by funding and supplying terrorist proxies in the Middle East and Central Asia is thus an official component of Iran's foreign policy.

23.     The Qods Force has four regional commands within Iran, with each focused on implementing Iran's foreign policy in a neighboring region. The First Corps focuses on Iraq, the Second Corps on Pakistan, the Third Corps on Turkey and Kurdistan, and the Fourth Corps on Afghanistan.

24.     In October 2007, the U.S. Treasury Department designated the Qods Force as an SDGT under Executive Order 13224 for providing material support to the Taliban and other terrorist organizations, including Hezbollah and terrorist groups in Iraq. The U.S. Treasury Department also designated multiple Qods Force members as Specially Designated Nationals pursuant to Executive Order 13224, based on their activities in Afghanistan.

25.     The U.S. State Department designated the Qods Force as an FTO in April 2019, along with the IRGC.

26.     Iran has also used its agent, Hezbollah, to commit terrorist attacks. Hezbollah is a Lebanon-based terrorist group that has pledged fealty to Iran's Supreme Leader. Each year Iran provides Hezbollah with approximately $100 million to $200 million in funding and weapons. As Ali Akbar Mohtashemi (a Hezbollah founder, former Iranian ambassador to Syria and Lebanon, and former Iranian Minister of Interior) explained, "[Hezbollah] is part of the Iranian rulership; [Hezbollah] is a central component of the Iranian military and security establishment; the ties between Iran and [Hezbollah] are far greater than those between a revolutionary regime with a revolutionary party or organization outside its borders."

27.     Iran has long provided support –through the IRGC, Qods Force, and Hezbollah – for terrorist attacks against American military forces and contractors. For example, Iran used the

IRGC and Hezbollah to train, guide, direct, and motivate Shi'a terrorists targeting American service members and civilians in Iraq. Similarly, Iran (Acting predominantly through Hezbollah) provided Iraqi terrorists with explosively formed penetrators, a weapon that inflicted more casualties on Americans than any other in Iraq. And Iranian officials have often participated directly in attacks on Americans in Iraq.

## II.    THE TALIBAN IS PART OF AN AL-QAEDA-BACKED TERRORIST SYNDICATE THAT HAS WAGED A DEADLY INSURGENCY AGAINST AMERICANS IN AFGHANISTAN

28.    Since the United States-led overthrow of the Taliban-controlled government in Afghanistan in 2001, terrorists have repeatedly attacked American service members and civilians working to rebuild Afghanistan and support its elected government. Iran provided material support for those attacks, which killed or injured Plaintiffs.

29.    Plaintiffs identify below several terrorist groups, subgroups, and partnerships responsible for the specific attacks that killed and injured them. Each worked in concert and shared resources, personnel, and operational plans. Indeed, the Taliban and al-Qaeda often participated in mafia-style meetings – attended by the leaders of several allied terrorist groups – in which they planned and authorized various terrorist attacks throughout Afghanistan. Given such coordination, one former CIA official and senior White House advisor called the resulting terrorist superstructure a "syndicate," composed of al-Qaeda, the Taliban, and several allied FTOs. In fact, bin Laden himself conceived of al-Qaeda as the leader of a broader coalition of terrorists drawing from other terrorist organizations in Pakistan and Afghanistan.

30.    Iran's support for multiple components of this "syndicate," ensured that its support had maximum effect. Due to the mutually reinforcing ties between the Taliban and al-Qaeda in Afghanistan, support for the one benefited the other – and vice versa. Iran recognized

those interrelationships and so spread its support across multiple parts of the Afghan terror syndicate. In doing so, Iran was able to achieve its intended effect: wide-ranging terrorist attacks against Americans, executed mostly by the Taliban but supported by (and sometimes jointly committed with) al-Qaeda and the other components of the syndicate.

31.     Against that backdrop, Plaintiffs identify below the principal Afghan terrorist groups, subgroups, and cells that committed the attacks that killed and injured them.

### A.  The Taliban

32.     The Taliban is a Sunni Islamic terrorist organization. It was formed in 1994 and was composed mostly of former mujahedin fighters who had expelled the Soviet Union from Afghanistan. From its inception, the Taliban was a predominantly Pashtun movement led by Mullah Mohammed Omar. It began to overtake Afghanistan in late 1994, seeking to establish a radical Islamic government demanding strict adherence to Sharia law. The Taliban largely ruled Afghanistan from 1996 until 2001, although only three foreign countries formally recognized the Taliban government during that time.

33.     From 1996 until after September 11, 2001, the Taliban government harbored Osama bin Laden and al-Qaeda operatives in Afghanistan. In late 2001, in response to al-Qaeda's September 11 attacks on the United States and the Taliban's refusal to turn over Osama bin Laden, American-led Coalition forces invaded Afghanistan. They quickly overthrew the Taliban government. By November 2001, the Taliban fled Kabul, and they abandoned Kandahar – their historical stronghold in southern Afghanistan – the following month. While rank-and-file Taliban terrorists dispersed back into the countryside, the Taliban leadership – including Mullah Omar – took refuge in Pakistan.

34.     In December 2001, the United Nations passed Resolution 1386 authorizing the International Security Assistance Force ("ISAF") in Afghanistan, whose mandate was to maintain stability in Afghanistan and assist the Afghan government in rebuilding the country.

35.     In July 2002, President George W. Bush amended Executive Order 13224 to designate the Taliban and its leader Mullah Omar as SDGTs.

36.     In May 2003, after the U.S. military toppled the Taliban-led government, the United States declared an end to major combat operations in Afghanistan. Afghanistan ratified a new Constitution in December 2003, and the Taliban was not invited to participate in the formation of a new government. The Taliban reacted by setting up "shadow" governments – including so-called "governors" – in most areas, seeking to exercise de-facto, extra-legal control over the Afghan people.

37.     The Taliban's principal goal has long been to expel Coalition forces, particularly Americans, from the country and undermine the elected government of Afghanistan. To that end, the Taliban began to ramp up its terrorist attacks on U.S. forces in Afghanistan during the mid-2000s. The Taliban also started using new attack types, including suicide bombings in Afghanistan in 2004, and 141 in 2006. Remotely detonated bombings more than doubled between 2005 and 2006.

38.     In 2008 and 2009, a growing Taliban insurgency attacked U.S. forces throughout Afghanistan with a particular emphasis on the southern provinces of Afghanistan, especially Helmand and Kandahar Provinces. By 2010, the Taliban had regained much of the territory it had lost after 9/11. Responding to the Taliban's growing threat, U.S. Marines launched counterinsurgency operations focused on "restoring government services, bolstering local police

forces, and protecting civilians from Taliban incursion." The Taliban, in turn, responded with escalating violence.

39.     In 2018, the Taliban had an active presence in 70% of the country. Although the Taliban was the primary terrorist organization operating in all of the areas of Afghanistan where Plaintiff veterans and servicemembers were attacked, it was particularly active in the southern provinces in Afghanistan, including the provinces of Helmand, Zabul, and Kandahar. It concentrated many of its most deadly attacks in and around Kandahar City.

40.     The Taliban often attacked American and Coalition forces, U.S. government contractors, and Afghan forces. But it has also targeted civilian aid workers, non-governmental organization workers, and Afghan civilians. Until the withdrawal of U.S. troops from Afghanistan, the Taliban has increased attacks on civilians by placing explosives in public locations and using suicide bombers. It has also used civilians to attract Coalition forces before detonating a bomb, frequently killing more civilians than Coalition forces.

41.     The Taliban routinely violated the laws of war and did not comply with the Geneva Conventions. Among other violations, Taliban terrorists refused to wear uniforms or otherwise distinguish themselves from civilians; intentionally slaughtered civilians; used indiscriminate weapons; conscripted children into committing attacks; and engaged in widespread kidnapping and torture in an effort to intimidate their enemies.

42.     The Taliban – sometimes operating jointly with other terrorist groups –committed the terrorist attacks that attempted to kill and injured the Plaintiffs in this case.

43.     To effectuate those attacks, the Taliban employed a number of different attack types in service of its terrorist agenda. Most prominently, the Taliban has relied heavily on Improvised Explosive Devices ("IEDs"), including Explosively Formed Penetrators ("EFPs"),

designed to destroy American armored vehicles and inflict heavy casualties. Some of the Plaintiffs were injured by a Taliban-planted IED or EFP.

44.     The Taliban also has attacked U.S. forces and U.S. government contractors with suicide bombers with increasing frequency in recent years. Some Plaintiffs were injured in Taliban suicide bomber attacks, while other servicemembers were killed in the same attacks. For example, Army Sergeant Joseph Sandlin, whose family members are also Plaintiffs, in this case, was injured on November 27, 2010, when a Taliban suicide bomber detonated his bomb in Paktika Province where Sergeant Sandlin was completing a mission.

**B.  The Haqqani Network**

45.     The Haqqani Network is a Sunni Islamic terrorist organization that has been operating in Afghanistan since the 1970s. It was founded by Jalaluddin Haqqani and is now led by his son, Sirajuddin Haqqani. The Haqqani Network is part of the Taliban.

46.     On September 19, 2012, the U.S. State Department designated the Haqqani Network as a FTO.

47.     The United States has also designated various Haqqani leaders as SDGTs. On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States." In March 2009, the U.S. State Department put out a bounty of $5 million for information leading to his capture. In 2010 and 2011, the United States designated three other members of the Haqqani – as fundraisers and commanders of the Haqqani Network. By February 2014, the U.S. State Department and the U.S. Treasury Department had designated 14 leaders in the Haqqani Network under Executive Order 13224.

48.     The Haqqani Network began supplying weapons to the Taliban in the mid-1990s when the Taliban was in its infancy. It has operated as part of the Taliban since approximately 1995, when its founder Jalaluddin Haqqani swore allegiance to the Taliban after the Taliban captured Kabul. Jalaluddin Haqqani was the Minister of Tribal and Border Affairs in the Taliban government until the United States invaded Afghanistan.

49.     The Haqqani Network is especially active in the southeastern parts of Afghanistan, particularly the provinces of Paktika, Paktika, and Khost, collectively called Loya Paktia. It also developed a significant presence in the surrounding provinces of Kabul, Logar, Wardak, Ghazni, and Zabul. Because of the Haqqani Network's longstanding tribal connections to the southeastern region of Afghanistan, the Taliban often acts through the Haqqani Network in these areas. The Haqqani Network leads the Taliban's Miramshah Shura – one of the four councils below the Taliban's leadership council – for Loya Paktika and provinces north of Kabul. Sirajuddin Haqqani explained in a 2010 interview that the Haqqani Network is "assigned by the Islamic Emirate in the southeastern front of Afghanistan (Paktika, Khost) and we have mujahideen members [guerilla fighters] who are carrying out jihad in the north (provinces in northern Afghanistan) and in the south (provinces in southern Afghanistan), and they are operating under the Amirs of the provinces they are under." The Taliban relies on the Haqqani Network to carry out the Taliban operations within the Haqqani Network's sphere of influence, permitting the Taliban to present a united terrorist front throughout much of the country.

50.     The Taliban's terrorist commanders and shadow governors in the Loya Paktika area are often members of the Haqqani Network. As the U.S. State Department explained when it announced the designation of Mullah Sangeen Zadran as a SDGT, Sangeen Zadran served as the "Shadow Governor for Paktika province, Afghanistan, and a commander of the Haqqani

Network, a Taliban-affiliated group." Similarly, Abdul Aziz Abbasin is a "key commander in the Haqqani Network" and the Taliban's shadow governor for the Orgun District of Paktika Province.

51.    The Haqqani Network's influence was not limited to the southeastern provinces. There was significant overlap between the broader leadership of the Taliban and the Haqqani Network. Sirajuddin Haqqani (Jalaluddin's son and successor) has been a member of the Taliban's governing council since at least 2010. Since 2015 he has been the Deputy Emir of the Taliban, the second-in-command in the Taliban's leadership.

52.    In particular, the Haqqani Network oversaw the Taliban's terrorist attacks on U.S. and Coalition forces in Afghanistan. Jalaluddin Haqqani planned many of the Taliban's attacks on U.S. forces in the early days following the overthrow of the Taliban government. In October 2001, a purported Jihadist publication (as published online) described Jalaluddin as the "chief of the Taliban army." Indeed, in an interview published by Gulf News UAE, the interviewer identified Jalaluddin as "the commander-in-chief of the Taliban's southern military command" – akin to the Taliban army chief – "[and] Mullah Omar's top military strategist and commander." As for his son, Sirajuddin oversees Taliban terrorist operations throughout the country.

53.    According to Brigadier General Charles H. Cleveland, the chief spokesman for United States and NATO forces in Afghanistan, from 2016 Sirajuddin Haqqani "increasingly runs the day-to-day military operations for the Taliban, and, we believe, is likely involved in appointing shadow governors."

54.    In 2016, the *New York Times* reported that, according to a senior Taliban commander in southern Afghanistan, Sirajuddin Haqqani was in "constant contact" with Taliban

field commanders throughout Afghanistan, including outside the Haqqani Network's area of particular influence in the southeast. According to the commander, all field commanders must contact Sirajuddin Haqqani for permission before launching a surge or changing fighting plans.

55.     The Haqqani Network also influenced Taliban strategic decisions about which types of attacks to employ. The Haqqani Network was the first to use suicide bombings in Afghanistan, an innovation that al-Qaeda taught it. The Haqqani Network also was involved in the rising number of Taliban insider attacks – attacks that strategically undermine relations between U.S. and Afghan forces. By 2007, Army Lieutenant Colonel Dave Anders, the director of operations for Combined Joint Task Force-82, explained that "Siraj[Uddin Haqqani] is the one dictating the new parameters in brutality associated with Taliban senior leadership" employing "[k]idnappings, assassinations, beheading women, indiscriminate killings and suicide bombers."

56.     The Haqqani Network's influence within the broader Taliban was not limited to planning and authorizing attacks. Even outside of the Haqqani Network's traditional stronghold, its members often commit attacks along with other Taliban terrorists. For example, in early 2009 the Haqqani Network was operating in the southern provinces of Helmand and Kandahar. A spokesman for the Taliban confirmed that the Haqqani Network was operating in "Kandahar as well as nearby Helmand province to provide training, support – particularly in bomb-making – and to carry out attacks."

57.     In 2013, "[a] combined force in …Kandahar [] arrested a Haqqani network facilitator who managed supply routes from [Kandahar City] to other provinces" and was "also [] believed to have been instrumental in the acquisition and distribution of lethal aid to Haqqani fighters for attacks against Afghan and coalition forces." And a successful 2017 Taliban attack in

Kandahar against the U.A.E. ambassador to Afghanistan, Juma Mohammad Abdullah al-Kaabi, has been attributed to the Haqqani Network.

58.     Both Sirajuddin and Jalaluddin Haqqani have confirmed that the Haqqani Network operates as part of the Taliban. The Taliban, for its part, has likewise rejected claims that the Haqqani Network is a separate entity from the Taliban.

59.     The Haqqani Network also has significant links to al-Qaeda, dating back to the 1980s when Osama bin Laden established a training camp for his nascent terrorist group in Haqqani-controlled territory. After the September 11, 2001, attacks, the Haqqanis provided sanctuary to bin Laden when he fled Afghanistan; Jalaluddin Haqqani himself announced that the Taliban would "retreat to the mountains and begin a long guerrilla war to reclaim our pure land from infidels" and "that Osama bin Laden is not only safe and sound, he is also in good spirits."

60.     The Haqqani Network's close relationships with other terrorist groups have helped spawn the  terrorist syndicate operating in Afghanistan. Senior Haqqani Network officials have indicated that the Haqqani Network and al-Qaeda operate as one group. And in July 2008, Jalaluddin Haqqani's son – 18-year-old Muhammad Omar Haqqani – was killed alongside a top al-Qaeda commander in southeast Afghanistan. The Haqqani Network also maintains training camps and safehouses that are used by both al-Qaeda and Taliban operatives.

61.     More recently, Sirajuddin Haqqani has openly welcomed al-Qaeda members to join and fight with the Haqqani Network and the rest of the Taliban. Accordingly, to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council. U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.

62.     The U.S. Treasury Department has repeatedly recognized the links between Haqqani Network leaders and al-Qaeda. For example, in July 2010, the U.S. Treasury Department designated Nasiruddin Haqqani, the brother of Sirajuddin Haqqani, pursuant to Executive Order 13224. The designation noted that Nasiruddin Haqqani had received funding via payments from al-Qaeda. And when the U.S. Treasury Department designated Sirjuddin Haqqani's uncle Khalil AL-Rahman Haqqani as a SDGT in 2011, it noted that he "has also acted on behalf of al-Qa'ida and has been linked to al-Qa'ida military operations."

63.     The Haqqani Network is often considered the most radical part of the Taliban. Like the Taliban, it relies on terrorist attacks – including suicide bombings, IED attacks, insider attacks, and complex attacks – rather than open combat. Like the rest of the Taliban, the Haqqani Network routinely violates the laws of war and does not comply with the Geneva Conventions.

64.     Some Plaintiffs injured in attacks by the Haqqani Network, while other servicemembers were killed in the same attacks. For example, the Haqqani Network conducted terrorist attacks in the Khost Province of Afghanistan, including the January 1, 2010, IED attack that severely injured Army PV2 Arik Miller.

65.     The Haqqani Network also participated in the suicide bomber attack in Paktika Province on August 18, 2011, that severely injured several other U.S. service members, including SPC John Iasiello, whose family members are also Plaintiffs in this case.

**C.  Al-Qaeda**

66.     Osama bin Laden formed al-Qaeda in the late 1980s in Afghanistan in response to the Soviet occupation of Afghanistan. For decades, al-Qaeda has been a Sunni Islamic terrorist organization with the purpose of destroying the United States.

67.     Following the Soviet withdrawal from Afghanistan, Osama bin Laden began to transform al-Qaeda into a global terrorist group capable of launching attacks around the world. After moving to Sudan in the early 1990s, al-Qaeda's leadership returned to Afghanistan in approximately 1996, where it was sheltered by the Taliban for the next five years. One scholar who surveyed first-hand accounts of the initial meeting between bin Laden and the Taliban reported that the initial meetings "emphasize[d] the Taliban's humble attitude toward the Saudi guest and their immediate readiness to serve him." While under the Taliban's shelter, Osama bin Laden declared war on the United States in a published fatwa (religious decree) in 1996.

68.     In return for the Taliban's safe harbor, al-Qaeda provided substantial resources to the Taliban. By March 1997, bin Laden had met with Mullah Omar personally and offered to lend his fighters to the Taliban in their battles with northern factions that were still resisting Taliban rule. As bin Laden's deputy, Abu Hafs al-Masri, wrote at the time, "The [Taliban] movement is a capable Islamic entity, and it is possible that it can be a turning point for the betterment of the Islamic world. The movement needs a vision, and it needs support. It needs someone who will give it a military strategy. And it needs to build a military force which is suitable for the situation in Afghanistan." Al-Qaeda supplied the strategy and support that the Taliban needed to morph into a deadly terrorist group capable of inflicting mass casualties on Americans. During this time period, al-Qaeda also shared technical knowledge with the Taliban and reportedly paid the Taliban $10 million in $20 million a year for shelter.

69.     At the same time that bin Laden was cementing his ties with the Taliban, he was escalating his attacks on the United States. In 1998, while under the Taliban's protection, he declared a global jihad calling on all Muslims to kill Americans at any opportunity.

70.     On August 7, 1998, al-Qaeda suicide bombers in explosive-laden trucks simultaneously attacked the U.S. embassies in Kenya and Tanzania, killing more than 200 people and wounding more than 5,000 others. The United States responded two weeks later with missile strikes on al-Qaeda bases in Afghanistan and demanded that Mullah Omar turn over bin Laden. He refused.

71.     As a result of these and other terrorist attacks, the U.S. State Department designated al-Qaeda as an FTO on October 8, 1999. A week later the U.N. called for sanctions against the Taliban unless it expelled bin Laden from Afghanistan. Again, the Taliban refused.

72.     In the spring of 2001, bin Laden, on behalf of al-Qaeda, pledged an oath of allegiance to Mullah Omar and the Taliban. A few months later, on September 11, 2001, al-Qaeda attacked the World Trade Center in New York and the Pentagon, killing thousands. A third attack, possibly aimed at the White House, was thwarted by passengers aboard United Flight 93. The United States demanded once again that the Taliban turn over bin Laden, and once again the Taliban refused. A U.S.-led coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.

73.     Al-Qaeda's and the Taliban's close relationship continued long after 9/11. In the years since it has become clear that the al-Qaeda and Taliban organizations have been fused together: al-Qaeda terrorists have often worked in close conjunction with Taliban terrorists and the affiliated Haqqani Network and Kabul Attack Network. In May 2007, Taliban official Mullah Dadullah said, "[W]e and al-Qaeda are as one." In early 2009, a military-intelligence official was quoted as saying, "The line between the Taliban and al-Qaeda is increasingly blurred, especially from a command-and-control perspective." By the end of that year, Chairman of the Joint Chiefs of Staff Admiral Michael Mullen said the same thing openly. "We are deeply

concerned about the growing level of collusion between the Taliban and al-Qaeda," he told *The Wall Street Journal.* And as Lieutenant General Ronald L. Burgess, Jr. reported in a February 2010 Hearing of the Senate Select Committee on Intelligence, "al-Qaeda's propaganda, attack planning and support of the Taliban and Haqqani networks continues."

74.    The Taliban and al-Qaeda have remained intimately intertwined. For example, in 2015, Osama bin Laden's successor, Ayman Zawahiri, pledged an oath of allegiance to the recently installed Taliban leader Mullah Akhtar Mohammad Mansour, who publicly announced his acceptance of the pledge the following day. When Mansour was killed in May 2016, Zawahiri pledged allegiances to his successor, Mawlawi Haibatullah Akhundzada.

75.    Often, individual Taliban leaders are also members of al-Qaeda. For example, in late 2011 or early 2012, the Taliban appointed Sheikh Mohammed Aminullah, who has close ties to al-Qaeda, as the head of its Peshawar Regional Military Shura, which is responsible for attacks in northern and eastern Afghanistan.

76.    Al-Qaeda also encouraged the Taliban to embrace new terrorist techniques. In February 2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and Iraq. Taliban terrorists had previously viewed suicide attacks as taboo, but al-Qaeda convinced them they were religiously permissible. Indeed, al-Qaeda trumpeted their ideological success online, announcing, "While suicide attacks were not accepted in the Afghani culture in the past, they have now become a regular phenomenon!" With al-Qaeda's encouragement and training, the number of such suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in 2005 and more than 100 in 2006. Al-Qaeda further encouraged these attacks by paying the families of suicide bombers in Afghanistan.

77.     Al-Qaeda's role in that suicide-bombing trend was pivotal. As Islamic history scholar Bryan Glyn Williams explained, "Al Qaeda operatives carried out two to three [suicide] bombings per year on the Afghan government and NATO troops from 2002 to 2004 that were meant to demonstrate the effectiveness of this alien tactic to the local Taliban. These demonstrative acts and videos of successful [Al Qaeda] suicide bombings in Iraq seem to have convinced the Taliban to condone the previously taboo tactic of suicide bombing."

78.     Al-Qaeda operatives also served as embedded trainers with Taliban forces. These experienced trainers provided instructions, funding, and resources for conducting local and international attacks. By 2005 at the latest, al-Qaeda began bringing instructors from Iraq to train the Taliban on how to fight Americans. For example, al-Qaeda members trained Taliban commanders in bomb-making techniques. Al-Qaeda also invited Taliban commanders to Iraq, where they learned how to make armor-penetrating "shaped" charged, a type of IED late known as an EFP. Taliban trainees also learned how to use remote controls and timers, and urban warfare tactics.

79.     As one writer put it in November 2009, "Small numbers of Al Qaeda instructors embedded with much larger Taliban units have functioned something like U.S. Special Forces do – as trainers and force multipliers."

80.     By the mid-2000s, al-Qaeda's partnership with the Haqqani Network had facilitated the emergence of a network of al-Qaeda training camps in North Waziristan. According to a declassified 2008 Defense Intelligence Agency intelligence report:

81.     Al-Qaeda has also established multiple training camps within Afghanistan reportedly "hosted by the Taliban." One such camp covered nearby 30 square miles and

contained heavy weapons, IED-making material, anti-aircraft weapons, rocket-propelled grenade systems, machine guns, pistols, rifles, and ammunition.

82.     On top of the myriad forms of support detailed above, al-Qaeda also jointly planned and authorized terrorist attacks that the Taliban carried out. Those joint planning sessions often occurred in meetings in which al-Qaeda, the Taliban, and other members of the al-Qaeda-Taliban syndicate (such as Lakshar-e Taiba) would confer about particular geographies and targets to attack. The close operational coordination not only manifested itself in the Kabul Attack Network but also provided a broader terrorist superstructure that organized the insurgency throughout Afghanistan. In observing that this superstructure formed an Afghan-Pakistani "syndicate" of sorts, a former CIA analyst and White House advisor documented several notable syndicate-sponsored terrorist attacks in Afghanistan that "demonstrated the intricate connections between al-Qaeda and its allies in Pakistan and Afghanistan." Those intimate connections enhanced the lethality of the overall anti-American insurgency.

83.     Al-Qaeda and Taliban detainees at Guantanamo Bay, Cuba provided information that corroborates the planning and authorization activities of the al-Qaeda-Taliban syndicate. For example, according to purported Gitmo intelligence files quoted by terrorism experts Bill Roggio and Thomas Joscelyn, one detainee, Abdul Razak, was a "high-level military commander in a newly-conceived 'unification' of Al Qaeda, [Hezb-e-Islami Gulbuddin ("HIG"),] and Taliban forces within Afghanistan," which the leaders of the respective terrorist groups "envisioned [as a] new coalition of HIG, Al Qaeda, and Taliban during a meeting in Pakistan in early spring 2003." Another purported Gitmo detainee file quoted by Mssrs Roggio and Joscelyn concerning Haroon al Afghani, a dual-hatted al-Qaeda/HIG terrorist, contained the following intelligence report:

[Afghani] is assessed to have attended joint operations meeting among extremist elements in mid-2006. A letter describing an 11 August 2006 meeting between commanders of the Taliban, al Qaeda [Lashkar e Taiba]. … and the Islamic Party (probably a reference to the HIG), disclosed that the groups decided to increase terrorist operations in the Kapisa, Kunar, Laghman, and Nangarhar provinces, including suicide bombings, mines, and assassinations.

84.    Taken together, these reports "demonstrate a high degree of collusion between al-Qaeda and other terrorist groups" as part of a "jihadist hydra" that shares the "common goal" of seeking to "drive the U.S.-led coalition out of Afghanistan."

**D.    The Kabul Attack Network**

85.    The Kabul Attack Network is the operational manifestation of the terrorist syndicate led by al-Qaeda and the Taliban, including the Haqqani Network. Specifically, the Kabul Attack Network is a set of terrorist cells focused on attacks against targets in Kabul, the capital, and extending outward into the provinces of Logar, Wardak, Nangarhar, Kapisa, Ghazni, and Zabul. It is particularly active around key waypoints and transit routes on the way to Kabul, including Wardak, Ghazni City, and areas of Logar Province. The Kabul Attack Network was responsible for suicide bombings and other attacks on Americans in these areas.

86.    The Kabul Attack Network's members include the Taliban, including the Haqqani Network, as well as al-Qaeda, Lashkar-e-Taiba, and other terrorists active in the Kabul area.

87.    The Kabul Attack Network is led by Mullah Dawood, the Taliban's shadow governor for Kabul who is also a Taliban and Haqqani Network commander, and Taj Mir Jawad, a top commander in the Haqqani Network with a long history of high-profile attacks.

88.     According to an ISAF public affairs officer, the "Haqqani Network is deeply entrenched in the Kabul Attack Network, specifically in the facilitation of weapons and fighters into the area south of Kabul in Logar and Wardak. Senior Haqqani Network leaders often planned and executed terrorist attacks by the Kabul Attack Network, including giving tactical advice during attacks.

## III.     IRAN PROVIDED MATERIAL SUPPORT TO THE TALIBAN AND AFFILIATED TERRORIST GROUPS IN AFGHANISTAN

### A.     Iran Provided Material Support For Anti-American Terrorism In Afghanistan To Undermine The U.S. Mission There

89.     Although there are religious differences between the Shiite Iranian regime and the Sunni Taliban organization, those differences have not deterred Iran from supporting the Taliban's terrorist activities. Iran and the Taliban share a core geopolitical aim: to inflict mass casualties on Americans in the region. As two military-intelligence scholars observed, "the Iranian regime is ideologically and religiously opposed to the Taliban, [but] it nevertheless views the group as a useful counterweight to the United States." Similarly, as a Taliban commander stated in 2010 of Iran, "Our religions and our histories are different, but our target is the same – we both want to kill Americans." Sectarian distinctions aside, Iran has supported and funded attacks by the Taliban on U.S. and allied forces in Afghanistan to harm the United States.

90.     The Fourth Corps of the Qods Force, one of its four regional commands, implements Iran's foreign policy in Afghanistan. During the relevant timeframe, the Qods Force did so largely by providing the Taliban (including the Haqqani Network) with material support for terrorist attacks in Afghanistan. The Fourth Corps' al-Ansar Command Center is based in

Iran's second-largest city, Mashhad, near the border with Afghanistan. Mashhad naturally serves as a stopping point between Afghanistan and Tehran, Iran's capital.

91.     Following the 9/11 attacks on the United States, Iran met with senior Taliban officials to offer military aid to support the Taliban's fight against U.S. led Coalition forces. Iran planned that meeting and hosted in on the Iranian side of the Afghanistan border. As part of his initial offer of support, Iran pledged to sell advanced military equipment to the Taliban for use against U.S. and allied forces, boasted of Iran's ability to track U.S. troop movements, and promised to allow terrorists entering Afghanistan to travel through Iranian territory. Iran also provided safe harbor to Taliban leaders who escaped U.S. forces.

92.     After the U.S. invasion of Afghanistan, Iran made a pretense of professing support for the U.S. and NATO mission but was already seeking to undermine it. In February 2002, then-CIA Director George J. Tenet testified before Congress that "initial signs of Tehran's cooperation and common cause with us in Afghanistan are being eclipsed by Iranian efforts to undermine U.S. influence there. While Iran's officials express a shared interest in a stable government in Afghanistan, its security forces appear bent on countering the US presence." As one scholar explained, Iran "feared the US might use Afghanistan as a base from which to launch a kinetic attack on Iran. The Taliban insurgency thus became viewed by Tehran as a tool with which to keep American forces preoccupied."

93.     The U.S. government kept records of Iran's escalating support for the Taliban terrorists over the course of the United States' involvement in Afghanistan. In April 2007, General Peter Pace, Chairman of the U.S. Joint Chiefs of Staff, stated that Iranian explosives had been captured in Kandahar Province en route to the Taliban but acknowledged that it was not yet entirely clear who within Iran was responsible. The next day, U.S. Assistant Secretary of State

Richard Boucher described "a series of indicators that Iran is maybe getting more involved in an unhealthy way in Afghanistan."

94.    Those indicators rapidly grew in intensity, and soon there was little doubt that Iran was actively sponsoring the Taliban terrorists as a core part of its foreign policy. A purported May 2007 U.S. State Department cable (as published online), for example, reported that Afghan President Hamid Karzai had expressed concerns "over Iranian agents engaging Taliban and supplying them with weapons." A purported July 2007 U.S. State Department cable (as published online) similarly reported that Taliban terrorists had received "light weapons and grenade launchers [that] bore the stamps of the Iranian factories where they were manufactured, primarily in 2006 and 2007." The same cable explained that the fighters claimed they had received training in Iran and had been promised access to antiaircraft rockets by Iranian officials. A purported military-intelligence summary the next month (as published online), reported on an "'alarmingly rapid increase' in Iranian presence in Afghanistan."

95.    The U.S. Treasury Department designated the Qods Force as a SDGT, it also confirmed in 2007 that the "Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan." The designation stated:

> The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since at least 2006, Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable defense systems to the Taliban…. Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.

96.    Similar observations continued in 2008. According to the U.S. State Department's 2008 Country Reports on Terrorism: "The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and

supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan."

97.     In a 2009 report, the U.S. government's JIEDDO recognized that "Iran's intentions are the same in both Iraq and Afghanistan: to develop, fund and arm proxy networks to leverage against the perceived U.S. aim of pursuing an active regime change doctrine in Iran." Similarly, a purported January 2010 cable (as published online) explained that senior officials from the United Arab Emirates' State Security Department had accused Iran, through the IRGC, of supporting the Taliban by providing money and weapons, smuggling drugs, and facilitating the movement of Taliban leaders and fighters.

98.     In another February 2010 cable (as published online), President Karzai's Chief of Staff and former Ambassador to Iran, Omar Daudzai, reported that Iranian officials were no longer denying Iran's support for the Taliban in Afghanistan, instead remaining silent in the face of the assertion by the Government of Afghanistan.

99.     In an April 2010 report, the U.S. Department of Defense stated that Iran was "covertly" supporting the Taliban, specifically stating "Arms caches have been recently uncovered with large amounts of Iranian manufactured weapons, to include 107mm rockets, which we assess IRGC-QF delivered to Afghan militants." It further explained that "Tehran's support to the Taliban is inconsistent with their historic enmity, but fits with Iran's strategy of backing many groups to ensure that it will have a positive relationship with the eventual leaders."

100.     On August 3, 2010, pursuant to Executive Order 13224, the U.S. Treasury Department designated General Hossein Musavi and Colonel Hasan Mortezavi, senior officials in the Qods Force, as SDGTs for their roles in supporting the Taliban. General Musavi was the

leader of the Ansar Corps, also known as the Fourth Corps, the branch of the Qods Force responsible for carrying out activities within Afghanistan. The U.S. Treasury Department also found that both General Musavi and Colonel Mortezavi, acting in their capacity as senior Qods Force officers, had provided "financial and material support to the Taliban." The U.S. Treasury Department further concluded that "the IRGC-QF provides select members of the Taliban with weapons, funding, logistics and training."

101.    General David Petraeus, who was Commander of the ISAF at the time, testified before the Senate Armed Services Committee in March 2011 that Iran "without question" supplied weapons, training, and funding to the Taliban in order to "make life difficult" for U.S. and NATO forces in Afghanistan.

102.    In April 2012, the U.S. Department of Defense gave Congress its Annual Report on Military Power of Iran, which provided that, even though Iranian "support to the Taliban is inconsistent with their historic enmity, it complements Iran's strategy of backing many groups to maximize its influence while also undermining U.S. and [NATO] objectives by fomenting violence." By means of "the IRGC-QF, Iran provides material support to terrorist or militant groups such as … the Taliban." The U.S. Department of Defense characterized the support as part of a "grand strategy" to "challeng[e] U.S. influence."

103.    In the U.S. Department of Defense's 2012 Report on Progress Toward Security and Stability in Afghanistan given to Congress, it was reported that Iran was engaging in "covert activities" in Afghanistan, including the provision of weapons and training to the Taliban. As the report stated, "Since 2007, Coalition and Afghan forces have interdicted several shipments of Iranian weapons. Tehran's relationship with the insurgency, although not ideologically based, is

consistent with Iran's short- to mid-term goal of undermining Coalition efforts and opposing the international military presence in Afghanistan."

104.    Less than two years later, the U.S. Treasury Department concluded that the Qods Force "utilized now-detained Afghan associate, Sayyed Kamal Musavi, who was designated today, to plan and execute attacks in Afghanistan." It further confirmed that "[t]wo IRGC-QF officers also designated today, Alireza Hemmati and Akbar Seyed Alhosseini, provided logistical support to this associate." Similarly, according to a Taliban commander in central Afghanistan in 2015: "Iran supplies us with whatever we need."

105.    In 2016, Taliban leader Mullah Mansour was killed by an American drone strike while returning to Afghanistan from Tehran, where he had been meeting with Iranian security officials, and possibly directly with Ayatollah Ali Khameni, to discuss tactical coordination of Taliban terrorist activities in Afghanistan. He had made at least two visits to Iran since 2013.

106.    Iran's support for terrorist groups in Afghanistan continued. The U.S. State Department stated in 2017 that "Iran is responsible for intensifying multiple conflicts and undermining the legitimate governments of, and U.S. interests in, Afghanistan…." The U.S. Department of Defense similarly confirmed that Iran "provides support to the Taliban and Haqqani Network." In May 2018, U.S. Secretary of State Michael Pompeo publicly accused Iran of supporting the Taliban and other terrorist groups in Afghanistan.

107.    In October 2018, pursuant to Executive Order 13224 the U.S. Treasury Department designated additional Qods Force officials "for acting for or on behalf of IRGC-QF and for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the Taliban." The U.S. Treasury Department acted

along with the six other member nations of the Terrorist Financing Targeting Center – a multinational, cooperative effort to combat terrorism in the Middle East.

108.    The Secretary of Iran's Supreme National Security Council, Ali Shamkhani, publicly acknowledged Iran's support for the Taliban in January 2019, claiming that it was designed to "curb [] the security problems in Afghanistan."

109.    Also, the United States has recognized Iran's support of the Taliban in the aftermath of Qassem Soleimani's death on January 3, 2020. In a press conference in the days after the killing of General Soleimani, Secretary of State Michael Pompeo publicly accused Iran of backing the Taliban and associated groups, including the Haqqani Network.

110.    Iran, in turn, signaled its continued focus on destabilizing U.S. forces in Afghanistan by appointing General Esmail Ghaani ("Ghaani" or "Qaani"), the former head of Iran's Qods Force branch in Afghanistan, to be the top commander of the Qods Force. General Ghaani traveled to Afghanistan in 2018 as the deputy ambassador of Iran to Kabul and remains focused on cultivating Iran's relationship with the Taliban in Afghanistan.

111.    The Taliban's reaction to Soleimani's death similarly recognized Iran's support for its terrorist activities. A Taliban statement condemned American forces for the attack on Soleimani and expressed regret for his "martyrdom." Additional details were reported in Taliban-aligned publications about Soleimani's support for the Taliban, including his meeting with Taliban delegations in Iran, personally traveling to Afghanistan, and planning attacks.

112.    Consistent with the policy described above, Iran provided material support or resources for the acts that injured Plaintiffs and their family members. As explained below, that support took the form of "currency … lodging, training, expert advice or assistance, safehouses,

false documentation or identification, communications equipment, facilities, weapons, lethal

substances, explosives, personnel, … and transportation."

B.    **Iran Provided The Taliban With Weapons, Explosives, and Lethal Substances**

113.    Iran provided material support or resources for the acts of extrajudicial killing that

injured Plaintiffs and attempted to kill Plaintiffs by providing (among other things) weapons,

explosives, and lethal substances to the Taliban. Many of the weapons Iran provided were

designed to be particularly effective against U.S. and allied forces operating in Afghanistan. For

example, Iran provided the Taliban with anti-tank mines, long-range rockets, explosively formed

penetrators, suicide vehicle-borne improvised explosive devices, rocket-propelled grenades, and

explosives, which were uniquely suited for terrorist attacks on U.S. and allied forces.

114.    U.S. and allied forces seized large caches of Iran-made weapons and explosives in

Afghanistan, many of which bore markings of Iranian origin. A purported April 2007 military-

intelligence summary (as published online) reported that "Iranian officials" were sending "to

Afghanistan explosive devices and vehicles ready to be used as SVBIEDs [suicide vehicle-borne

improvised explosive devices.]" A purported U.S. government document from August of that

year (as published online) also reported that the Afghanistan National Police had found evidence

of a planning meeting for 25 suicide attacks in which it was stated that "[t]he

materials for the bombs will be supplied by Iran Government …."

115.    In October 2007, under Executive Order 13224 the U.S. Treasury Department

designated the Qods Force as a SDGT, specifically documenting Iran's frequent shipments of

weapons to the Taliban over at least the prior year. A purported December 2007 military-

intelligence summary (as published online) further reported that explosive samples in suicide

vests seized from four suicide bombers "tasked by Taliban/Al-Qaeda leaders" with carrying out a

suicide attack in Helmand Province were found to be a 92% probability of a match against a suspected sample of Iran-sourced C4.

116.    In January 2008, a raid by Afghan Police in Farah Province discovered 130 mines, of which the Afghan Police concluded 60 were Iran-made. That same month the U.S. Ambassador to Afghanistan stated that "[t]here is no question that elements of insurgency have received weapons from Iran."

117.    In a purported June 2008 U.S. State Department cable (as published online) it was noted that multiple instances of Iran transferring arms to the Taliban in 2007 and 2008 and it concluded that analyses of the weaponry "indicate the Taliban had access to Iranian weaponry produced as recently as 2006 and 2007." Similarly, Afghan forces discovered a large cache of Iran-made explosives hidden near the Bakhshabad Dam in Farah Province in March 2009. That same month, a purported military-intelligence summary (as published online) indicated that Taliban commanders had obtained portable surface-to-air missiles that originated in Iran.

118.    In May 2009, 44 bricks of Iran-made explosives and dozens of Iran-made mortars were discovered in a Taliban stronghold in Helmand Province. Also in May 2009, Afghanistan border police intercepted a shipment crossing the Iranian border with dozens of anti-tank mines bound for Afghan militants. And in September 2009, a purported military-intelligence summary report (as published online) claimed that the Taliban had received "six very powerful anti-tank mines from Iran" to target ISAF forces or important Afghan Police Officers. That same year, the U.S. State Department reported that, "[s]ince at least 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket-propelled grenades, mortar rounds, 107mm rockets, and plastic explosives."

119.     By 2011, Taliban terrorists were using Iran-made and -sourced long-range rockets to attack Coalition targets in Afghanistan. In February 2011, British forces intercepted more than four dozen 122-millimeter rockets in Nimruz Province near the Iranian border, which gave the terrorists roughly double the range to attack Coalition targets. British Foreign Secretary William Hague stated that "detailed technical analysis, together with the circumstances of the seizure, leave us in no doubt that the weaponry recovered came from Iran." The *Wall Street Journal* similarly reported that U.S. officials "said the rockets' markings, and the location of their discovery, give them a 'high degree' of confidence that they came from the Revolutionary Guard's overseas unit, the Qods Force." General Petraeus later confirmed that the Qods Force had supplied these rockets to a "known Taliban facilitator." The U.S. Department of Defense's 2011 Report on Progress Toward Security and Stability in Afghanistan similarly stated that "[f]orensics teams examined the rockets and confirmed an Iranian point of origin."

120.     In June 2015, Iran hired smugglers to ferry supplies across the Iranian border and deliver them to Taliban units in Afghanistan. These Iran-supplied weapons included 82mm mortars, light machine guns, AK-47 rifles, rocket-propelled grenades, and materials for making roadside bombs.

121.     Iran also provided EFPs to the Taliban. EFPs are specially shaped charges, first used by Hezbollah in Lebanon, which typically employ a manufactured concave copper disk and an explosive-packed liner. Thus, when Iran "smuggled [EFPs] to Afghan insurgents for use against U.S. Forces," Iran supplied the Taliban with a particularly lethal form of support. Indeed, Iran and Hezbollah designed EFPs to defeat armored vehicles like the ones used by Coalition forces in Afghanistan. Those EFPs gave the Taliban a sophisticated anti-American weapon that it could not have obtained or deployed effectively on its own.

122.     The Taliban began using EFPs against Coalition forces in 2007. A purported May 2007 U.S. State Department cable (as published online) reported on increased IED attacks and noted that recent attacks had been successful against armored ISAF vehicles, which indicated an Iran-supplied EFP. Just days later another purported cable (as published online) reported that two EFPs had been discovered in April 2007 in Herat Province. Through the summer of 2007, at least four EFPs were discovered in Herat Province, near other Iranian arms shipments.

123.     A purported September 2007 cable (as published online) stated that British forces "in Farah Province, Afghanistan intercepted an arms convoy they had been tracking from inside Iran," which included EFPs "of Iranian origin." One week later, another purported cable (as published online) reported that, according to the U.K. Ambassador to NATO, Steward Eldon, analysis of the munitions "showed a clear link to Iran and weapons the Iranian Revolutionary Guard Corps Qods Force has sent to insurgents in Iraq." In 2008, the United Kingdom obtained proof that Iran was supplying the components for these EFPs.

124.     By 2007, the JIEDDO concluded that Iran was attempting to "inflict psychological damage" on the United States by smuggling EFPs "to Afghan insurgents for use against U.S. Forces."

125.     In Afghanistan, Iranian EFPs earned the nickname "Dragons" because their explosive force was concentrated in the direction of the designated target rather than blasting in all directions and dispersing the impact. Unlike ordinary mines that cause only minor damage to U.S. military vehicles, a Dragon "superbomb" can completely destroy a military Humvee or tank. According to one Taliban commander, "If you lay an ordinary mine, it will only cause minor damage to Humvees or one of their big tanks. But if you lay a[n] [Iranian] Dragon, it will destroy it completely."

126.   On information and belief, some Plaintiffs were severely injured and other servicemembers were killed in terrorist attacks using Iran-supplied EFPs.

127.   Iran also provided the Taliban with rockets and similar weapons that were particularly effective against U.S. and Coalition forces. A purported April 2007 military-intelligence summary (as published online), for example, reported that Iran had purchased anti-aircraft missiles from Algeria in late 2006 and then smuggled them from Mashhad, Iran – where the Fourth Corps of the Qods Force is headquartered – into Afghanistan. A purported Afghanistan Police Report from the next month (as published online) claimed that Iran intelligence sources issued three anti-aircraft launchers and ammunition to a Taliban commander. A purported March 2009 military intelligence summary (as published online) included intelligence reports of portable surface-to-air missiles arriving in Afghanistan from Iran. Similarly, a purported July 2009 military-intelligence summary (as published online) included reports of two dozen "Stinger" style surface-to-air missiles smuggled from Iran into Afghanistan.

128.   According to a purported September 2009 military-intelligence summary (as published online), Taliban terrorists used an Iran-made rocket-propelled grenade launcher to shoot down Coalition helicopters. The launcher was marked "Made In Iran." The launcher was particularly effective because, unlike some other launchers, the Iran-made launcher had a scope that could be adjusted for targeting and was more accurate for shooting helicopters.

**C.     Iran Provided The Taliban With Lodging, Training, Expert Advice or Assistance, Safehouses, Personnel, and Transportation**

129.   Iran also provided members of the Taliban and affiliated terrorist groups with lodging, training, expert advice or assistance, safe harbor, and transportation. Iran taught the Taliban attack techniques that were particularly effective against U.S. and Coalition forces.

Without the training from Iran and its agents, the Taliban would not have been able to launch as successful a terrorist campaign against American forces.

130.    According to a purported June 2006 military-intelligence summary (as published online), two members of the Iranian Intelligence Secret Service had arrived in Parwan Province to help Taliban members "in carrying out terrorist attacks against the [Afghanistan] governmental authorities and the [Coalition] members, especially against the American forces." A purported military-intelligence summary later that year (as published online), reported that injured Taliban terrorists were evacuating to Tehran for shelter.

131.    Iran also trained Taliban fighters at camps with Iran. For example, a purported April 2007 military intelligence summary (as published online) reported that "Iranian officials train" members of the Taliban at an Iranian base in Birjand, Iran, near the Afghanistan border. A similar purported June 2007 military intelligence summary (as published online) claimed that the IRGC was training roughly 300 foreign fighters in Iran, presumably to fight in Afghanistan.

132.    A purported military-intelligence summary (as published online) from May 2008 claimed that a Taliban commander had traveled to Iran for training and returned with 40 trained terrorists. Similarly, a military-intelligence summary (as published online) from July 2008 referenced "trained fighters moving in from Iran." And a purported military-intelligence summary (as published online) from October 2009 likewise reported on the return of a Taliban commander from training "in an Iran army barracks."

133.    Iran provided Taliban terrorists with specialized training on how best to deploy Iran-supplied weapons against U.S. and Coalition forces. A purported December 2008 military-intelligence summary (as published online) reported on a group of 40 insurgents "who allegedly were trained in an Iranian Military base" who had plans to attack the capital of Farah Province

using weapons that "Iran Intelligence could have provided." According to a purported April 2009 military-intelligence summary (as published online), Iran was recruiting Taliban terrorists for training in Iran on shooting down Coalition helicopters. And another purported April 2009 military-intelligence summary (as published online), reported on the return of a Taliban commander after receiving IED-manufacturing training in Iran.

134.    A March 21, 2010, article in London's *The Sunday Times* reported extensively on Iranian security officials training Taliban recruits to "ambush" Coalition forces, attack checkpoints, and use guns and IEDs. The *Times* interviewed two Taliban commanders – from Wardak and Ghanzi province – who had traveled to Iran with groups of Taliban terrorists for training, which improved their ability to launch lethal attacks on Coalition forces. According to the commanders, Iran paid for this travel and training. One commander who received training in Iran observed that the Taliban's and Iran's "religious and …histories are different, but our target is the same – we both want to kill Americans."

135.    By 2009, U.S. government officials were openly accusing the IRGC of training the Taliban. In an August 2009 report, ISAF Commander General Stanley McChrystal explained that "the Iranian Qods Force is reportedly training fighters for certain Taliban groups and providing other forms of military assistance to insurgents." He confirmed again in May 2010 that Iran was training Afghan fighters in Iran. In its 2009 Country Reports on Terrorism, the U.S. State Department reported: "Iran's Qods Force provided training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons …." Similarly, in 2012 it explained: "the IRGC-QF trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets."

136.     Iran's training of Taliban terrorists never diminished. By 2015, the IRGC was operating at least four Taliban training camps within Iran.

137.     Iran also facilitated the Taliban's attacks by allowing the Taliban to establish offices in Iran to serve as bases for planning terrorist attacks. For example, Iran permitted a senior leader of the Taliban to set up an office in Zahedan, Iran, near the borders with Afghanistan and Pakistan. In or about 2014, the Taliban also opened an office in Mashhad, Iran, where the Fourth Corps of the Qods Force is headquartered. As of January 2019, the Taliban maintained an office in Tehran, Iran.

138.     Iranian fighters also conducted attacks alongside Taliban terrorists. In an October 2016 Taliban attack in Farah Province, four senior Iranian commandos were killed, and many of the other Taliban died and all were taken across the border to Iran for burial.

139.     Mohammad Arif Shahjahan, the governor of Farah Province in western Afghanistan, told Radio Free Afghanistan in 2017 that Taliban leaders had been traveling frequently to Iran, where they received protection and support. He reported that Qods Force operatives had recently met with and advised the Taliban in Farah Province.

140.     Iran's training of Taliban terrorists in small unit tactics, small arms, explosives, indirect fire, and other techniques enabled the Taliban to more effectively attack U.S. forces and Coalition forces through the U.S. withdraw from Afghanistan. The Taliban and affiliated terrorist groups in Afghanistan used Iran's training to injure Plaintiffs and kill other servicemembers.

**D.     Iran Provided The Taliban With Financial Support**

141.     Iran has also supported the Taliban financially. On an annual basis, Iran provided large cash payments to the Taliban. For example, a purported February 2005 military intelligence summary (as published online) reported that the IRGC delivered 10 million Afghanis (worth

roughly $212,000) to a location on Iran's border where the money was transferred to four members of a Taliban-associated terrorist group.

142.    Iran also directly paid Taliban insurgents to kill U.S. forces. Another purported February 2005 military-intelligence summary (as published online) reported on a Taliban group that was being paid by the Iranian government $1,740 for each Afghanistan soldier killed and $3,481 for each Government of Afghanistan official killed. The report further explained that the group would begin attacking U.S. forces if the attacks on Afghans were successful. Iran paid Taliban terrorists an estimated $1,000 for each U.S. soldier murdered in Afghanistan and $6,000 for each destroyed American military vehicle. In one specific example, Taliban fighters received $18,000 from Iran as a reward for an attack in 2010 than killed several Afghan forces and destroyed an American armored vehicle.

143.    Iran also provided funding to individual Taliban commanders, often as they were returning to Afghanistan from training in Iran. A purported May 2008 military-intelligence summary (as published online) reported on a Taliban leader returning from training in Iran "along with a considerable amount of money." A purported May 2009 U.S. State Department Cable (as published online) stated that the IRGC may provide Taliban Commander Mullah Sangin with financial support to engage Coalition forces, including U.S. contractors.

144.    Iran has also supported the Taliban's finances by supporting its ability to traffic narcotics, which Taliban terrorists use "to finance their acts of terror and violence." As the U.S. Treasury Department explained when it designated Iranian Qods Force General Gholamreza Baghbani as a Specially Designated Narcotics Trafficker in March 2012, General Baghbani allowed Afghan narcotics traffickers to smuggle opiates through Iran, facilitated the smuggling of chemicals necessary to produce heroin from Iran into Afghanistan, and helped "facilitate

shipments of opium into Iran." General Baghbani also had narcotics traffickers deliver weapons on his behalf to the Taliban.

145.    In a 2015 *Wall Street Journal* article, a Taliban commander described Iran's financial support of the Taliban in the form of recruiting and paying individual terrorists. The commander explained that he had been detained for working illegally in Iran when he was approached by the IRGC and offered double his previous salary – to be paid by Iran – if he fought with the Taliban in Afghanistan. And in 2017, officials in Ghor Province accused Iran of financing a Taliban offensive that briefly enabled the Taliban to overtake a key district.

### E.  Iran Provided Material Support to Al-Qaeda

146.    Iran has also long provided material support to al-Qaeda. As with the Taliban, the sectarian differences between the Shiite regime in Tehran and the Sunni al-Qaeda leadership have not hindered cooperation between the groups. Whatever their religious differences, both groups share a hatred of America and support anti-American violence.

147.    Iran has supported al-Qaeda's terrorist activities since the early 1990s, when Osama bin Laden lived in Sudan. Iran, through the IRGC and Hezbollah, served as the original trainer for al-Qaeda with respect to suicide bombings, attacks against large buildings, IEDs, explosives, intelligence, and general attack tactics directed at American interests. For example, senior al-Qaeda operatives traveled to Iran and Lebanon during this period to camps run by Hezbollah and sponsored by the Qods Force. The operatives received advanced explosives training that enabled al-Qaeda to launch large-scale terrorist attacks on American embassies in Africa. According to one senior al-Qaeda official, trainers at this time were already researching how to develop shaped charges to pierce armor plating – the technology later perfected in EFPs.

148.     When the U.S. Department of Justice indicted Osama bin Laden for the 1998 bombings of the U.S. embassies in Kenya and Tanzania, the indictment alleged that al-Qaeda had "forged alliances" with "the government of Iran and its associated terrorist group Hezballah [sic] for the purpose of working together against their perceived common enemies in the West, particularly the United States." This Court subsequently found that Iran had caused the East Africa Embassy bombings by materially supporting al-Qaeda's operations.

149.     In the aftermath of the September 11, 2001, attacks on the United States, Iran provided safe harbor to many senior leaders of al-Qaeda and their families, including Osama bin Laden's sons. Iran permitted these senior leaders to move freely within Iran in the early 2000s, while they continued to direct, organize, and support al-Qaeda's terrorist operations throughout the world. In essence, Iran provided al-Qaeda with a safe location to orchestrate its terrorist activities.

150.     In 2007, Osama bin Laden discouraged terrorist attacks against Iran because of its historical support for al-Qaeda's terrorist operations, and he referred to Iran as al-Qaeda's "main artery for funds, personnel, and communication." Similarly, a letter reportedly written by al-Qaeda's second-in-command, Ayman al-Zawahiri, thanked the IRGC for its support in setting up al-Qaeda's terrorist network in Yemen in 2008.

151.     In 2012, the Council on Foreign Relations reported that "al-Qaeda has stepped up its cooperation on logistics and training with Hezbollah, a radical, Iran-backed Lebanese militia drawn from the minority Shiite strain of Islam."

152.     The U.S. government has also recognized these connections. In July 2011, the U.S. Treasury Department designated as SDGTs six members of al-Qaeda operating in Iran under a secret agreement between Iran and al-Qaeda. The agreement provided that al-Qaeda

terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities. In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities in Afghanistan and Pakistan." The Treasury Department found that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia." Indeed, al-Qaeda has honored its commitment to Iran despite its attacks on Shi'a Muslims elsewhere in the Middle East.

153.    Under Executive Order 13224, the U.S. Treasury Department has repeatedly recognized the link between al-Qaeda and Iran in making SDGT designations. In February 2012, the agency designated the Iranian Ministry of Intelligence and Security as a terrorist-sponsoring entity for, among other things, supporting al-Qaeda. Two years later the agency likewise designated a "key Iran-based" al-Qaeda facilitator who has "assisted extremists and operatives transiting Iran on their way into and out of Pakistan and Afghanistan."

## IV.    THE TALIBAN INJURED PLAINTIFFS THROUGH TERRORIST ATTACKS FOR WHICH IRAN PROVIDED MATERIAL SUPPORT OR RESOURCES

154.    Plaintiffs are former and current members of the U.S. military who served in Afghanistan, and their direct family members, who were injured in terrorist attacks conducted by the Taliban in conjunction with the Haqqani Network and affiliated terrorist groups. Iran's provision of material support or resources for these acts of extrajudicial killing and attempts at extrajudicial killing, which caused the Plaintiffs' personal injuries.

///

**The Namig Baker Family**

155.    Plaintiff Private First-Class Namig Baker served in Afghanistan as a member of the U.S. Army. On June 2, 2011, PFC Baker was injured in an IED attack committed by the Taliban in Zabul Province, Afghanistan. The attack severely wounded PFC Baker, who suffered fasciculation of the platysma and general tics of the head and neck, impaired vision/optic nerve damage, PTSD, as well as a Traumatic Brain Injury. As a result of the June 2, 2011, attack and his injuries, PFC Baker has experienced severe physical and emotional pain and suffering.

156.    PFC Baker was a national of the United States at the time of the attack and remains one to this day.

157.    Plaintiff Glenn Baker is the father of PFC Baker. He is a national of the United States.

158.    Plaintiff Irina Gorodnitsky is the mother of PFC Baker. She is a national of the United States.

159.    Plaintiff Samuel Baker is the brother of PFC Baker. He is a national of the United States.

160.    Plaintiff Natig Baker is the brother of PFC Baker. He is a national of the United States.

161.    As a result of the June 2, 2011, attack and Private First-Class Baker's injuries, each member of the Baker Family has experienced severe mental anguish and emotional pain and suffering.

**The Johnny Butler, Jr. Family**

162.    Plaintiff Specialist Johnny Butler served in Afghanistan as a member of the U.S. Army. On June 4, 2011, SPC Butler was injured in an IED attack committed by the Taliban

in Kandahar Province, Afghanistan. The attack severely wounded Corporal Butler, who suffered shrapnel wounds, spinal injury, Traumatic Brain Injury, PTSD, and 90% vision loss. As a result of the June 4, 2011, attack and his injuries, SPC Butler has experienced severe physical and emotional pain and suffering. SPC Butler was a national of the United States at the time of the attack and remains one to this day.

163.    SPC Butler was a national of the United States at the time of the attack and remains one to this day.

164.    Plaintiff J.B., a minor, by and through Johnny Joe Butler, Jr., next friend is the minor child of SPC Butler. He is a national of the United States.

165.    Plaintiff A.B., a minor, by and through Johnny Joe Butler, Jr., next friend is the minor child of SPC Butler. She is a national of the United States.

166.    Plaintiff Jaylen Butler is the child of SPC Butler. He is a national of the United States.

167.    Plaintiff Johnathan Butler is the child of SPC Butler.  He is a national of the United States.

168.    Plaintiff Sherita Sanders is the sister of SPC Butler. She is a national of the United States.

169.    Plaintiff Arletha Pettie is the sister of SPC Butler. She is a national of the United States.

170.    Plaintiff Claudia Pettie is the sister of SPC Butler. She is a national of the United States.

171.    Plaintiff Mecko Johnson is the sister of SPC Butler. She is a national of the United States.

172.     As a result of the June 4, 2011, attack and Specialist Butler's injuries, each member of the Butler Family has experienced severe mental anguish and emotional pain and suffering.

**The Kevin Deas, Sr. Family**

173.     Plaintiff Staff Sergeant Kevin Deas, Sr. served in Afghanistan as a member of the U.S. Army. On August 18, 2009, SSG Deas was injured in an IED and shooting attack committed by the Taliban in Arghandab River Valley, Kandahar, Afghanistan. The attack severely wounded SSG Deas, who suffered a gunshot to the shoulder, Traumatic Brain Injury, PTSD, and erectile dysfunction. As a result of the August 18, 2009, attack, and his injuries, SSG Deas has experienced severe physical and emotional pain and suffering.

174.     SSG Deas was a national of the United States at the time of the attack and remains one to this day.

175.     Plaintiff KD is the minor child of SSG. Deas. He is a national of the United States.

176.     Plaintiff AD is the minor child of SSG Deas. She is a national of the United States.

177.     Plaintiff Annmarie Deas is the former spouse of Staff Sgt. Deas. She is a national of the United States.

178.     As a result of the August 18, 2009, attack and Staff Sergeant Deas's injuries, each member of the Deas Family has experienced severe mental anguish and emotional pain and suffering.

**The Christopher Hardesty Family**

179.     Plaintiff Specialist Christopher Hardesty served in Afghanistan as a member of the U.S. Army. On July 5, 2010, SPC. Hardesty was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. The attack severely wounded SPC. Hardesty, who suffered multiple fractures on the left side of his body, orbital floor shattered, ruptured bicep, shattered left ankle, cracked teeth, tinnitus, Traumatic Brain Injury, and PTSD. As a result of the July 5, 2010, attack, and his injuries, SPC Hardesty has experienced severe physical and emotional pain and suffering.

180.     SPC Hardesty was a national of the United States at the time of the attack and remains one to this day.

181.     Plaintiff James Hardesty is the father of SPC Hardesty. He is a national of the United States.

182.     Plaintiff Kelli Hardesty is the mother of SPC Hardesty. She is a national of the United States.

183.     Plaintiff Nicholas Hardesty is the brother of SPC Hardesty. He is a national of the United States.

184.     As a result of the July 5, 2010, attack and Specialist Hardesty's injuries, each member of the Hardesty Family has experienced severe mental anguish and emotional pain and suffering.

**The Grady Horner Family**

185.     Plaintiff Staff Sergeant Grady Horner served in Afghanistan as a member of the U.S. Army. On May 6, 2011, SSG Horner was injured in a Rocket attack committed by the Taliban in Ghazni Province, Afghanistan. The attack severely wounded SSG Horner, who suffered a Traumatic Brain Injury, nerve damage, loss of use of genitals, and PTSD. As a result

of the May 6, 2011, attack and his injuries, SSG Horner has experienced severe physical and emotional pain and suffering.

186.     SSG Horner was a national of the United States at the time of the attack and remains one to this day.

187.     Plaintiff Cameron Horner is the daughter of SSG Horner. She is a national of the United States.

188.     As a result of the May 6, 2011, attack and Staff Sergeant Horner's injuries, each member of the Horner Family has experienced severe mental anguish and emotional pain and suffering.

**John Iasiello**

189.     Plaintiff Specialist John Iasiello served in Afghanistan as a member of the U.S. Army. On August 18, 2011, SPC Iasiello was injured in an IED attack committed by the Haqqani Network in Paktia Province, Afghanistan. The attack severely wounded SPC Iasiello, who suffered a spinal injury, Traumatic Brain Injury and PTSD. As a result of the August 18, 2011, attack and his injuries, SPC Iasiello has experienced severe physical and emotional pain and suffering.

**The Daniel Kernan Family**

190.     Plaintiff Specialist Daniel Kernan served in Afghanistan as a member of the U.S. Army. On May 30, 2010, SPC Kernan was injured in an RPG attack committed by the Taliban in Marawara District, Kunar Province, Afghanistan. The attack severely wounded SPC Kernan, who suffered shrapnel wounds, Traumatic Brain Injury, multiple facial fractures, and PTSD. The attack constituted an extrajudicial killing. As a result of the May 30, 2010, attack, SPC Kernan has experienced severe physical and emotional pain and suffering.

191.    SPC Kernan was a national of the United States at the time of the attack and remains one to this day.

192.    Plaintiff Leaann McCartney is the mother of SPC Kernan. She is a national of the United States.

193.    Plaintiff James Kernan is the brother of SPC Kernan. He is a national of the United States.

194.    As a result of the May 30, 2010, attack, and Specialist Kernan's injuries, each member of the Kernan Family has experienced severe mental anguish and emotional pain and suffering.

**The Donald McDaniel, Jr. Family**

195.    Plaintiff Specialist Donald McDaniel, Jr. severed in Afghanistan as a member of the U.S. Army. On August 23, 2011, SPC McDaniel was injured in an IED attack committed by the Taliban in Wardak Province, Afghanistan. The attack severely wounded SPC McDaniel, who suffered shrapnel wounds, Traumatic Brain Injury, and a broken back. As a result of the August 23, 2011, attack and his injuries, SPC McDaniel has experienced severe physical and emotional pain and suffering.

196.    SPC McDaniel was a national of the United States at the time of the attack and remains one to this day.

197.    Plaintiff Donald McDaniel Sr. is the father of SPC McDaniel. He is a national of the United States.

198.    Plaintiff James McDaniel is the son of SPC McDaniel. He is a national of the United States.

199.    Plaintiff Logan McDaniel is the daughter of SPC McDaniel. She is a national of the United States.

200.    Plaintiff Shelby McDaniel is the daughter of SPC McDaniel. She is a national of the United States.

201.    Plaintiff Teresa Defusto is the sister of SPC McDaniel. She is a national of the United States.

202.    As a result of the August 23, 2011, attack and Specialist McDaniel's injuries, each member of the McDaniel Family has experienced severe mental anguish and emotional pain and suffering.

**The Arik Miller Family**

203.    Plaintiff Private Second-Class Arik Miller served in Afghanistan as a member of the U.S. Army. On January 1, 2010, Private Miller was injured in an IED attack committed by the Haqqani Network and Taliban in Khost Province, Afghanistan. The attack severely wounded PV2 Miller, who suffered a Traumatic Brain Injury, PTSD, and vision loss. As a result of the January 1, 2010, attack and his injuries, PV2 has experienced severe physical and emotional pain and suffering.

204.    PV2 Miller was a national of the United States at the time of the attack and remains one to this day.

205.    Plaintiff Calandra Bailey is the mother of PV2 Miller.  She is a national of the United States.

206.    Plaintiff Tyresha Williams is the sister of PV2 Miller.  She is a national of the United States.

207.    Plaintiff Arika Miller is the daughter of PV2 Miller.  She is a national of the United States.

208.    As a result of the January 1, 2010, attack and Private Second Class Miller's injuries, each member of the Miller Family has experienced severe mental anguish and emotional pain and suffering.

**The Michael Pabon Family**

209.    Plaintiff Sergeant Michael Pabon served in Afghanistan as a member of the U.S. Army. On October 29, 2011, SGT Pabon was injured in a VBIED attack committed by the Taliban in Kabul Province, Afghanistan. The attack severely wounded SGT Pabon, who suffered a full shoulder tear, internal bleeding, PTSD, and a Traumatic Brain Injury. As a result of the October 29, 2011, attack and his injuries, SGT Pabon has experienced severe physical and emotional pain and suffering.

210.    SGT Pabon was a national of the United States at the time of the attack and remains one to this day.

211.    Plaintiff Eva Carrera is the wife of SGT Pabon. She is a national of the United States.

212.    Plaintiff Maricruz Carrera is the mother-in-law of SGT Pabon and at all times has been the functional equivalent of a biological mother.  She is a national of the United States.

213.    As a result of the October 29, 2011, attack and Sergeant Pabon's injuries, each member of the Pabon Family has experienced severe mental anguish and emotional pain and suffering.

///

///

**The Brandon Paredes Family**

214.     Plaintiff Sergeant Brandon Paredes served in Afghanistan as a member of the U.S. Army. On January 7, 2010, SGT Paredes was injured in an IED, and POT Mine attack committed by the Taliban in Kandahar Province, Afghanistan. The attack severely wounded SGT Paredes, who suffered a spinal injury, shrapnel wounds, PTSD, burns on his right shoulder and neck, tinnitus, and Traumatic Brain Injury. As a result of the January 7, 2010, attack and his injuries, SGT Paredes has experienced severe physical and emotional pain and suffering.

215.     SGT Paredes was a national of the United States at the time of the attack and remains one to this day.

216.     Plaintiff Julie Parades is the wife of SGT Parades. She is a national of the United States.

217.     Plaintiff Jesse Paredes is the brother of SGT Paredes. He is a national of the United States.

218.     Plaintiff Gary Paredes is the brother of SGT Parades. He is national of the United States.

219.     Plaintiff Adam Paredes is the brother of SGT Paredes. He is a national of the United States.

220.     Plaintiff Estate of Nevaeh Paredes, by and through Brandon Paredes, as Special Administrator, as appointed by Sedgwick County, Kansas, under Case No: 2022-PR-000314-DE

221.     As a result of the January 7, 2010, attack and Sergeant Paredes's injuries, each member of the Paredes Family has experienced severe mental anguish and emotional pain and suffering.

**Evan Pronzati**

222.    Plaintiff Sergeant Evan Pronzati served in Afghanistan as a member of the U.S. Army. On April 4, 2012, SGT Pronzati was injured in an IED attack committed by the Taliban in Nangarhar Province, Afghanistan. The attack severely wounded SGT Pronzati, who suffered a Traumatic Brain Injury and shattered right eye socket. As a result of the April 4, 2012, attack and his injuries, SGT Pronzati has experienced severe physical and emotional pain and suffering.

223.    SGT Pronzati was a national of the United States at the time of the attack and remains one to this day.

**The Joseph Sandlin Family**

224.    Plaintiff Sergeant Joseph Sandlin served in Afghanistan as a member of the U.S. Army. On November 27, 2010, SGT Sandlin was injured in a Suicide Bomb attack committed by the Haqqani Network in Paktika Province, Afghanistan. The attack severely wounded SGT Sandlin, who suffered shrapnel wounds, brain lesions, dental injuries, nerve damage, Traumatic Brain Injury, and PTSD. As a result of the November 27, 2010, attack and his injuries, SGT Sandlin has experienced severe physical and emotional pain and suffering.

225.    SGT Sandlin was a national of the United States at the time of the attack and remains one to this day.

226.    Plaintiff Savannah Sandlin is the daughter of SGT Sandlin.  She is a national of the United States.

227.    As a result of the November 27, 2010, attack and Sergeant Sandlin's injuries, each member of the Sandlin Family has experienced severe mental anguish and emotional pain and suffering.

///

**The Scott Smith Family**

228.    Plaintiff Specialist Scott Smith served in Afghanistan as a member of the U.S. Army. On May 18, 2012, SPC Smith was injured in a Rocket/Mortar attack committed by the Taliban in Kunar Province, Afghanistan. The attack severely wounded SPC Smith, who suffered a Traumatic Brain Injury, shrapnel wounds, spinal injury, multiple fractures, and PTSD. As a result of the May 18, 2012, attack and his injuries, SPC Smith has experienced severe physical and emotional pain and suffering.

229.    SPC Smith was a national of the United States at the time of the attack and remains one to this day.

230.    Plaintiff RS is the minor child of SPC Smith. She is a national of the United States.

231.    Plaintiff WS is the minor child of SPC Smith. He is a national of the United States.

232.    As a result of the May 18, 2012, attack and Specialist Smith's injuries, each member of the Smith Family has experienced severe mental anguish and emotional pain and suffering.

**Andrew Vega**

233.    Plaintiff Specialist Andrew Vega served in Afghanistan as a member of the U.S. Army. On July 28, 2010, SPC Vega was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. The attack severely wounded SPC Vega, who suffered a Traumatic Brain Injury, eye injury resulting in blindness in the left eye, and PTSD. As a result of the July 28, 2010, attack and his injuries, SPC Vega has experienced severe physical and emotional pain and suffering.

234.    SPC Vega was a national of the United States at the time of the attack and remains one to this day.

**The Ryan Winston Family**

235.    Plaintiff Staff Sergeant Ryan Winston served in Afghanistan as a member of the U.S. Army. On September 17, 2008, SSG Winston was injured in an ambush attack committed by the Taliban in Kunar Province, Afghanistan. The attack severely wounded SSG Winston, who suffered a gunshot wound through the hip and shoulder, Traumatic Brain Injury, and PTSD. As a result of the September 17, 2008, attack and his injuries, SSG Winston has experienced severe physical and emotional pain and suffering.

236.    SSG Winston was a national of the United States at the time of the attack and remains one to this day.

237.    Plaintiff Amari Winston is the child of SSG Winston. He is a national of the United States.

238.    Plaintiff Arshianna Reece is the child of SSG Winston. She is a national of the United States.

239.    Plaintiff Courtney Winston is the sister of SSG Winston. She is a national of the United States.

240.    Plaintiff Sherman Winston is the brother of SSG Winston. He is a national of the United States.

241.    Plaintiff Jazmine Winston is the child of SSG Winston. She is a national of the United States.

242.    Plaintiff Merrel Winston is the brother of SSG Winston. He is a national of the United States.

243.    Plaintiff Sophronia Winston is the wife of SSG Winston. She is a national of the United States.

244.    As a result of the September 17, 2008, attack and Staff Sergeant Winston's injuries, each member of the Winston Family has experienced severe mental anguish and emotional pain and suffering.

## CLAIM FOR RELIEF

## COUNT ONE: PERSONAL INJURY OR DEATH UNER 28 U.S.C. § 1605A(c)

245.    Plaintiffs incorporate the allegations above.

246.    Plaintiffs and their family members were injured by acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such acts, and such acts or provision of material support or resources were committed by officials, employees, or agents of Iran while acting within the scope of their office, employment, or agency.

247.    The terrorist attacks that injured Plaintiffs and their family members occurred in Afghanistan.

248.    Iran was designated as a State Sponsor of Terrorism at the time of the terrorist acts that attempted to kill and injured Plaintiffs and remains so today.

249.    At the time of the attacks, all Plaintiffs were U.S. nationals and/or members of the U.S Armed Forces, acting within the scope of their employment.

250.    Plaintiffs are also currently nationals of the United States, members of the U.S. Armed Forces, or the legal representatives of one of the foregoing.

///

///

251.    Iran's conduct was criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public, warranting an award of punitive damages against Iran pursuant to 28 U.S.C § 1605A(c).

252.    As a result of the Defendant's liability under 28 U.S.C § 1605A(c), Plaintiffs are entitled to recover compensatory damages, including, but not limited to, damages for their severe physical injuries, extreme mental anguish, pain and suffering, and solatium damages as determined by the trier of fact.

## PRAYER FOR RELIEF

253.    Plaintiffs request that the Court:

a.    Enter judgment against Iran finding it liable under 28 U.S.C § 1605A(c);

b.    Award Plaintiffs compensatory damages for physical injury, pain and suffering, extreme mental and emotional anguish, solatium and economic loss, against Defendant Iran, in amounts set forth herein and as shall be determined in accordance with evidence to be submitted to this Court;

c.    Award Plaintiffs punitive or exemplary damages against Defendant Iran in the amount to be determined by the Court for each Plaintiff, as punishment for its continued provision of material support and resources for, and sponsorship of, acts of terror against Americans, and to send a message to the world that this Court will not countenance the continued sponsorship of terror by Defendant Iran, in accordance with evidence to be submitted to this Court;

d.    Award Plaintiffs prejudgment and post judgment interest; and

e.    Award Plaintiffs any such further relief that the Court deems just and proper.

Dated:      September 13, 2022                    Respectfully submitted,

                                                 */s/ Peter Cameron*

                                                 Peter Cameron, Esq. (#CA00088)
                                                 Cameron Firm, P.C.
                                                 4003 Wabash Avenue
                                                 San Diego, CA 92104
                                                 Tel. (619) 819-5021
                                                 Email: peter@veteranappeal.com
                                                 *Attorney for Plaintiffs*