UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NAMIG BAKER, *et al.*,                )
                                      )
                    *Plaintiffs*,     )
                                      )
        v.                            )
                                      )   Civil Action No. 1:22-v-02765 (BAH)
ISLAMIC REPUBLIC OF IRAN,             )
                                      )
                    *Defendant*.      )
_____)

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

DATED:  October 3, 2024.                Respectfully Submitted,


                                        */s/ Peter Cameron*
                                        Peter Cameron, Esq. (#CA00088)

                                        CAMERON FIRM, PC
                                        4003 Wabash Avenue
                                        San Diego, CA 92104
                                        Tel. (619) 819-5021
                                        Email: peter@veteranappeal.com

                                        *Attorney for Plaintiff*

                                        *Of Counsel for Plaintiffs:*

                                        F. R. Jenkins, Esq. (D. C. Bar No. 1615786)
                                        MERIDIAN 361 INTERNATIONAL LAW
                                        GROUP, PLLC
                                        400 Congress Street, No. 7040
                                        Portland, ME 04101
                                        Tel. (202) 361-4944
                                        Email: Jenkins@meridian361.com

# TABLE OF CONTENTS

Page

I.  TABLE OF AUTHORITIES ................................................................................. iii

II.  BACKGROUND AND PROCEDURAL HISTORY ............................................. 1

III.  PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ............... 2

    A.  EVIDENTIARY STANDARDS ..................................................................... 2

    B.  CONCURRENT MOTION FOR JUDICIAL NOTICE ............................. 4

    C.  SUBJECT-MATTER JURISDICTION ........................................................ 6

1.  The Requirement of a Death: *Borochov v. Islamic Republic of Iran* ...................... 7
2.  A Taliban-Led Terrorist Syndicate Operated in Afghanistan at All
    Relevant Times .................................................................................................... 11
3.  Iran Provided Material Support and Resources to the Taliban-Led
    Terrorist Syndicate ............................................................................................. 13
4.  The Taliban-led Terrorist Syndicate Committed the Attacks that Injured
    the Direct Victim Military Plaintiffs ................................................................. 16

        Southeastern Afghanistan
        Namig Baker ................................................................................................. 17
        Grady Horner ............................................................................................... 17
        Donald McDaniel, II .................................................................................... 18
        Andrew Vega ................................................................................................ 19

        Southern Afghanistan
        Kevin Deas ................................................................................................... 20
        Christopher Hardesty .................................................................................. 20
        Johnny Butler, Jr ......................................................................................... 21
        Brandon Paredes .......................................................................................... 22

        Loya Paktia
        John Iasiello .................................................................................................. 23
        Joseph Sandlin .............................................................................................. 23
        Arik Miller .................................................................................................... 24

        Kabul
        Michael Pabon .............................................................................................. 25

        Eastern Afghanistan
        Scott Smith .................................................................................................... 26

Ryan Winston.............................................................................27
Daniel Kernan............................................................................28
Evan Pronzati............................................................................28

5. Personal Injury.................................................................29
6. Causation........................................................................30
7. Additional Requirements for a Federal Court to Hear Claims..............34

**D. PERSONAL JURISDICTION**...............................................36

**E. FEDERAL CAUSE OF ACTION**............................................37

**IV. DAMAGES**....................................................................38

**A. COMPENSATORY DAMAGES FOR THE DIRECT VICTIMS**...........38

Attacks Including a Simultaneous Fatality
Namig Baker..............................................................................39
Kevin Deas...............................................................................41
Christopher Hardesty....................................................................42
John Iasiello............................................................................43
Michael Pabon...........................................................................44
Joseph Sandlin..........................................................................46
Scott Smith.............................................................................48
Ryan Winston............................................................................50

Attacks *Not* Including a Simultaneous Fatality
Johnny Butler, Jr.......................................................................52
Grady Horner............................................................................53
Daniel Kernan...........................................................................55
Donald McDaniel, II.....................................................................56
Arik Miller.............................................................................57
Brandon Paredes.........................................................................59
Evan Pronzati...........................................................................61
Andrew Vega.............................................................................62

**B. COMPENSATORY DAMAGES FOR THE IMMEDIATE FAMILY MEMBERS OF DIRECT VICTIMS**.............................................63

Attacks Including a Simultaneous Fatality
*Namig Baker Family Members*
Irina Gorodnitsky.......................................................................64
Glenn Eli Baker.........................................................................65
Samuel Baker............................................................................65
Natiq Baker.............................................................................66

*Kevin Deas Family Members*
Annmari Deas...................................................................................................67
K.D..................................................................................................................67
A.D..................................................................................................................68
*Christopher Hardesty Family Members*
James Hardesty.................................................................................................69
Kelli Hardesty..................................................................................................69
Nicholas Hardesty............................................................................................70
*Michael Pabon Family Members*
Eva Carrera......................................................................................................70
Maricruz Carrera..............................................................................................71
*Joseph Sandlin Family Members*
Savannah Sandlin.............................................................................................72
*Scott Smith Family Members*
W.S...................................................................................................................73
R.S....................................................................................................................74
*Ryan Winston Family Members*
Sophronia Winston...........................................................................................73
Amari Winston..................................................................................................74
Jazmine Winston..............................................................................................75
Arshianna Winston...........................................................................................75
Sherman Winston..............................................................................................76
Corkney Winston..............................................................................................76
Merrell Winston................................................................................................77

Attacks *Not* Including a Simultaneous Fatality
*Johnny Butler, Jr. Family Members*
Sherita Sanders.................................................................................................78
Arletha Pettie...................................................................................................78
Claudia Pettie...................................................................................................79
Mecko Johnson.................................................................................................79
Jonathan James Butler......................................................................................80
Jaylen Butler.....................................................................................................80
Jada Butler........................................................................................................81
*Daniel Kernan Family Members*
Lea Ann McCartney.........................................................................................82
James Kernan....................................................................................................82
*Donald McDaniel, II Family Members*
Donald McDaniel, Sr.......................................................................................83
Shelby McDaniel..............................................................................................83
James McDaniel................................................................................................84
Logan McDaniel...............................................................................................85
Terasa Dafusto..................................................................................................85
*Arik Miller Family Members*
A.M..................................................................................................................86

Calandra Bailey........................................................................................86
Tyresha Williams.....................................................................................87
*Brandon Paredes Family Members*
Julie Paredes...........................................................................................87
Gary Paredes...........................................................................................88
Jesse Paredes...........................................................................................88
Adam Paredes..........................................................................................89
Estate of Nevaeh Paredes........................................................................89
*Grady Horner Family Members*
Cameron Horner......................................................................................90

**C. PUNITIVE DAMAGES**................................................................90

**D. PREJUDGMENT INTEREST**......................................................92

**E. POSTJUDGMENT INTEREST**....................................................94

**V. CONCLUSION**...............................................................................94

<u>**TABLE OF AUTHORITIES**</u>

Page

**Cases**

*Aceto v. Islamic Republic of Iran*, No. 19-cv-464 (BAH), 2020 U.S. Dist. LEXIS 22084, at \*16 (D.D.C. Feb. 7, 2020).................................................................................64

*Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15 (D.D.C. 2008).....................63, 91

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989).....................6

*Ben-Rafael v. Islamic Republic of Iran,* 540 F. Supp. 2d 39 (D.D.C. 2008)................4, 36

*Borochov v. Islamic Republic of Iran*, 589 F. Supp. 3d 15 (D.D.C. 2022).........................8

*Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024)...................7, 8, 10

*Braun v. Islamic Republic of Iran*, CA No. 15-1136 (BAH) Minute Order (D.D.C. filed November 9, 2016).......................................................................................3

*Brown v. Islamic Republic of Iran,* 2023 U.S. Dist. LEXIS 129612 (D.D.C. 2023)...........5

*Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB), 2022 U.S. Dist. LEXIS 127290 (D.D.C. 2022)..................................................1, 5-8, 10-26, 31, 33, 92-93

*Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB), 2023 U.S. Dist. LEXIS 14874 (D.D.C. 2023)........................................................................................7, 8

*Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003).................91

*Cont'l Transfert Technique Ltd. v. Fed. Gov't Nigeria*, 850 F. Supp. 2d 277 (D.D.C. 2012)............................................................................................................................94

*Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006)...........63

*Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236 (D.D.C. 2020).....................91-94

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998)..................................63

*Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186 (D.D.C. 2017)...............................34

*Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2022)...............32, 34, 38

*Forman v. Korean Air Lines Co.*, 84 F.3d 446 (D.C. Cir. 1996).......................................94

*Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348 (D.C. Cir. 2018)................................63

*Friends of Mayanot Institute, Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50 (D.D.C. 2018)........................................................................................................2-3

*Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018)..............................33

*Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018)..................64, 72, 93

*Fuld v. Islamic Republic of Iran*, 2024 U.S. Dist. LEXIS 56727 (D.D.C. 2024).............30

*Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85 (D.D.C. 2019)....................32, 37

*Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014) ....................................................................................................................2-4

*Kaplan v. Hezbollah*, 213 F. Supp. 3d 27 (D.C. Cir. 2016)..............................................39

*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019).........................37

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004)........................................................................................................30

*Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136 (D.D.C. 2010).......................37

*Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475 (D.D.C. 2021)..............................35

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51 (D.D.C. 2010).........................92

*Mustard v. Islamic Republic of Iran,* 2023 U.S Dist. LEXIS 19738 (D.D.C. 2023)................................................................................................5, 39, 63

*Opati v. Republic of Sudan*, 60 F. Supp. 3d 68 (D.D.C. 2014)....................................4, 92

*Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16 (D.D.C. 2011).........................93

*Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44 (D.D.C. 2012)....................91, 93

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017)................3, 4, 30, 33, 64

*Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007).................38, 64

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002)........36

*Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 (D.D.C. 2015)................................5

*Schooley v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 108011 (D.D.C. 2019).....39

*Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40 (D.D.C. 2021)...............................92

*Sheikh v. Republic of Sudan,* 485 F. Supp. 3d 255 (D.D.C. 2020)..............................38, 92

*Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121 (D.D.C. 2021)..............................32

*Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016)............................3

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010).......3, 36, 38-39, 91

*Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84 (D.D.C. 2014)..........................54, 64, 92

**Statutes**

28 U.S.C. § 1330.......................................................................................................6
28 U.S.C. § 1330(b)................................................................................................36

Arms Export Control Act, 22 U.S.C. 2780, § 40 ..................................................35

Export Administration Act of 1979, 50 U.S.C.S. app. 2405(j), § 6(j) ..............................35

Foreign Assistance Act of 1961, 22 U.S.C.S. 2371, § 620A.................................................35

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*.............................................1
          28 U.S.C. § 1604....................................................................................6
          28 U.S.C. §1605A...................................................................................3
          28 U.S.C. § 1605A(a)(1)....................................................................7, 8, 34
          28 U.S.C. § 1605A(a)(2).......................................................................34
          28 U.S.C. § 1605A(c).......................................................................6, 37, 38
          28 U.S.C. § 1605A(c)(4).......................................................................38
          28 U.S.C. §1608(a).........................................................................2, 36
          28 U.S.C. § 1608(a)(1)..........................................................................36
          28 U.S.C. § 1608(a)(2)..........................................................................36
          28 U.S.C. § 1608(a)(3)..........................................................................36
          28 U.S.C. § 1608(a)(4).......................................................................2, 36, 37
          28 U.S.C. § 1608(e)..........................................................................2, 3

28 U.S.C. § 1961(a)...............................................................................................94

**Rules**

Fed. R. Evid. 201(b)..................................................................................................5

**Other Authorities**

E.O. 13224, 66 Fed.Reg. 49079 (Sept 23, 2001)...............................................................35

*United States District Court for the District of Columbia's Attorney Manual for Service of Process on a Foreign Defendant* (Revised: December 2021).........................36

## II. BACKGROUND AND PROCEDURAL HISTORY

Between 2006 and 2019, a terrorist syndicate (the "Syndicate" or the "Terrorist Syndicate") comprising *inter alia* the Taliban, the Haqqani Network, the Kabul Attack Network and al-Qaeda operated in Afghanistan. Ex. 80, *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB), 2022 U.S. Dist. LEXIS 127290, at *20-*21 (D.D.C. 2022).[1]  The Syndicate maintained operational dominance in certain geographies in Afghanistan. *Id.* at *44-*54.  The Syndicate conducted terrorist attacks on U.S. armed forces personnel in its areas of operational dominance. *Id.* at *54-*100.  Islamic Republic of Iran provided material support and resources to the Syndicate. *Id.* at *33-*44.  The Syndicate and Iran shared a common objective - to drive the United States out of Afghanistan by killing and injuring its soldiers. *Id.* at *37-*38.

In *Cabrera*, the court found Iran liable under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq* ("FSIA") for deaths and injuries inflicted on U.S. armed forces personnel, by the Syndicate, in terrorist attacks that the Syndicate conducted in its areas of operational dominance in Afghanistan in the 2008 - 2017 timeframe. *Id.* at *199-*200.  In this case, as in *Cabrera*, Plaintiffs are former U.S. armed forces personnel injured in terrorist attacks conducted by the Syndicate in its areas of operational dominance in Afghanistan, together with their immediate family members. The attacks in this case occurred in the 2008 - 2012 timeframe.

---

[1] Plaintiffs have filed an Index of Exhibits concurrently with this Proposed Findings of Fact and Conclusions of Law.  When first introducing an exhibit in this document, Plaintiffs have included in their citation the exhibit number, exhibit name and where appropriate more specific pinpoint references to internal exhibit page and/or paragraph numbers. Thereafter, the citation refers to an abbreviated name.

Plaintiffs initiated this action under the FSIA on September 13, 2022. ECF 1. Plaintiffs adhered to the hierarchy of service methods prescribed in 28 U.S.C. § 1608(a), and on March 6, 2023, Islamic Republic of Iran was properly served with a copy of the Summons, Complaint, Notice of Suit, and administrative documents by diplomatic means pursuant to 28 U.S.C. § 1608(a)(4). *See* Section III.D of this filing; ECF 8, 8-1, 8-2, 13. Having been served, and having failed to answer, Plaintiffs requested that the Clerk enter default against Iran. ECF 14. On May 15, 2023, the Clerk entered default against Iran. ECF 15. Plaintiffs have moved the Court under 28 U.S.C. § 1608(e) to enter substantive Default Judgment as to liability against Iran, and award compensatory and punitive damages commensurate with the injuries and resultant damages each Plaintiff has suffered.

## III. PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## A. EVIDENTIARY STANDARDS

In this default proceeding, Plaintiffs do not have the same evidentiary obligations present in other civil cases. The D.C. Circuit has recognized that "courts have the authority — indeed, we think, the obligation — to adjust evidentiary requirements to differing situations." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014). In this particular FSIA terrorism exception context, courts liberally construe the Rules of Evidence to prevent defaulting state sponsors of terrorism from "effectively immuniz[ing] themselves by killing their victims, intimidating witnesses, and refusing to appear in court." *Id*.

Courts have not required claimants to prove their FSIA case in a full hearing. "Under Federal Rule of Civil Procedure 55(b)(2), the court may enter [a] default judgment upon application by a party seeking that relief." *Friends of Mayanot Institute*, *Inc. v.*

*Islamic Republic of Iran*, 313 F. Supp. 3d 50, 55-56 (D.D.C. 2018). "In the FSIA context, [a] default judgment may be entered if: (1) the court has subject matter jurisdiction over the claims; (2) personal jurisdiction is properly exercised over Defendant; and (3) Plaintiff has presented satisfactory evidence to establish its claim against Defendant." *Id.* at 56 (citing *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016)).  A full hearing on liability is not required to award Plaintiffs relief, "the FSIA requires only that a plaintiff 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.D.C. 2017) (quoting 28 U.S.C. § 1608(e)).

Instead of a hearing, the standard may be met "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (internal quotation marks omitted).  Affidavits alone can satisfy 28 U.S.C. § 1608(e); *see Braun v. Islamic Republic of Iran*, CA No. 15-1136 (BAH) Minute Order (D.D.C. filed November 9, 2016).  In *Han Kim*, the D.C. Circuit relied on affidavits by two experts to reverse and remand to the District Court to enter a default judgment without an evidentiary hearing.  774 F.3d at 1050-51.

Critically, in assessing whether a plaintiff has established a claim under the FSIA, the court "must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the 'aim[ ] to prevent state sponsors of terrorism— entities particularly unlikely to submit to this country's laws—from escaping liability for their sins.'" *Friends of Mayanot*, 313 F. Supp. 3d at 56 (quoting *Han Kim*, 774 F.3d at 1047-48). Thus, the D. C. Circuit recently observed that a "district court also has an unusual

degree of discretion over evidentiary rulings in a FSIA case against a defaulting state

sponsor of terrorism":

> *For example, we have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial. See Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1048-51, 413 U.S. App. D.C. 356 (D.C. Cir. 2014) (noting "courts have the authority — indeed, we think, the obligation — to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding) (internal alterations and quotation marks removed). This broad discretion extends to the admission of expert testimony, which, even in the ordinary case, "does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak." Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 567 (D.C. Cir. 1993). Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems. Cf. Bell Helicopter Textron, 734 F.3d at 1181.*

*Owens*, 864 F.3d at 785-86 (emphasis added).

The Court may also "take judicial notice of related proceedings and records." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 43 (D.D.C. 2008).

Accordingly, Plaintiffs have relied upon: (1) Plaintiffs' prior pleadings and submissions; (2) the Exhibits attached hereto, including *inter alia* Plaintiff's Declarations submitted under the penalty of perjury, written expert opinions, and U.S. government records; and (3) the judicial decision in *Cabrera v. Islamic Republic of Iran*, Civil Action No. 19-3835 (JDB), 2022 U.S. Dist. LEXIS 127290 (D.D.C. July 19, 2022), together with the expert opinions that support the decision.

## B. CONCURRENT MOTION FOR JUDICIAL NOTICE

The Court may "rely on the evidence presented in [ ] earlier litigation and make [its] own independent findings of fact based on that evidence . . . ." *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 73 (D.D.C. 2014).  The type of evidence that it may judicially

notice and rely upon includes expert testimony. *See, e.g.*, *Brown v. Islamic Republic of Iran*, 2023 U.S. Dist. LEXIS 129612 at *5 (D.D.C. 2023) ("The Court will thus take judicial notice of the cases Plaintiffs cite...including its prior decision and [the expert] testimony in *Roth v. Islamic Republic of Iran*."); *Mustard v. Islamic Republic of Iran*, 2023 U.S Dist. LEXIS 19738 at *2-4 (D.D.C. 2023) (taking judicial notice of expert testimony in prior cases).

Concurrently with their Motion for Default Judgment, Plaintiffs have, in a separate filing, moved the Court under Fed. R. Evid. 201(b) to take judicial notice of the judicial decision in *Cabrera* (Ex. 80), and of the following expert opinions that form the framework for that decision:

> *William F. Roggio*, Senior Fellow, Foundation for the Defense of Democracies, *see Cabrera v. Islamic Republic of Iran*, 1:19-cv-03835-JDB, ECF 59 (pp. 1-179), Ex. 81;
>
> *Dr. Colin Clarke*, (then) Director of Policy and Strategy at the Soufan Group, *see Cabrera v. Islamic Republic of Iran*, 1:19-cv-03835-JDB, ECF 59 (pp. 180-322), Ex. 81; and
>
> *Lt. Col. (U.S. Army, Ret.) Steven A. Wood, see Cabrera v. Islamic Republic of Iran*, 1:19-cv-03835-JDB, ECF 59 (pp. 323-482), Ex. 81.

Both *Cabrera* and *Baker* involve the same state sponsor, providing material support and resources to the same terrorist organization, in the same geography, during overlapping timeframes, for attacks targeting U.S. armed forces personnel serving on active duty in Afghanistan. Further, two of the experts in *Cabrera*, Dr. Colin Clarke[2] and Lt. Col. Steven

---

[2] Plaintiffs request that the Court qualify Dr. Clarke as an expert in Middle Eastern terrorism for the purposes of this case. Dr. Clarke's qualifications are set forth in detail in his expert report. *See* Ex. 78, Clarke, pp. 2-5. In summary, his career has been devoted to studying terror groups and state sponsors of terrorism. One of the five case studies addressed in his successful Ph.D. dissertation was the Afghan Taliban. *Id.* at p. 2. During his decade-long career at the Rand Corporation, Dr. Clarke executed numerous projects

Wood,[3] are also experts in this case.  The core of the testimony of the third *Cabrera* expert,

William Roggio, has been incorporated into the opinions offered in this case by Dr. Clarke

and Lt. Col. Wood.

## C.  SUBJECT-MATTER JURISDICTION

The FSIA is the sole basis for obtaining jurisdiction in U.S. courts over a foreign

state like Iran.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434

(1989).  Although foreign states are generally "immune from" jurisdiction, the FSIA

provides for certain exceptions in sections 1605 to 1607.  28 U.S.C. § 1604.  Federal district

courts have original jurisdiction over claims brought within these exceptions.  28 U.S.C. §

1330.

The Court has subject-matter jurisdiction here because Plaintiffs' claims fall within

the FSIA's terrorism exception, 28 U.S.C. § 1605A(c).  The terrorism exception provides:

---

related to Afghanistan, terrorism and state sponsorship of terrorism for the Office of the
Secretary of Defense, the U.S. military's combat commands, and the U.S. intelligence
community.  *Id.* In 2011, Dr. Clarke was stationed in Kabul, Afghanistan and worked in a
conflict setting while conducting real analysis on the Taliban and the Haqqani Network, as
he served as a senior analyst for U.S. Forces-Afghanistan's Combined Joint Interagency
Task Force.  *Id.*  The *Cabrera* court qualified Dr. Clarke as an expert in "Middle Eastern
terrorism".  *Cabrera*, 2022 U.S. Dist. LEXIS 127290 at *16-*17.

[3]  Plaintiffs request that the Court qualify Lt. Col. Wood as an expert in terror attack
attribution analysis for the purposes of this case.  Lt. Col. Wood has extensive experience
in intelligence and weapons analysis related to U.S. counterterrorism operations, especially
in Afghanistan.  His 22-year career in the U.S. Army included service in the Joint
Improvised Explosive Device Defeat Organization, and Combined Joint Task Force
Paladin, a military command in Afghanistan dedicated to the counter-improvised explosive
device fight.  He also worked as Director of Operations for the Advanced Geospatial
Intelligence Office at the National Geospatial Agency, where he developed and managed
processes for targeting Afghan insurgent groups and their logistics supply chain.
Throughout the mid-to-late 2010s, he repeatedly deployed to Afghanistan to serve as an
intelligence and operations advisor.  He is currently employed as Chief Growth Officer for
Data Machines Corporation, an artificial intelligence firm. The *Cabrera* court qualified Lt.
Col. Wood as an expert in "attack attribution analysis".  *Cabrera*, 2022 U.S. Dist. LEXIS
127290 at *17-*18.

*A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.*

28 U.S.C. § 1605A(a)(1).  To satisfy the terrorism exception, Plaintiffs must show that the relevant "personal injury or death" was "caused by" an "act of torture, extrajudicial killing, aircraft sabotage, hostage taking, *or the provision of material support or resources for such an act*" (emphasis added). *Id.*  They further must show that the material support or resources were provided by "an official, employee, or agent" of the foreign state acting within the scope of their official position. *Id.*

### 1.    The Requirement of a Death: *Borochov v. Islamic Republic of Iran*

28 U.S.C. § 1605A(a)(1) waives the sovereign immunity of foreign states "in two instances: (1) when a plaintiff's 'personal injury or death . . . was caused by an act of . . . extrajudicial killing" (or any other enumerated act) or (2) when that "personal injury or death . . . was caused by . . . the provision of material support or resources for such an act." *Cabrera v. Islamic Republic of Iran*, 2023 U.S. Dist. LEXIS 14874 at *13-*14 (D.D.C. 2023).  On its face, the first or "direct" prong of the terrorism exception does not apply in this case because Iran itself did not directly commit the attacks; rather, it provided material support and resources to external proxies.  *Id.* at *14. Thus, this case implicates the second prong, the "material support" prong.

In *Cabrera*, Judge Bates held that 28 U.S.C. § 1605A(a)(1) confers subject matter jurisdiction over personal injury claims even where the terrorist attack resulted in no actual

killing.  2022 U.S. Dist. LEXIS 127290 at *134 (D.D.C. 2022).  He interpreted the language "the provision of material support or resources for such an act" which appears in the material support prong of 28 U.S.C. § 1605A(a)(1), to mean that "a foreign state's support *with the object or purpose* of an extrajudicial killing constitutes support 'for such an act' under the statute." *Cabrera*, 2023 U.S. Dist. LEXIS 14874 at * 22 (D.D.C. 2023) (emphasis added), quoting *Borochov v. Islamic Republic of Iran*, 589 F. Supp. 3d 15, 32 (D.D.C. 2022).  In this case, Plaintiffs' experts have both opined that Iran provided its material support and resources to the Syndicate with the object and purpose of killing U.S. armed forces personnel.  Ex. 78, Clarke, pp. 1, 42, 55; Ex. 79, Wood, pp. 39, 49, 80, 87, 102, 106,

However, in *Borochov v. Islamic Republic of Iran*, the U.S. Court of Appeals for the District of Columbia Circuit very recently overturned this limited aspect of *Cabrera*, holding that courts lack subject matter jurisdiction to hear claims for personal injury arising under either the direct prong or the material support prong of 28 U.S.C. § 1605A(a)(1), unless the perpetrator actually killed someone. 94 F.4th 1053, 1061 (D.C. Cir. 2024) (not enough that "the perpetrator attempted, but failed to commit an extrajudicial killing."); 1063 ("Section 1605A's text does not support extending the material support provision to cover attempted but uncompleted extrajudicial killings.").

For the convenience of the Court, the chart in Figure A below distinguishes the direct victim military Plaintiffs injured in terrorist attacks that included simultaneous fatalities, from those injured in terrorist attacks that did not include simultaneous fatalities.

**Figure A**[4]

| Direct Victim Military Plaintiffs Injured in Attack Including a Simultaneous Fatality | Direct Victim Military Plaintiffs Injured in Attack Not Including Simultaneous Fatality |
|---|---|
| Namig Baker<br>*Zabul Province, 2011* | Johnny Butler<br>*Kandahar Province, 2011* |
| Kevin Deas<br>*Kandahar Province, 2009* | Grady Horner<br>*Ghazni Province, 2011* |
| Christopher Hardesty<br>*Kandahar Province, 2010* | Daniel Kernan<br>*Kunar Province, 2010* |
| John Iasiello<br>*Paktia Province, 2011* | Donald McDaniel<br>*Wardok Province, 2011* |
| Michael Pabon<br>*Kabul Province, 2011* | Arik Miller<br>*Khost Province, 2010* |
| Joseph Sandlin<br>*Paktika Province, 2010* | Brandon Paredes<br>*Kandahar Province, 2010* |
| Scott Smith<br>*Kunar Province, 2012* | Evan Pronzati<br>*Nangarhar Province, 2012* |
| Ryan Winston<br>*Kunar Province, 2008* | Andrew Vega<br>*Zabul Province, 2010* |

---

[4] Counsel has prepared a Declaration outlining Plaintiff's unsuccessful efforts to obtain, through the Freedom of Information Act, official government records from the Department of Defense that would assist in identifying fatalities. *See* Ex. 85, Declaration of Peter Cameron.

Plaintiffs contend that *Borochov* can be distinguished on its facts. *Borochov* arises from a single, discrete terrorist attack - a Hamas terrorist ramming his car into a bus stop in Jerusalem, on a particular day, at a particular time. *Borochov*, 94 F.4th at 1057-1058. The attack occurred in 2015, thus was isolated and was not a part of the First Intifada (1987-1993) or the Second Intifada (2000-2005).[5] *Id.* It appears that the *Borochov* court was not asked to consider, and therefore did not consider, whether, for the purposes of determining if a killing has occurred, a closely related series of terrorist attacks that are part of a larger terrorist campaign backed by the same state sponsor and executed by the same terrorist group may be viewed as a whole and treated as a single macro-attack, or instead must be viewed separately and treated as different micro-attacks. That remains an open question.

The *Cabrera* court described the Syndicates' attacks in Afghanistan as "an extended terrorist campaign". *See, e.g.*, Ex. 80, *Cabrera* at *138. Mr. Roggio called them a "terrorist insurgency" and a "campaign". Ex. 81, Roggio at p. 14, ¶ 23. Lt. Col. Wood referred to them as a "terrorist insurgency" and an "asymmetric campaign". *Id.*, Wood at p. 336, ¶ 21, p. 340, ¶ 29. Lt. Col. Wood explains further that:

> *The conflict in Afghanistan was part of an ongoing "war on terror" from September 2001 until August 2021 against the Taliban and allied terror groups, referred to as the "Taliban Led Syndicate".* **Individual attacks and larger battles in Afghanistan were part of this wider conflict and reflected the execution of a strategic campaign by the Taliban Led Syndicate to regain Afghanistan and defeat the west and should be considered in the context of the wider war and not in isolation.**

Ex. 79, Wood, p. 7 (emphasis added). In Section III.C.4 *infra*, with respect to each of the attacks listed in the right column of Figure A, Lt. Col. Wood identifies fatal Syndicate attacks that occurred shortly before or after (or both) the attack that injured the Plaintiff

---

[5] *See* https://www.britannica.com/topic/intifada.

service member, in the same geographic area, and avers that these attacks are part of a single, continuous terror campaign.

In other words, the Taliban-led terrorist Syndicate conducted a continuous, protracted macro-attack on U.S. armed forces personnel in Afghanistan from 2006-2019 that killed thousands of Americans. The macro-attack rolled out over time, in different parts of Afghanistan. On these facts, the Court should find that the lack of a simultaneous fatality in a given micro-attack is immaterial for the purposes of assessing subject-matter jurisdiction, and allow the claims arising from the micro-attacks listed in the right column of Figure A to proceed.

Nevertheless, for the convenience of the Court, the analysis of the terrorist attacks appearing in Section III.C.4 *infra* clearly differentiates attacks that include simultaneous fatalities, from attacks that do not, and the damages evidence in Section IV.A is similarly differentiated.

### 2. A Taliban-led Terrorist Syndicate Operated in Afghanistan at All Relevant Times

After the end of the Soviet occupation of Afghanistan in 1989, Islamic scholars practicing an austere form of Islam formed the Taliban and through it sought to impose order through "brute force." Ex. 78, Clarke, p. 6. As a Sunni jihadist force, the Taliban mobilized to overthrow the Afghan government and impose Sharia law. Ex. 80, *Cabrera* at *22. In 1996, the Taliban captured the capital city Kabul and proclaimed Islamic Emirate of Afghanistan. *Id.* at *23. By September 2001, the Taliban had established *de facto* control of Afghanistan. *Id.* The United States invaded Afghanistan in October 2001, following the attacks of September 11, 2001. *Id.* By December 2001, the Taliban withdrew from Kabul, and its leadership and fighters scattered, including to Iran. *Id.* The United

Nations authorized an International Security Assistance Force to secure Kabul and assist the Afghan government to rebuild. *Id.* at \*23-\*24. The North Atlantic Treaty Organization ("NATO") took control of ISAF in August 2003. *Id.* at \*24. In January 2004, Afghanistan formed Islamic Republic of Afghanistan under a new constitution, and the Islamic Republic remained the lawful government of Afghanistan from 2006 to 2019. *Id.* The Taliban did not participate in drafting or adopting the new constitution or forming the Republic. *Id.* Neither the United Nations nor the United States ever recognized the Taliban or its Emirate as the lawful government of Afghanistan. *Id.*

The Taliban regrouped and began to launch attacks against U.S., NATO and Afghan forces. *Id.* at \*25. By 2008, the Taliban-led Syndicate had launched a "terrorist insurgency" and an "extended terror campaign" that spread across Afghanistan. *Id.* at \*25, \*138; Ex. 81, Roggio, p. 14 ¶ 23, p. 29 ¶ 55; Ex. 81, Wood, p. 336 ¶ 21, p. 340 ¶ 29, p. 459. The U.S. responded by surging more troops into Afghanistan. Ex. 80, *Cabrera* at \*25. None of the attacks carried out by the Syndicate was authorized by the lawful government of Afghanistan. *Id.* The terror campaign continued until August 30, 2021, when the U.S. withdrew its forces from Afghanistan, the legitimate government of the Republic fell, and the Taliban seized control of the country. Ex. 78, Clarke, p. 55.

From at least 2006 to 2019, the Syndicate, comprising four terrorist groups - the Taliban, the Haqqani Network, the Kabul Attack Network and al-Qaeda - operated in Afghanistan. Ex. 78, Clarke, p. 6; Ex. 80, *Cabrera*, at \*20-\*21. The Afghan Taliban and its leader at the time Mullah Muhammad Omar were designated a Specially Designated Global Terror Entity ("SDGTE") on July 2, 2002.[6] The U.S. Department of State

---

[6] *See* https://www.state.gov/executive-order-13224/.

designated al-Qaeda as a Foreign Terrorist Organization ("FTO") on October 8, 1999.[7]

Both al-Qaeda and its leader at the time, Osama bin Laden, were designated as SDGTE on

September 23, 2001.[8]   The Department of State designated the Haqqani Network as an

FTO on September 19, 2012.[9]   Haqqani Network leader Sirajuddin Haqqani was

designated as an SDGTE on March 11, 2008, and the Network itself was designated an

SDGTE on September 7, 2012.[10]

The U.S. government viewed these terrorist groups "'not as separate independent

operators that occasionally cooperate with one another, but as part of a syndicate of

terrorism...[T]he level of operational cooperation, training, equipping, financing has grown

exponentially.'" *Id.*   The members of the Syndicate "shared close strategic, tactical, and

operational coordination, which enabled each group to make its operations more lethal for

American forces." Ex. 80, *Cabrera* at *20-*21; Ex. 78, Clarke, p. 6.   Further, they "shared

a common goal: reestablishing the Islamic Emirate by driving the United States and its

allies out of Afghanistan by 'driving up the cost for U.S. presence . . by killing and

wounding American troops.'" *Id.;* Ex. 78, Clarke, p. 6.

3. **Iran Provided Material Support and Resources to the Taliban-led Terrorist Syndicate**

Iran and the Syndicate shared a common geopolitical goal in Afghanistan, namely

"to end the American and Coalition occupation by killing and wounding American

soldiers."   Ex. 80, *Cabrera*, at *37-*38.   Dr. Clarke opines that in furtherance of that goal,

Iran "provided the Syndicate with material support and resources, including without

---

[7] *See* https://www.state.gov/foreign-terrorist-organizations/.

[8] *See* https://www.state.gov/executive-order-13224/.

[9] *See* https://www.state.gov/foreign-terrorist-organizations/.

[10] *See* https://www.state.gov/executive-order-13224/.

limitation high-level support, safe haven, training, weapons and explosives, and financing, for decades, and at all times relevant to the attacks in this case." Ex. 78, Clarke, pp. 40-41, and *see generally* pp. 40-56 providing specific examples of each type of support; Ex. 80, *Cabrera* at \*38-\*39; Ex. 81, Roggio, see generally pp. 72-108.

Iran provided high-level support to the Syndicate by ensuring that "senior Syndicate and IRGC commanders have coordinated for decades in order to maximize Taliban effectiveness in its fight against NATO and Afghan government forces." Ex. 78, Clarke, pp. 42-43. The coordination has included *inter alia* repeated meetings between Taliban commanders and Iranian intelligence, and staffing of Taliban offices inside Iran. *Id.* An Iranian diplomat boasted that Iran "was in contact with the Taliban for 'control and intelligence.'" *Id.* at p. 43. Iran provided safe haven to the Syndicate by "allow[ing] the Taliban to recruit, train and house fighters in Iran", and permitting Taliban leaders to maintain "hideouts" on its territory. *Id.* Iran provided training to the Syndicate by assisting the Taliban to operate at least four training camps on its territory. *Id.* at pp. 43-44. In each year from 2008 to 2012, the U.S. Department of State determined that Iran's Qods Force, a special operations unit within Islamic Revolutionary Guards Corp, "provided training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets." *Id.*

Iran provided weapons and explosives to the Syndicate. The U.S. Department of State has determined that "since 2006, Iran has arranged arms shipments to the Taliban, including 'small arms and associated ammunition, rocket-propelled grenades, mortar rounds, 107 mm rockets, and plastic explosives.'" Ex. 78, Clarke, p. 45. Improvised explosive devices ("IEDs") "became the Taliban's weapon of choice" and a "crucial

element[ ] of its insurgency." *Id.* at pp. 12, 14. "Iranian assistance contributed to the increasing sophistication of the Taliban's IEDs over time." *Id.* at p. 12. Iran provided the Taliban with "industrially manufactured mines", "explosively formed penetrators" and "remote control mines" that "increased the lethality" of the Taliban's attacks, and "likely featured" in the attacks that injured Plaintiffs. *Id.* at p. 15.

Iran provided substantial funding to the Syndicate. "The U.S. government maintains that Iran has financed the Syndicate consistently since 2007." Ex. 78, Clarke, p. 46. In 2010, the U.S. Department of the Treasury sanctioned two senior Qods Force officers for funding the Syndicate. *Id.* Syndicate officials have admitted that Iran funds their terror operations. *Id.* U.S. military intelligence determined that Iran placed a bounty on the heads of U.S. service members in Afghanistan, and paid Syndicate fighters per each U.S. death. *Id.* Iran facilitated the Syndicate's opium and heroin drug trade. Id., and *see generally* pp. 47-55. Iran's financial support facilitated the Syndicate's terrorist attacks, and removed pressure to raise funds independently. Ex. 80, *Cabrera* at *42.

Iran is a theocratic republic, ruled by a Supreme Leader appointed for life by a council of theologians. Ex. 78, Clarke, p. 41. The Supreme Leader exercises "decisive influence" over all branches of government and the military, including the Iranian Revolutionary Guards Corp ("IRGC") and its elite Quds Force. *Id.* The Supreme Leader is the "commander-in-chief" of the IRGC. *Id.* "The IRGC employs terrorism to pursue Iran's strategic objectives worldwide, through the Quds Force, its elite special operations unit, which arms, funds, trains and directs terror proxies." *Id.* Dr. Clarke concludes that "[i]t is impossible that the IRGC and Quds Force could have channeled material support

and resources to the Syndicate as set forth herein, without the blessing of Iran's Supreme

Leader." *Id.*

### 4. The Taliban-led Terrorist Syndicate Committed the Attacks that Injured the Direct Victim Military Plaintiffs

The *Cabrera* court employed a two-step attack attribution methodology.  In the first

step, it considered the geography and time period in which each attack occurred, based on

Dr. Clarke's analysis.  Ex. 80, *Cabrera* at *44-*46.  Dr. Clarke analyzed which terrorist

group(s) had "operational dominance" in defined geographic regions of Afghanistan at

particular times, and opined on the likelihood that the Syndicate, rather than a competitor

terror group, committed a specific attack.  *Id.* at *46-*54.  In the second step, with the

assistance of Lt. Col. Wood, it considered other factors including *inter alia* the tactics,

techniques and procedures employed in an attack, claims of responsibility, attribution by

government agencies and eyewitness accounts.  *Id.* at *54-*100.

The attacks that injured the direct victim military Plaintiffs occurred in five

different geographic regions in Afghanistan: Southeastern Afghanistan, Southern

Afghanistan, Loya Paktia, Eastern Afghanistan ("N2KL") and Kabul.  The attack

attribution analysis is grouped into the foregoing regions.[11]  The evidence shows that the

Syndicate committed all of these attacks.

#### <u>Southeastern Afghanistan</u>

In *Cabrera*, Dr. Clarke determined and the court held that the Haqqani Network or

the broader Taliban had "operational dominance" in Southeastern Afghanistan, comprising

---

[11] Further details of each attack are set forth in Lt. Col. Wood's expert report, and in the
service members' respective Declarations.  The nature and extent of the injuries inflicted
on the service members are summarized *infra* in Section IV.A.

Ghazni, Logar, Uruzgan, Wardak, and Zabul Provinces, from 2007-2019, and "very likely" committed all of the attacks that occurred in that geographic region in that timeframe. Ex. 80, *Cabrera* at *52; Ex. 81, Clarke, p. 44. Dr. Clarke reaches the same conclusion in this case. Ex. 78, Clarke, p. 17, and *see generally* pp. 25-31.

      **a.**      **Namig Baker - June 2, 2011 IED Attack in Zabul Province (Attack Includes Simultaneous Fatality)**

Namig Baker is a United States citizen, ███████████████████████ ███████████████████████████████████ Ex. 1, ███████████████████, ¶ 1 and Exs. A and B thereto. Mr. Baker was ███████████ and serving on active duty in the U.S. Army ███████████ at the time of the attack that injured him on June 2, 2011 in Zabul Province, for which he received a Purple Heart. *Id.* at ¶ 2 and Ex. D thereto. An IED exploded under his armored vehicle. *Id.* at ¶¶ 5, 8. The explosion killed ████████████. *Id.* at ¶ 9, Exs. C and E; Ex. 77, █████████████████████, ¶ 8. Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack. Ex. 79, p. 74. He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "very likely" carried out this attack, and further notes the statement of a local scholar that "the insurgency practically controls all the districts of the province with the exception of Qalat centre...the insurgency in Zabul is overwhelmingly dominated by the Taliban." *Id.* at p. 76. He opines the "pressure plate" IED used in the attack is a "signature tactic" used by the Syndicate in Zabul. *Id.* at p. 77.

      **b.**      **Grady Horner - May 6, 2011 Rocket Attack in Ghazni Province (Attack Does Not Include Simultaneous Fatality)**

Grady Horner is a United States citizen, ███████████████████████ █████████████. Ex. 24, █████████████████████, ¶ 1 and Ex. A. Mr. Horner was

████████, and serving on active duty in the U.S. Army ████████ at the time of the attack that injured him on May 6, 2011 in Ghazni Province. *Id.* at ¶¶ 3-4. A rocket-propelled grenade struck a metal container within 50 feet of a wooden field hut in which Mr. Horner was sitting, with a "deafening" explosion filling the barracks with smoke. *Id.* at ¶ 4. Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack. Ex. 79, p. 68. He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "very likely" carried out this attack, and opines that the attack was committed with an "improvised rocket" and that such a weapon is a "signature tactic" used by the Syndicate in Ghazni. *Id.* at p. 72. In February 2011, the Syndicate "likely conducted" an IED attack that killed another American soldier in Ghazni, "indicating a continued campaign of attacks and violence to reclaim Ghazni." *Id.* at p. 74.

      **c.    Donald McDaniel, II - August 23, 2011 IED Attack in Wardak Province (Attack Does Not Include Simultaneous Fatality**)

Donald McDaniel, II is a United States citizen, ████████████████ ████████████████. Ex. 31, ████████████████, ¶¶ 1-2, Ex. A. Mr. McDaniel was ████████, and serving on active duty in the U.S. Army ████████ at the time of the attack that injured him on August 23, 2011 in Wardak Province. *Id.* at ¶ 6. An IED exploded underneath the armored vehicle in which he was riding, and launched it into the air and flipped it, injuring Mr. McDaniel. *Id.* at ¶¶ 6-7. Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack. Ex. 79, p. 85. He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "very likely" carried out this attack, and further notes that Sayedabad where the attack occurred was a "hotbed of Taliban and Haqqani activity" of great strategic significance. Id. at p. 86. He opines that the attack was committed with a "command wire"

IED, which the Taliban "commonly used" to destroy vehicles of the type driven by Mr. McDaniel. *Id.* at pp. 19, 87.

      **d.**      **Andrew Vega - July 28, 2010 IED Attack in Zabul Province (Attack Does Not Include Simultaneous Fatality**)

Andrew Vega is a United States citizen, ███████████████████

████████████████. Ex. 66, ██████████████████, ¶¶ 1-2, Ex. A. Mr. Vega was ████████, and serving on active duty in the U.S. Army ████████ at the time of the attack that injured him on July 28, 2010 in Kandahar Province. *Id.* at ¶¶ 6, 29 and Ex. E. An IED exploded under the armored vehicle in which he was riding. *Id.* at ¶ 9, and injured him. Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack. Ex. 79, p. 79. He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "very likely" carried out this attack, and further notes that the attack area was a "traditional Taliban Led Syndicate resupply route". Id. at p. 81. He opines that the attack was committed with a "pressure plate" IED, a "signature tactic" of the Syndicate and one they "commonly used" in Zabul . *Id.* at pp. 82-83. In June 2010, the Taliban claimed responsibility for a suicide bombing occurring in the same month in nearby Shah Joy District, Zabul Province, that killed 13 American soldiers. *Id.* at p. 81. This suicide bombing and the attack that injured Mr. Vega the following month in the same Province are part of the same, continuous Taliban terror campaign. *Id.*

      **Southern Afghanistan**

In *Cabrera*, Dr. Clarke determined and the court held that the Taliban had "operational dominance" in Southern Afghanistan, comprising Kandahar and Helmand Provinces, from 2007-2019, and "very likely" committed all of the attacks that occurred in

that geographic region in that timeframe.  Ex. 80, *Cabrera* at *46-*47; Ex. 81, Clarke, p. 44.  Dr. Clarke reaches the same conclusion in this case.  Ex. 78, Clarke, p. 17, and *see generally* pp. 17-21.

       **e.**      **Kevin Deas - August 18, 2009 Complex Attack in Kandahar Province (Attack Includes Simultaneous Fatality)**

Kevin Deas is a United States citizen, ███████████████████████████ ████████████████. Ex. 14, █████████████████████, ¶ 1 and Ex. A.  Mr. Deas was ████████, and serving on active duty in the U.S. Army ████████ at the time of the attack that injured him on August 18, 2009 in Kandahar Province, for which he received a Purple Heart.  *Id.* at ¶¶ 3-4, and Ex. C.  An IED exploded between ten and thirty feet behind Mr. Deas, while he was on foot patrol, and an ambush ensued.  *Id.*  The same explosion killed at least one other U.S. soldier, ██████████████. *Id.* at ¶ 5 and Ex. D; Ex. 79, p. 99.  Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack.  Ex. 79, p. 99.  He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "very likely" carried out this attack, and further opines that the attack was committed with a "command wire" IED, which the Taliban "commonly used" to initiate complex attacks like this one that included an ambush.  *Id.* at pp. 19, 102.  He notes that the U.S. government attributes the attack to the Taliban.  *Id.* at p. 102.

       **f.**      **Christopher Hardesty - July 5, 2010 IED Attack in Kandahar Province (Attack Includes Simultaneous Fatality)**

Christopher Hardesty is a United States citizen, █████████████ ██████████████████. Ex. 20, ████████████████████████, ¶ 1 and Ex. A.  Mr. Hardesty was ████████ and serving on active duty in the U.S. Army ████ ████ at the time of the attack that injured him on July 5, 2010 in Kandahar Province, for

which he received a Purple Heart.  *Id.* at ¶¶ 2, 4.  An IED exploded underneath his armored vehicle.  *Id.* at ¶¶ 5-6 and Ex. C.  The force of the explosion killed two other soldiers, ███████████████████████.  *Id.* at ¶ 7 and Ex. D.  Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack.  Ex. 79, pp. 103-104.  He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "very likely" carried out this attack, and further notes that the Taliban were "very active" in Kandahar in the weeks leading up to the attack, assaulting two bases.  *Id.* at p. 105.  He opines that the attack was committed with a sophisticated "radio controlled" IED designed to evade jamming countermeasures, and was a Taliban signature tactic.  *Id.* at p. 106.

### g.    Johnny Butler, Jr. - June 4, 2011 IED Attack in Kandahar Province (Attack Does Not Include Simultaneous Fatality)

Johnny Butler, Jr. is a United States citizen, ██████████████████████ ███████████████.  Ex. 8, ████████████████████, ¶ 1 and Ex. A thereto.  Mr. Butler was ███████████ and serving on active duty in the U.S. Army ███████████ at the time of the attack that injured him on June 4, 2011 in Kandahar Province, for which he received a Purple Heart.  *Id.* at ¶ 3 and Ex. C.  An IED exploded under his armored vehicle.  *Id.* at ¶¶ 7-8 and Ex. D.  Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack.  Ex. 79, pp. 88-89.  He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "very likely" carried out this attack, and further notes that Kandahar was the "center of gravity" for the Taliban, and their attacks against U.S. forces were "prolific and common" there.  *Id.* at p. 90.  The Taliban had killed seven American soldiers with an IED in Kandahar, only a week before.  *Id.*  He opines that the attack was committed with was committed with a "command wire" IED, which the

Taliban "commonly used" and were a "common tactic" to initiate complex attacks like this one, which also involved an immediate follow-on attack with small arms. *Id.* at pp. 90-92. Only a week earlier, on May 27, 2011, the Taliban conducted a fatal attack against American forces in the same Province, killing 7 American soldiers. *Id.* at p. 90. These two attacks, separated by only one week and occurring in the same Province, are part of the same, continuous Taliban terror campaign. *Id.*

### h.    Brandon Paredes - January 8, 2010 IED Attack in Kandahar Province (Attack Does Not Include Simultaneous Fatality)

Brandon Paredes is a United States citizen, ██████████████████████████████ ██████████████. Ex. 50, ████████████████████████, ¶¶ 1-2, Ex. A. Mr. Paredes was ████████████, and serving on active duty in the U.S. Army ██████████ at the time of the attack that injured him on January 8, 2010 in Kandahar Province, for which he was awarded the Purple Heart. *Id.* at ¶ 16 and Exs. C and D. Mr. Paredes was driving an armored vehicle, when an IED exploded underneath it. *Id.* at ¶ 12. Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack. Ex. 79, pp. 93-94. He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "very likely" carried out this attack, and opines that the "pressure plate" IED used in the attack is a "signature tactic" used by the Syndicate in Kandahar. *Id.* at pp. 95-96. Only five days prior to this attack, on January 3, 2010, an IED attack in Kandarhar Province had killed an American airman. *Id.* at p. 94. These two attacks, separated by only five days and occurring in the same Province, are part of the same, continuous Taliban terror campaign. *Id.*

**<u>Loya Paktia</u>**

In *Cabrera*, Dr. Clarke determined and the court held that the Haqqani Network had "operational dominance" in Loya Paktia, comprising Khost, Paktia and Paktika Provinces, from 2007-2019, and "very likely" committed all of the attacks that occurred in that geographic region in that timeframe. Ex. 80, *Cabrera* at *47-*48; Ex. 81, Clarke, p. 44. Dr. Clarke reaches the same conclusion in this case. Ex. 78, Clarke, p. 17, and *see generally* pp. 21-25.

### i.    John Iasiello - August 18, 2011 Complex Attack in Paktia Province (Attack Includes Simultaneous Fatality)



John Iasiello is a United States citizen, ███████████████████████ ███████████. Ex. 27, ████████████████████, ¶¶ 1-2, Ex. A. Mr. Iasiello was ███████, and serving on active duty in the U.S. Army ███████ at the time of the attack that injured him on August 18, 2011 in Paktia Province. *Id.* at ¶¶ 3-4, Exs. D, E and F. A suicide truck bomber exploded an IED, and the blast killed two security guards. *Id.* at ¶ 5, Ex. E. Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack. Ex. 79, pp. 58-59. He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban and Haqqani Network "very likely" carried out this attack, and notes that Paktia is an "historic, traditional tribal" area for the Haqqani Network and that "no other group had a meaningful presence in the region" from 2007 to 2012. *Id.* at pp. 10, 12, 59. He further notes that the Taliban's spokesman claimed responsibility for the attack. *Id.* at p. 61.

### j.    Joseph Sandlin - November 27, 2010 Suicide Vest Attack in Paktika Province (Attack Includes Simultaneous Fatality)

Joseph Sandlin is a United States citizen, ████████████████████ ███████. Ex. 57, ████████████████████, ¶¶ 1-2, Ex. A. Mr. Sandlin was ███

███████, and serving on active duty in the U.S. Army ████████ at the time of the attack that injured him on November 27, 2010 in Paktika Province, for which he was awarded the Purple Heart. *Id.* at ¶¶ 7, 13 and Ex. C.      Suicide bombers disguised as Afghan police infiltrated the base, and blew up their suicide vests within 20-25 feet of Mr. Sandlin. *Id.* at ¶¶ 11, 16, 17 and Exs. D and E. The blast also killed at least twelve others, including Afghan police officers. *Id.* at ¶ 12 and Ex. D; Ex. 79, p. 53, fn. 183. Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack. Ex. 79, pp. 52, 54. He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban and Haqqani Network "very likely" carried out this attack. *Id.* at pp. 10, 59. He opines that the Haqqani Network "commonly used suicide bombers to attack American and Afghan forces, to infiltrate Afghan forces dressed in civilian clothes." *Id.* at pp. 55-56. He notes that on July 21, 2009 the Haqqani Network had used suicide bombers dressed in burkhas to infiltrate and attack personnel in secure Afghan government buildings in nearby Gardez, Paktia Province. *Id.* at p. 56. He also notes that the Taliban claimed responsibility for the attack. *Id.* at p. 57.

**k.    Arik Miller - January 1, 2010 ID Attack in Khost Province (Attack Does Not Include Simultaneous Fatality)**

Arik Miller is a United States citizen, ████████████████████ ████████████. Ex. 39, ████████████████, ¶¶ 1-2, Ex. A. Mr. Miller was ███ ████████, and serving on active duty in the U.S. Army ████████ at the time of the attack that injured him on January 1, 2010 in Khost Province, for which he was awarded the Purple Heart. *Id.* at ¶¶ 7, 13 and Ex. D. An IED exploded under his armored vehicle, destroying the vehicle. *Id.* at ¶¶ 7, 8 and Ex. C. Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack. Ex. 79, p. 48. He concurs with Dr.

Clarke's time, geography and "operational dominance" opinion that the Taliban and Haqqani Network "very likely" carried out this attack. *Id.* at pp. 10, 52. He opines that the attack was committed with a "command wire" IED, and that the "Haqqani Network commonly used command wire IEDs in Khost Province in 2010." *Id.* at p. 50. Only two days before the attack on Mr. Miller, a Taliban suicide bomber detonated a suicide vest at Forward Operating Base Chapman, in Khost Province, killing seven American intelligence agents. Id. at p. 52. These two attacks, separated by only two days and occurring in the same Province, are part of the same, continuous Taliban terror campaign. *Id.*

**Kabul**

In *Cabrera*, Dr. Clarke determined and the court held that the Kabul Attack Network had "operational dominance" in Kabul, from 2007-2019, and "very likely" committed all of the attacks that occurred in that geographic region in that timeframe. Ex. 80, *Cabrera* at *48-*49; Ex. 81, Clarke, p. 44. Dr. Clarke reaches the same conclusion in this case. Ex. 78, Clarke, p. 17, and *see generally* pp. 36-38.

**l.    Michael Pabon - October 29, 2011 Vehicle Borne Suicide Bombing Attack in Kabul (Attack Includes Simultaneous Fatality)**

Michael Pabon is a United States citizen, ████████████████████ ███████████. Ex. 45, ████████████████, ¶ 1, Ex. A. Mr. Pabon was ██████, and serving on active duty in the U.S. Army ██████ at the time of the terrorist attack that injured him on October 29, 2011 in Kabul Province. *Id.* at ¶ 4. A suicide bomber drove an explosive-laden van into a bus in front of the armored vehicle in which Mr. Pabon was riding, injuring him, for which he received a Purple Heart. *Id.* at ¶ 6; Ex. 79, p. 62-63, fn. 18. The blast killed thirteen coalition personnel, including five American soldiers, four Afghan policemen, one Afghan civilian adult and three Afghan

children.  *Id.* at ¶ 7 and Ex. D; Ex. 79, p. 63.  Lt. Col. Wood has concluded with "high confidence" that the Syndicate's Kabul Attack Network conducted the attack.  Ex. 79, p. 48.  He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Kabul Attack Network "very likely" carried out this attack.  *Id.* at pp. 16, 64-65. He opines that the Kabul Attack Network was responsible for most terrorist attacks, and all sophisticated attacks, within Kabul at the time of this attack" and describes this attack as "sophisticated".  *Id.* at p. 65.  He opines that chlorate was used in the explosives in this attack, and that the use of chlorate is "critical for attribution" because "the Kabul Attack Network often used chlorate-based explosives to conduct suicide attacks".  *Id.* at pp. 65-66.  Finally, he notes that the Taliban claimed responsibility for the attack. *Id.* at p. 67.

### Eastern Afghanistan / "N2KL"

In *Cabrera*, Dr. Clarke determined and the court held that the Taliban (with direct participation from al-Qaida) had "operational dominance" in Eastern Afghanistan, comprising Nangarhar, Nuristan, Kunar and Laghman Provinces, from 2007-2019, and "likely" committed all of the attacks that occurred in that geographic region in that timeframe. Ex. 80, *Cabrera* at *49-*50; Ex. 81, Clarke, p. 44.  Dr. Clarke reaches the same conclusion in this case.  Ex. 78, Clarke, p. 17, and *see generally* pp. 31-34.

### m.    Scott Smith - May 18, 2012 Indirect Fire Attack in Kunar Province (Attack Includes Simultaneous Fatality)

Scott Smith is a United States citizen, ███████████████████████████ ████████████.  Ex. 61, █████████████████, ¶¶ 1-2, Ex. A.  Mr. Smith was ██ ██████, and serving on active duty in the U.S. Army ██████████ at the time of the attack that injured him on May 18, 2012 in Kunar Province, for which he was awarded the Purple Heart.  *Id.* at ¶¶ 6, 29 and Ex. E.  His base came under heavy terror attack from rocket

mortar and small-arms fire.  *Id.* at ¶ 7.  At least two U.S. soldiers and two Afghan children were killed in the same attack.  Id. at ¶¶ 9, 26; Wood, pp. 27-28 and fns. 94, 95 and 96 (citing to an AR 15-6 U.S. Army Report of Investigation).  Lt. Col. Wood has concluded with "high confidence" that the Syndicate's Kabul Attack Network conducted the attack.  Ex. 79, p. 28.  He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "likely" carried out this attack.  *Id.* at pp. 7-8, 30-31.  He opines that Mr. Smith's base was hit with 82mm rocket mortar "indirect fire" and that the Taliban "frequently" targeted that base with 82mm rocket mortar "indirect fire".  *Id.* at p. 31.  He opines that the "Syndicate used the 82mm mortar extensively, and that Iran supplied the Taliban with 82mm mortars and trained the Taliban to use them."  *Id.* at p. 32. Finally, he notes that a coalition spokesman attributed the attack to the Taliban.  *Id.*

### n.    Ryan Winston - September 17, 2008 Complex Attack in Kunar Province (Attack Includes Simultaneous Fatality)

Ryan Winston is a United States citizen, ███████████████████████
███████████.  Ex. 67, ███████████████████, ¶¶ 1-2, Ex. A.  Mr. Winston was ███████, and serving on active duty in the U.S. Army ███████ at the time of the attack that injured him on September 17, 2008 in Kunar Province, for which he received the Purple Heart.  *Id.* at ¶¶ 7, 9, 23 and Ex. D.  The armored vehicle carrying Mr. Winston was struck by rocket-propelled grenades, which killed other soldiers in the vehicle, and another soldier was shot and killed.  *Id.* at ¶¶ 11-12 and Ex. H; Ex. 79, p. 39.  Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack.  Ex. 79, pp. 38-39.  He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "likely" carried out this attack.  *Id.* at pp. 7-8, 41.  He opines that the Taliban would "often use" young boys as scouts to set up attacks, and "would often use

the tactic of attacking when an American patrol was returning to base", both features of this attack. *Id.* at p. 41.

  **o. Daniel Kernan - May 30, 2010 Complex Attack in Kunar Province (Attack Does Not Include Simultaneous Fatality)**

  Daniel Kernan is a United States citizen, ████████████████████ ████████████. Ex. 28, ███████████████, ¶¶ 1-2, Ex. A. Mr. Kernan was ████████, and serving on active duty in the U.S. Army ████████ at the time of the attack that injured him on May 30, 2010 in Kunar Province, for which he received a Purple Heart. *Id.* at ¶¶ 6, 14, Ex. E. His armored vehicle was hit with a rocket-propelled grenade, ████████████████████ *Id.* at ¶¶ 6-7, 9. Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack. Ex. 79, pp. 33-34. He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "likely" carried out this attack. *Id.* at pp. 7-8, 36. He notes the "heavy presence" of the Taliban in the Marawara District where the attack occurred. *Id.* He opines that the sophistication of the attack, the use of mortars and rocket-propelled grenades, and the large number of fighters deployed are consistent with the reputation of the Taliban leader who commanded 300 fighters in the district. *Id.* at pp. 36-37. The Taliban also conducted an IED strike in Marawara only seven days later, on June 7th, 2010 that killed five American soldiers, and nine days prior, on May 21, a suicide bomber had killed two Americans at a checkpoint in Marawara. *Id.* at p. 38. These three attacks, separated by days and occurring in the same District, are part of the same, continuous Taliban terror campaign. *Id.*

  **p. Evan Pronzati - April 4, 2012 IED Attack in Nangarhar Province (Attack Does Not Include Simultaneous Fatality)**

Evan Pronzati is a United States citizen, ████████████████████ ████████████████. Ex. 56, ██████████████████, ¶¶ 1-2, Ex. A. Mr. Pronzati was ████████, and serving on active duty in the U.S. Army ████████ at the time of the attack that injured him on April 4, 2012 in Nangarhar Province, for which he was awarded the Purple Heart. *Id.* at ¶¶ 6, 15 and Ex. C. An IED exploded under his armored vehicle, launched it into the air and flipped it. *Id.*, ¶¶ 12-14, Ex. B. Lt. Col. Wood has concluded with "high confidence" that the Syndicate conducted the attack. Ex. 79, pp. 42-43. He concurs with Dr. Clarke's time, geography and "operational dominance" opinion that the Taliban "likely" carried out this attack. *Id.* at p. 45, fn. 169 and accompanying text. He notes the Taliban "frequently target[ed] route clearance patrols along" a strategic highway that was an important trade route in Nangarhar. *Id.* Further, he opines that the attack was committed with a "command wire IED", and that the Syndicate "commonly used the command wire IED tactic to strike coalition forces". *Id.* at p. 47. Only four days following the attack on Mr. Pronzati, the Taliban attacked and killed an Afghan policeman in the same Province. The attack on SGT Pronzati was a "precursor to the Taliban 'spring offensive' attacks" that occurred only eleven days later, on April 15, in three Provinces including Nangarhar and that killed an Afghan civilian. *Id.* at p. 47. These attacks are part of the same, continuous Taliban terror campaign. Id.

**5.    Personal Injury**

As set forth in detail in Section IV.A *infra*, all of the direct victim military Plaintiffs have alleged and sustained serious physical, emotional and psychological personal injuries. As set forth in Section IV.B *infra*, their immediate family members, the indirect victim Plaintiffs, have alleged and sustained serious emotional and psychological injuries.

6.      **Causation**

There is no requirement that "a state's material support must go directly for the specific act." *Owens*, 864 F.3d at 799 (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)).  Such a limitation "would likely render . . . [the] material support provision ineffectual because material support is fungible and terrorist organizations can hardly be counted on to keep careful bookkeeping records." *Id.* For that reason, the terrorism exception strips immunity for both a foreign state that "specifically instructs" a terrorist organization "to carry out an attack against a U.S. citizen" and one that "only provides general support, but was not involved with the act giving rise to the suit." *Kilburn*, 376 F.3d at 1128.

Nor does the statutory text require Plaintiffs to show that Iran's material support was a "but for" cause of their injuries.  "[T]here is no 'but-for' causation requirement for claims made under the FSIA." *Fuld v. Islamic Republic of Iran*, 2024 U.S. Dist. LEXIS 56727 at \*32 (D.D.C. 2024) (internal quotations omitted).  Instead, the FSIA causation element requires only "proximate cause," defined as a "'reasonable connection' between the behavior of the defendant and the damage suffered." *Id.*, quoting *Owens*, 864 F.3d at 794.  To demonstrate the "reasonable connection," Plaintiffs must show that (1) " defendant's actions were a substantial factor in the sequence of events that led to [their] injury" and (2) "plaintiffs' injuries were reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id*.  Plaintiffs satisfy both prongs of that proximate-cause test.

a.      **Iran's Provision of Material Support and Resources to the Taliban-led Terrorist Syndicate was a Substantial Factor in the Attacks**

Material support is a "substantial factor in the sequence of events" when it "enhances a terrorist group's ability to attack". Ex. 80, *Cabrera* at \*142. In this case, Dr. Clarke has concluded that "Iran's material support and resources played a significant role in [the Syndicate's] success, by enhancing the Syndicate's ability to carry out a higher number and frequency of deadly attacks over a sustained period." Ex. 78, Clarke, p. 55. He states that "without [Iran's support], the Syndicate would have been a less deadly and less effective terrorist organization." *Id.* He explains that without Iranian weapons and training, "the Syndicate might not have been able to execute the attacks at issue in this case, and those attacks might not have resulted in deaths and severe injuries." *Id.* Without Iranian money, "the Syndicate might have struggled to fund its operations and pay its fighters." *Id.* Dr. Clarke also points to the statements of both Taliban leadership and Afghan government officials confirming that Iranian support enhanced the Syndicate's lethality. *Id.*

The *Cabrera* court similarly found, based on expert testimony, that "Iran's support was critical from the very beginning. . . . It permitted the Taliban to kill and wound American troops and ultimately forced the U.S. to leave the country." Ex. 80, *Cabrera*, at \* (quoting Roggio); *see also* Ex. 81, Roggio, p. 116 ("Iran's material support helped turn the tide of the Taliban's terrorist insurgency"), ("Iran's material support thereby enabled the Taliban to carry out a higher quantity of more successful and advanced attacks against Coalition forces"), p. 118 ("I conclude that Iran's material support played a substantial role in the Syndicate's ability to successfully kill and wound U.S. forces.").

Lt. Col. Wood reinforces Dr. Clarke's conclusion, with concrete references to the specific attacks in this case that suggest a direct link between Iran's support and these

31

particular attacks:

- Iran provided the Syndicate with 82mm mortars and with training on how to use them, and the Syndicate used this type of mortar in the attack that injured Scott Smith. Ex. 79, Wood, pp. 31-32.

- "The technical knowledge, ability to establish multiple points of attack, understanding of routes of movement, and general IED knowledge and training required to conduct this attack [on Namig Baker] were highly likely to have been trained and resourced by Iran." *Id.* at pp. 78-79.

- "The tactical knowledge, ability to establish multiple points of contact, understanding of routes of movement and general IED knowledge and training required to conduct this attack [on Kevin Deas] were highly likely to have been trained and resourced by Iran." Id. at pp. 102-103. It is not a prerequisite of subject matter jurisdiction or liability to link Iran's provision of material support and resources to any of the specific attacks that gave rise to the claims in this case.

However, in order to establish subject matter jurisdiction, Plaintiffs need not demonstrate a direct link between Iran's support and any of the specific attacks in this case. *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 334-335 (D.D.C. 2022) ("such a 'nexus' is not necessary because funds - and, in certain instances, arms and other support - are fungible."); *see also Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 139 (D.D.C. 2021) ("Syria's material support to ISIS—its release of prisoners, financial relationship with ISIS, and military coordination with it—was a substantial factor in its development into a wealthy proto-state with sophisticated, battle-hardened leadership that controlled large swaths of territory. . . . And it was only under those conditions that ISIS could" commit the attacks at issue); *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 103-04 (D.D.C. 2019) (Iran's provision of "weapons, financial support, and training" was a substantial factor in plaintiffs' attacks because it "put the Houthis in a position of power to commit acts of terrorism like the ones at issue in this case").

Dr. Clarke has averred that Iran's support of the Syndicate was fungible. "[S]ince money, weapons and training are all fungible, Iran's provision of material support and resources to any part of the Syndicate benefitted the entire Syndicate." Ex. 78, Clarke, p. 56. "Whether or not Iranian-provided arms were used in these specific attacks, the steady flow of weapons from Iran to the Syndicate made it easier for the Syndicate to commit weapons and explosives to the attacks in this case." *Id.* at p. 55. The Cabrera court made the same finding of fungibility. Ex. 80, *Cabrera* at *38 ("Iran's support was fungible: although Iran. . . may not have been involved in the details of individual attacks, the money, training, weapons, and expertise Iran provided were critical to the Syndicate's success. Through cross-cutting organizational support, Iran substantially contributed to all eleven of the bellwether attacks at issue in this proceeding."), *146 ("Iran's support was fungible between members of the Syndicate, and it eliminated the need for those members to compete with each other for resources."), ("'Support for one element of the Syndicate that came from Iran didn't have to be distributed to the others. They all received the support. So it was a cumulative effect. There was a synergy.'") (quoting Roggio).

### b.    The Results Were Reasonably Foreseeable to Iran

To establish proximate cause, Plaintiffs must also demonstrate that their injuries were "reasonably foreseeable or anticipated as a natural consequence" of Iran's material support for the Taliban-led Terrorist Syndicate. *Owens*, 864 F.3d at 794. In assessing reasonable foreseeability, courts "must 'consider the broader context of Iran's conduct.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 86 (D.D.C. 2018) (quoting *Owens*, 864 F.3d at 797). When Iran's support for a terrorist organization is "part of a broader geopolitical strategy, [t]he death and injury to innocent people and the suffering of their

families was, by any measure, foreseeable." *Force*, 464 F. Supp. 3d at 369; *see also Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 204 (D.D.C. 2017) (finding foreseeability prong satisfied when plaintiffs presented expert testimony that "Syria's support for the Zarqawi Terrorist Organization was given for the purpose of allowing this group to commit precisely the types of terrorist attacks at issue, so as to cause unrest in Syria's neighboring countries which Syria viewed as being to its political advantage").

Dr. Clarke has opined that Iran and the Syndicate had a "shared goal of driving the U.S, out of Afghanistan by killing and maiming U.S. personnel." Ex. 78, Clarke, p. 56; *see also* "Iran's Motivation" at p. 42. Further, "Iran furnished material support and resources to the Syndicate...with the intention of furthering terror attacks that would kill U.S. armed forces personnel". *Id.* Reinforcing Dr. Clarke's opinion in this case, in *Cabrera*, the court found that "[P]laintiffs' injuries were not only foreseeable: they were the <u>intended</u> result of Iran's support." Ex. 80, Cabrera, at \*147 (emphasis in original).

Plaintiffs do not need to show that Iran intended the Taliban-led Syndicate to commit the *particular* attacks at issue in this case: "a state sponsor of terrorism may not avoid liability for supporting known terrorist groups by professing ignorance of their specific plans for attacks." *Owens*, 864 F.3d at 799. Because Iran intended for its material support and resources to enable the Taliban-led Terrorist Syndicate's attacks on American forces in Afghanistan, the *Baker* Plaintiffs' injuries were foreseeable.

## 7.    Additional Requirements for a Federal Court to Hear § 1605A Claims

Once the threshold jurisdictional immunity-stripping elements of § 1605A(a)(1) have been satisfied, Plaintiffs must then meet the requirements for a court to hear claims set forth in § 1605A(a)(2), namely that: (1) the Defendant was a designated state sponsor

of terrorism; (2) the claimant or victim was — at the time of the attack — a U.S. national, a member of the armed forces, or a U.S. government employee or contractor; and (3) if the attack took place within the Defendant's borders, the Defendant received an opportunity to arbitrate the claims.

In 1984, the U.S. Department of State designated the Islamic Republic of Iran as a State Sponsor of Terrorism under § 6(j) of the Export Administration Act of 1979, 50 U.S.C.S. app. 2405(j), § 40 of the Arms Export Control Act, 22 U.S.C. 2780, and § 620A of the Foreign Assistance Act of 1961, 22 U.S.C.S. 2371.[12]  In 2007, the U.S. Department of the Treasury designated the Qods Force, an elite special operations unit within the IRGC, as a Specially Designated Global Terrorist Entity under E.O. 13224, 66 Fed.Reg. 49079 (Sept 23, 2001).[13]  The U.S. Department of State has designated the entire IRGC, including the Qods Force, as a foreign terrorist organization.[14] Ex. 78, Clarke, p. 41.  The Court may also take judicial notice of the countless decisions establishing these facts.

Further, the evidence establishes that, at the time of the attacks, each victim was "a national of the United States" or "a member of the armed forces."  All of the direct victims were actively serving members of the U.S. armed forces.  *See supra* Section III.C.4.   All of the family members of the direct victims were U.S. nationals.  *See infra* Section IV.B.

Third, because the attacks did not take place in Iran, Plaintiffs were not required to offer to arbitrate these claims.  *See*, *e.g.*, *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491 (D.D.C. 2021) ("[A]ll of the acts Plaintiffs complained of occurred in Iraq, not Iran, so the requirement to afford Iran the opportunity to arbitrate is not implicated here.").

---

[12] *See* https://www.state.gov/state-sponsors-of-terrorism/.
[13] *See* https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm.
[14] *See* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

## D. PERSONAL JURISDICTION

"Personal jurisdiction over a foreign state shall exist . . . where service has been made under section 1608 of this title." 28 U.S.C. § 1330(b). The Court does not need to consider whether exercising personal jurisdiction is consistent with due process because "foreign states are not 'persons' protected by the Fifth Amendment." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002). The Court thus can exercise jurisdiction as long as service was proper. Section 1608 prescribes four methods of service on a foreign state. *See* 28 U.S.C. § 1608(a). "Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." *Valore*, 700 F. Supp. 2d at 69.

Plaintiffs could not serve Iran under § 1608(a)(1) "because plaintiffs had no 'special arrangement' for service with Iran. Likewise, because Iran is not party to an 'international convention on service of judicial documents,' service under § 1608(a)(2) was impossible." *Ben-Rafael*, 540 F. Supp. 2d at 52. Accordingly, Plaintiffs attempted service under § 1608(a)(3), which authorizes service "by any form of mail requiring a signed receipt". Section I (B)(1)(a) of the *United States District Court for the District of Columbia's Attorney Manual for Service of Process on a Foreign Defendant (Pursuant to FRCP 4 and the Foreign Sovereign Immunities Act (Revised: December 2021)* provides: "(Please note: Service by U.S. Postal Service is not permitted to Iran or Syria)." Section III (B)(a) also provides: "Service by registered mail under this rule is not permitted as the Clerk's Office cannot dispatch packages to the U.S. Post Office. Please proceed to service by DHL." Accordingly, Plaintiffs requested that the Clerk's office dispatch the documents via DHL, with signed return receipt requested, to the Minister of Foreign Affairs for Iran. *See* ECF

6, 6-1.  DHL could not deliver the documents to Iran.  *See* ECF 7 at 2, ECF 9.

Having exhausted the first three methods of service, Plaintiffs sought and the Court granted leave to proceed with service under 28 U.S.C. § 1608(a)(4).  *See* ECF 8, 8-1, 8-2, and November 28, 2022 Minute Order.  The *Baker* Plaintiffs properly effectuated service of the Complaint on Iran under § 1608(a)(4) by having the Clerk of the Court send by certified mail "[t]wo copies of the summons, complaint and a notice of suit, together with a translation of each into the official language of the foreign state" to the Secretary of State. *See* ECF 10, 10-1, 12.  The State Department delivered the documents to the Foreign Interests Section of the Embassy of Switzerland in Tehran, which delivered them to the Iranian Ministry of Foreign Affairs on March 6, 2023.  *See* ECF 13.  The State Department then "sen[t] to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted," 28 U.S.C. § 1608(a)(4).  *Id.*  Iran did not respond.  "Because Plaintiffs accomplished service under 28 U.S.C. § 1608(a)(4) on the Islamic Republic of Iran, the Court possesses personal jurisdiction over Defendant."  *Hamen*, 401 F. Supp. 3d at 108.

## E.  FEDERAL CAUSE OF ACTION

Plaintiffs bring claims solely pursuant to the private right of action in 28 U.S.C. § 1605A(c).  The elements for establishing Iran's liability are "essentially the same" as the elements necessary to establish subject matter jurisdiction and the waiver of sovereign immunity discussed above.  *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010).  "In other words, [§ 1605A(c)] creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity."  *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 59 (D.D.C.

2019). Thus, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law." *Force*, 464 F. Supp. 3d at 369. The federal cause of action, § 1605A(c), does require that the plaintiff — rather than the plaintiff *or* the victim — be a national of the United States, a member of the armed forces, or a government employee or contractor. 28 U.S.C. § 1605A(c). As hereinbefore stated, all of the direct victims are U.S. nationals, and at the time of the terrorist attack that injured them actively serving members of the U.S. armed forces. *See infra* Section III.C.4. All of the family members of the direct victims are U.S. nationals. *See supra* Section IV.B.

## IV. DAMAGES

Under the federal cause of action, "damages may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4).

## A. COMPENSATORY DAMAGES FOR THE DIRECT VICTIMS

"[J]udges in this district have developed a general framework for assessing pain and suffering damages for direct victims of terrorist attacks . . . ." *Sheikh v. Republic of Sudan,* 485 F. Supp. 3d 255, 268 (D.D.C. 2020). Under the "*Peterson II framework*," the baseline award for surviving direct terrorist attack victims is $5 million. *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007) (*Peterson II*). Courts "depart upward from this baseline to $7.5-$12 million in more severe instances of physical and psychological pain." *Valore*, 700 F. Supp. 2d at 84 (noting that the court in *Peterson II* departed upward where, for example, "victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead"). Courts may depart downward for "'minor shrapnel injuries or minor

injury from small-arms fire.'" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 36 (D.C. Cir. 2016) (quoting *Valore*, 700 F. Supp. 2d at 84).

In *Schooley v. Islamic Republic of Iran*, this Court relied on Department of Veterans Affairs ("VA") disability ratings as an "objective metric" to assist in quantifying and "determin[ing] the relative degree of injury suffered by each service member plaintiff." 2019 U.S. Dist. LEXIS 108011 at *74. VA Disability Ratings are the federal agency's "official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id.* (internal quotations omitted). This Court has adopted the *Schooley* approach in more recent cases and explained that:

> '[t[he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides' an effective way of comparing injuries to ensure that similar injuries yield similar awards.

*Mustard,* 2023 U.S. Dist. LEXIS 19748 at *31-32 (quoting *Schooley*, 2019 U.S. Dist. LEXIS 108011 at *74). Under the *Schooley* rubric, plaintiffs with up to a 30% VA Disability Rating receive a baseline pain and suffering award of $5,000,000; plaintiffs rated by the VA as being 40-60% disabled receive an upward departure to $6,000,000; and plaintiffs rated 70%-100% disabled by the VA receive a further upward departure to $7,000,000. *Id.* at 32.

### *Service Members Injured in an Attack that __Did Include__ a Simultaneous Death*

#### 1. Namig Baker

An IED exploded under Mr. Baker's armored vehicle, destroyed the vehicle, and

. Ex. 1, , ¶¶ 5, 8.

███████████████████████████████████████████████████████████████

█████████████████████████████████████. *Id.* at ¶¶ 8, 11.  Mr. Baker received a

Purple Heart for his injuries.  *Id.* at ¶ 2 and Ex. D thereto.  The powerful explosion killed

███████████████, who was riding in the vehicle with Mr. Baker, and two other passengers

███████████████████████████. *Id.* at ¶ 9, Exs. C and E; Ex. 77, ██████████████

████████████████, ¶ 8.

     *a. Pain and Suffering*

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Accordingly,

in accordance with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain

and suffering damages for Namig Baker.

     *b.  Economic Loss*

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████    Accordingly, Plaintiffs request an award of $3,295,945 in economic loss damages for Namig Baker.

### 2. Kevin Deas

A 500 lb. IED exploded between ten and thirty feet behind Mr. Deas, while he was on foot patrol. *Id.* Ex. 14, ██████████████████, ¶¶ 3-4. The force of the explosion ██████████████████████████████. *Id.* The same explosion killed ██████████████████████. *Id.* at ¶ 5 and x. D; Ex. 79, Wood, p. 99.

*a. Pain and Suffering*

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████    Accordingly, in accordance with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for Kevin Deas.

      *b. Economic Loss*

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Accordingly, Plaintiffs request an award of $2,591,730 in economic loss damages for Kevin Deas.

**3. Christopher Hardesty**

A 500 lb. IED exploded underneath the armored vehicle on top of which he was mounted ████████. *Id.* at ¶¶ 5-6 and Ex. C.  Mr. Hardesty ███████████. *Id.* The force of the explosion killed two other soldiers, ██████████████████. *Id.* at ¶ 7 and Ex. D.

*a. Pain and Suffering*



███████ Accordingly, in accordance with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for Christopher Hardesty.

## 4. John Iasiello

A suicide truck bomber exploded a very powerful IED, causing extensive damage, killing two security guards and wounding others.  Ex. 27, ████████████████, ¶ 5,

Ex. E. ████████████████████████████████████████████████████

███████████████████████████████. *Id.*

    *a. Pain and Suffering*

██████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

Accordingly, in accordance with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for John Iasiello.

**5. Michael Pabon**

Mr. Pabon was mounted on an armored vehicle ████████, when a suicide bomber drove a van carrying a 1600-pound IED into a bus in font of his armored vehicle.  Ex. 45, ██████████████████, ¶ 6.  The blast was very powerful, and killed thirteen coalition personnel, including five American soldiers, four Afghan policemen, one Afghan civilian adult and three Afghan children.  *Id.* at ¶ 7 and Ex. D; Ex. 79, Wood, p. 63.  █

███████████████████████████████████████████. Ex. 45 at ¶ 7 and Ex. D. ███

████████████████████████████████████████████████████████

████████████████████████████████. *Id.* and Ex. F.  He was awarded a Purple Heart.  Id.

at ¶ 6; Ex. 79, pp. 62-63, fn. 18.

      *a. Pain and Suffering*

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



Accordingly, in accordance with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for Michael Pabon.

  *b. Economic Loss*

Accordingly, Plaintiffs request an award of $2,679,725 in economic loss damages for Michael Pabon.

  **6. Joseph Sandlin**

  Suicide bombers disguised as Afghan police infiltrated the base, and blew up their suicide vests within 20-25 feet of Mr. Sandlin.  Ex. 57, ███████████████████, ¶¶ 11, 16, 17 and Exs. D and E.  The blast ████████████████████████ .  *Id.* ████████████████████████████ .  *Id.* at ¶¶ 20, 21.  Mr. Sandlin was awarded the Purple Heart.  *Id.* at ¶¶ 7, 13 and Ex. C.  The blasts that

injured Mr. Sandlin also killed at least 12 Afghan police officers, and wounded 16 others.
*Id.* at ¶ 12; Ex. 79, Wood, p. 53, fn. 183

       *a.*      *Pain and Suffering*



███████████████████████████████████ Accordingly, in accordance with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for Joseph Sandlin.

    *b. Economic Loss*

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Accordingly, Plaintiffs request an award of $2,220,467 in economic loss damages for Joseph Sandlin.

### 7. Scott Smith

    Mr. Smith's base came under heavy terror attack from mortar and small-arms fire. Ex. 61, ██████████████████████, ¶ 7. A powerful explosion ████████████████ ███████████████████████████████████████. *Id.* Two U.S. soldiers were killed in the same attack. Id. at ¶ 26 and Ex. I; Ex. 79, Wood, pp. 27-28 and fns. 94, 95 and 96. He was awarded the Purple Heart. *Id.* at ¶ 29 and Ex. E.

    *a.    Pain and Suffering*

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████     Accordingly, in accordance with the *Schooley*

rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for Scott

Smith.

     *b. Economic Loss*

████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

49

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████   Accordingly, Plaintiffs request an award of $1,917,198 in economic loss damages for Scott Smith.

### 8. Ryan Winston

The armored vehicle carrying Mr. Winston was struck by rocket-propelled grenades, which exploded within feet of him and ████████████████████, and killed other soldiers in the vehicle. *Id.* at ¶¶ 11-12 and Ex. H. Another soldier was shot and killed. *Id.* ████████████████████████████. Ex. 67 at ¶ 14. ████████████████████████████████████████

██████████████████████. *Id.* at ¶ 13. He received a Purple Heart. *Id.* at ¶ 23 and Ex. D.

*a. Pain and Suffering*

████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████ Accordingly, in accordance
with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering
damages for Ryan Winston.

    *b. Economic Loss*

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███ Accordingly, Plaintiffs request an award of $2,796,643 in economic loss damages for Ryan Winston.

***Service Members Injured in an Attack that <u>Did Not</u> Include a Simultaneous Fatality***

**9. Johnny Butler, Jr.**

A powerful 150-pound IED exploded under Mr. Butler's vehicle, blowing it ten feet into the air and five feet forward, and leaving a crater.  Ex. 8, ███████████ ███████ at ¶¶ 7-8 and Ex. D. ██████████████████████████.  *Id.* ███ ████████████████████████████████████████.  *Id.* ████████████████████████████████████.  *Id.* at ¶ 11, and Ex. E ████████████████████████.  ████████████████████████████.  *Id.*  He received a Purple Heart.  *Id.* at ¶ 3 and Ex. C.

*a. Pain and Suffering*

████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

surgeries, the Soldier continues to experience a significant loss of visual acuity in the left eye . . . Solider only has light perception in the left eye." *Id.* at Ex. G (Enclosure 2, p. 5, ¶ 12). The injuries Mr. Butler sustained in the attack resulted in his medical retirement from the service in July 2014. Id. at ¶ 13 and Ex. B. In 2016, an Army Board reviewed Mr. Butler's medical records and determined that he "suffered a sensory loss of the left eye resulting from a traumatic event on 4 June 2011" and "his loss of vision will not improve (with reasonable certainty) throughout his life." *Id.* at Ex. G (Enclosure 1). Mr. Butler avers that prior to the attack, he did not suffer from any of the PTSD or physical injuries or symptoms noted in the VA Disability Rating (with the exception of childhood glaucoma). *Id.* at ¶ 13. This is corroborated by his family. Ex. 12, Declaration of Mecko Johnson, ¶ 20. Accordingly, in accordance with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for Johnny Butler, Jr.

### 10. Grady Horner

A rocket-propelled grenade struck a metal container within 50 feet of a wooden field hut in which Mr. Horner was sitting, with a "deafening" explosion filling the barracks with smoke. *Id.* at ¶ 4.

*a. Pain and Suffering*





Accordingly, in accordance with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for Grady Horner.

    *b. Economic Loss*

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██ Accordingly, Plaintiffs request an award of $1,887,638 in economic loss damages for Grady Horner.

**11. Daniel Kernan**

Mr. Kearnen was ████████ in a vehicle hit with a rocket-propelled grenade while on patrol. Ex. 28, ████████████████████, ¶¶ 6-7.  The grenade exploded ████████ ███████████████████████████████████. Id. at ¶ 10. ████████████████████ ████████████████████████████████████████. Id. at ¶¶ 11-12. ████ ████████████████████████████████. *Id.* at ¶ 9. He received a Purple Heart. *Id.* at ¶¶ 6, 14, Ex. E.

*a. Pain and Suffering*

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████



Accordingly, in accordance with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for Daniel Kernan.

**12. Donald McDaniel, II**

Mr. McDaniel was riding on an armored vehicle as part of a dismount team, when an IED exploded underneath the vehicle, and launched it into the air and flipped it. Ex. 31, ██████████████████████████, ¶¶ 6-7. The force of the blast █████████████ ████████████████████████████████. *Id.*

*a. Pain and Suffering*



Accordingly, in accordance with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for Donald McDaniel.

*b. Economic Loss*

Accordingly, Plaintiffs request an award of $2,017,923 in economic loss damages for Donald McDaniel.

**13. Arik Miller**

Mr. Miller was riding in an armored vehicle as part of a convoy, when an IED exploded under his vehicle, destroying the vehicle. Ex. 39, ██████████████████, ¶¶ 7, 8 and Ex. C. The blast ████████████████. *Id.* ████████████████████

███████████████████████████████████████████████████

████████████. *Id.* at ¶¶ 11-12. He was awarded the Purple Heart. *Id.* at ¶¶ 7, 13 and Ex. D.

   *a. Pain and Suffering*

██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ Accordingly, in accordance with the *Schooley*

rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for Arik Miller.

> b. *Economic Loss*



Accordingly, Plaintiffs request an award of $2,017,923 in economic loss damages for Arik Miller.

**14. Brandon Paredes**

Mr. Paredes was driving an armored wrecking vehicle, when an IED exploded underneath it. Ex. 50, ███████████████, ¶ 12. The explosion ███████ ███████████. *Id.* at ¶ 13. The blast ████████████████████████ ████████████████████████████. *Id.* He was awarded the Purple Heart. *Id.* at ¶ 16 and Exs. C and D.

> a.    *Pain and Suffering*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Accordingly, in accordance with the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering damages for Brandon Paredes.

    *b. Economic Loss*

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██ Accordingly, Plaintiffs request an award of $2,489,540 in economic loss damages for Brandon Paredes.

**15. Evan Pronzati**

An IED exploded under his armored vehicle, launched it into the air and flipped it. Ex. 56, ████████████████, ¶¶ 12-14, Ex. B. ██████████████████████████ ████████████████████████████. *Id.* He was awarded the Purple Heart. *Id.* at ¶¶ 6, 15 and Ex. C.

    a.    *Pain and Suffering*

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████ Accordingly, Plaintiffs request an award of not less than $5,000,000 in pain and suffering damages for Evan Pronzati.

**16. Andrew Vega**

Mr. Vega was riding in an armored vehicle ██████, standing in the gun turret with hatch open, when an IED exploded under the vehicle. Ex. 66, ██████████ ██████████, ¶ 9. ██████████████████████████████████ ██████████████. *Id.* ████████████████████████████████. *Id.*

a.    *Pain and Suffering*

██████████████████████████████████

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████ ██ ██████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ Accordingly, in accordance with

the *Schooley* rubric, Plaintiffs request an award of $7,000,000 in pain and suffering

damages for Andrew Vega.

## B.  COMPENSATORY DAMAGES FOR THE FAMILY MEMBERS

All of the Baker direct victim plaintiffs are service members who survived terrorist

attacks with physical and mental injuries.  This Court has previously awarded solatium

damages "to compensate for the emotional distress of the family members of [such]

*surviving* victims."  *Mustard*, 2023 U.S. Dist. LEXIS 19748 at *34 (emphasis added).

"Mental anguish, bereavement and grief resulting from" an immediate family member's

death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*

*v.Islamic Republic of Iran*, 892 F.3d 348, 356-57 (D.C. Cir. 2018)  (alteration adopted)

(quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998)).

In determining the appropriate amount of a solatium award, "the Court may look to

prior decisions awarding damages . . . for solatium." *Acosta v. Islamic Republic of Iran*,

574 F. Supp. 2d 15, 29 (D.D.C. 2008).  This Court has previously applied the standardized

"*Heiser I framework*" for solatium damages.  *Mustard*, 2023 U.S. Dist. LEXIS 19748 at

*35-*36, citing *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269

(D.D.C. 2006).   Under *Heiser I*, as a baseline, spouses of *deceased* victims receive

$8,000,000, parents and children of deceased victims receive $5,000,000 and siblings of

deceased victims receive $2,500,000.  *Id.*  However, courts in this District have awarded

family members of *surviving* victims one-half of the baseline awards for family members

of the deceased, so that, as a baseline, spouses of the *Baker* direct victims should receive

63

$4,000,000, their parents should receive $2,500,000, their children should receive $1,500,000 and their siblings should receive $1,250,000.  *Id.*  Courts have the discretion to deviate upward or downward from the baseline awards.  *Id.*

Generally "only immediate family members — parents, siblings, spouses, and children — are entitled to solatium awards." *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 94 (D.D.C. 2014), *aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017).  However, "immediate family members may include members of the victim's household who are viewed as the functional equivalents of immediate family members." *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018).  Immediate family members include those of the half-blood, as "siblings of half-blood to the servicemen in this case are presumed to recover as a full-blood sibling member would." *Peterson II*, 515 F. Supp. 2d at 52; *Aceto v. Islamic Republic of Iran*, No. 19-cv-464 (BAH), 2020 U.S. Dist. LEXIS 22084, 2020 WL 619925, at *16 (D.D.C. Feb. 7, 2020) (although plaintiff half-sibling "did not grow up in the same house" as the decedent, closeness in childhood, vacations, and family outings demonstrated requisite relationship).

The family-member Plaintiffs meet all of these requirements.

### *Immediate Family Members of Service Members*
### *Injured in an Attack that <u>Did Include</u> a Simultaneous Fatality*

**1. Namig Baker Family Members**

**a. Irina Gorodnitsky**

Irina Gorodnitsky naturalized as a citizen of the United States ███████████. Ex. 2, ████████████████████████, ¶ 1 and Ex. A.  She is the adoptive mother of Namig Baker, ████████████████████████.  Id. at ¶¶ 2-3 and Ex. B.  ███████████



Accordingly, Plaintiffs request a solatium award of $2,500,000 for Namig Baker's adoptive mother Irina Gorodnitsky.

**b. Glenn Eli Baker**

Glenn Eli Baker is a United States citizen, and the adoptive father of Namig Baker. Ex. 3, ¶¶ 1-2 and Ex. A.

Accordingly, Plaintiffs request a solatium award of $2,500,000 for Namig Baker's adoptive father Glenn Baker.    .

**c. Samuel Baker**

Samuel Baker has been a United States citizen ████████████. Ex. 5, ████████████, ¶ 1 and Ex. C. The Bakers adopted Namig and Natiq from one orphanage in ████████, and Samuel from another one, but at the same time. *Id.* at ¶ 2. █████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████  Accordingly,

Plaintiffs request a solatium award of $1,250,000 for Namig Baker's younger brother

Samuel Baker.

### d. Natiq Baker

Natiq Baker is a United States citizen ████████████████████████

█████████████████████ █ ████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████. Ex. 2, ¶ 2 and Ex. B; Ex. 4, █████████████████████, ¶ 2 and Exs. A

and B.  The Bakers adopted Namig and Natiq from the same orphanage in ████████, and

at the same time. Ex. 2 at ¶ 2-3 and Ex. B.  ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[15] *See* https://www.uscis.gov/adoption/after-your-child-enters-the-united-states.



████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ Accordingly, Plaintiffs request a solatium award of $1,250,000

for Namig Baker's younger brother Natiq Baker.

**2. Kevin Deas Family Members**

**a. Annmarie Deas**

Annmarie Deas is the former wife of Kevin Deas, having married him ████████

████████████████, and she has been a United States citizen since birth. Ex.

15, ████████████████, ¶¶ 1-2, Exs. A and B. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ Accordingly, Plaintiffs request a solatium

award of $4,000,000 for Kevin Deas' former wife, Annmarie Deas.

**b. K.D.**

K.D. is the biological son of Kevin Deas, and has been a United States citizen since

birth ████. Ex. 17, ████████████, ¶ 1; Ex. 16, at Ex. C. ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████ Accordingly, Plaintiffs request

a solatium award of $1,500,000 for Kevin Deas' biological son, K.D.

### c. A.D.

A.D. is the biological daughter of Kevin Deas, and has been a United States citizen

since birth██████. Ex. 16, ████████████████, ¶ 1; Ex. 16, at Ex. C. ███████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

Accordingly, Plaintiffs request a solatium award of $1,500,000 for Kevin Deas' biological

daughter, A.D.

**3. Christopher Hardesty Family Members**

**a. James Hardesty**

James Hardesty is a United States citizen, and the biological father of Christopher Hardesty. Ex. 21, ¶ 1 and Ex. A. [redacted] Accordingly, Plaintiffs request a solatium award of $2,500,000 for Christopher Hardesty's biological father James Hardesty.

**b. Kelli Hardesty**

Kelli Hardesty is a United States citizen, and the biological mother of Christopher Hardesty. Ex. 22, [redacted], ¶ 1 and Ex. A. [redacted]

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

████    Accordingly, Plaintiffs request a solatium award of $2,500,000 for Christopher

Hardesty's biological mother Kelli Hardesty.

**c. Nicholas Hardesty**

Nicholas Hardesty is a United States citizen, and the biological brother of

Christopher Hardesty.  Ex. 23, ████████████████, ¶ 1 and Ex. A. ██████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████    Accordingly, Plaintiffs

request a solatium award of $1,250,000 for Christopher Hardesty's biological brother

Nicholas Hardesty.

**4. Michael Pabon Family Members**

**a. Eva Carrera**

Eva Carrera is a United States citizen, and has been since birth ███████

███████. Ex. 47, ███████████████, ¶ 1, Ex. A.  Eva married Michael Pabon

on ███████. *Id.* at ¶ 2, Ex. B. ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███ Accordingly, Plaintiffs request a solatium award of $4,000,000 for Michael Pabon's

wife, Eva Carrera.

**b. Maricruz Carrera**

Maricruz Carrera is a United States citizen, and the mother-in-law of Michael

Pabon.  Ex. 46, ███████████████, ¶¶ 1-2. ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Accordingly, Plaintiffs request

a solatium award of $2,500,000 for Michael Pabon's mother-in-law Maricruz Carrera.

### 5. Joseph Sandlin Family Members

### a. Savannah Sandlin

Savannah Sandlin is a United States citizen, and the biological daughter of Joseph

Sandlin.  Ex. 58, ███████████████████, ¶¶ 1, 2, and Ex. A.  ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Accordingly, Plaintiffs request a

solatium award of $1,500,000 for Joseph Sandlin's biological daughter, Savannah Sandlin.

### 6. Scott Smith Family Members

### a. W.S.

W.S. is a United States citizen, and the biological son of Scott Smith.  Ex. 61,

███████████████████, ¶ 48 and Ex. H thereto.  ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Accordingly, Plaintiffs request a solatium award

of $1,500,000 for Scott Smith's biological son, W.S.

### b. R.S.

R.S. is a United States citizen, and the biological daughter of Scott Smith.  Ex. 61,

████████████████, ¶ 48 and Ex. H thereto. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Accordingly, Plaintiffs request a solatium

award of $1,500,000 for Scott Smith's biological daughter, R.S.

### 7.  Ryan Winston Family Members

### a.  Sophronia Winston

Sophronia Winston is a United States citizen, and the spouse of Ryan Winston.  Ex.

72, ██████████████████████, ¶¶ 1-2; Ex. 67, ██████████████████████, ¶ 28.



███████████████ Accordingly, Plaintiffs request a solatium award of $4,000,000

for Ryan Winston's wife, Sophronia Winston.

**b. Amari Winston**

Amari Winston is a United States citizen, and the biological daughter of Ryan

Winston.  Ex. 68, █████████████████████, ¶¶ 1-2 and Ex. A thereto; Ex. 67 at ¶ 30

and Ex. G thereto. ██████████████████████████████████

████████████████████ Accordingly, Plaintiffs request a solatium award of

$1,500,000 for Ryan Winston's biological daughter, Amari Winston.

### c. Jazmine Winston

Jazmine Winston is a United States citizen, and the biological daughter of Ryan Winston.  Ex. 71, ███████████████████, ¶¶ 1-2 and Ex. A thereto; Ex. 67 at ¶ 30 and Ex. G thereto.  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ Accordingly, Plaintiffs request a solatium award of $1,500,000 for Ryan Winston's biological daughter, Jazmine Winston.

### d. Arshianna Winston

Arshianna Winston is a United States citizen, and the biological daughter of Ryan Winston.  Ex. 69, ███████████████████, ¶¶ 1-2 and Ex. A thereto; Ex. 67 at ¶ 30.  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

 Accordingly, Plaintiffs request a solatium award of $1,500,000 for Ryan Winston's biological daughter, Arshianna Winston.

### e. Sherman Winston

Sherman Winston is a United States citizen, and the biological brother of Ryan Winston. Ex. 73, , ¶¶ 1-2 and Ex. A thereto; Ex. 67 at ¶ 36.

Accordingly, Plaintiffs request a solatium award of $1,250,000 for Ryan Winston's biological brother Sherman Winston.

### f. Corkney Winston

Corkney Winston[16] is a United States citizen, and the biological sister of Ryan Winston. Ex. 70, , ¶¶ 1-2 and Ex. A thereto; Ex. 67 at ¶ 36.



███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████ Accordingly, Plaintiffs request a solatium

award of $1,250,000 for Ryan Winston's biological sister Corkney Winston.

**g. Merrel Winston**

Merrel Winston is a United States citizen, and has been since his birth ████████

████, and is the biological brother of Ryan Winston.  Ex. 74, ████████████

████, ¶¶ 1-2 and Ex. A thereto; Ex. 67 at ¶ 36. ████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████ Accordingly, Plaintiffs request a solatium award

of $1,250,000 for Ryan Winston's biological brother Merrel Winston.

***Immediate Family Members of Service Members***
***Injured in an Attack that <u>Did Not Include</u> a Simultaneous Fatality***

**8. Johnny Butler, Jr. Family Members**

77

**a. Sherita Sanders**

Sherita Sanders is the biological sister of Johnny Butler, Jr. ████████████████

██████, and a United States citizen. Ex. 82, ███████████████████, ¶¶ 1-2, Ex.

A. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

Accordingly, Plaintiffs request a solatium award of $1,250,000 for Johnny Butler Jr.'s

biological sister Sherita Sanders.

**b. Arletha Pettie**

Arletha Pettie is the biological sister of Johnny Butler, Jr., ████████████████

██████, and a United States citizen. Ex. 9, ███████████████████, ¶¶ 2-3, Ex. A.

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ Accordingly, Plaintiffs request a

solatium award of $1,250,000 for Johnny Butler Jr.'s biological sister Arletha Pettie.

### c. Claudia Pettie

Claudia Pettie is the biological sister of Johnny Butler, ███████████████,

and a United States citizen. Ex. 10, ████████████████, ¶¶ 2-3, Ex. A. █████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████ Accordingly,

Plaintiffs request a solatium award of $1,250,000 for Johnny Butler Jr.'s biological sister

Claudia Pettie.

### d. Mecko Johnson

Mecko Johnson is the biological sister of Johnny Butler, ███████████████,

and a United States citizen. Ex. 12, ██████████████████, ¶¶ 2-3, Ex. A. █████

████████████████████████████████████████████████

████████████████████████████████████████████████



███████████ Accordingly, Plaintiffs request a solatium award of $1,250,000 for Johnny

Butler Jr.'s biological sister Mecko Johnson.

### e. Jonathan James Butler

Jonathan James Butler is the biological son of Johnny Butler, Jr., and has been a

United States citizen ██████████████. Ex. 13, █████████████████████

███, ¶ 1, Ex. A. ████████████████████████████████

███████████ Accordingly, Plaintiffs request a solatium award of $1,500,000 for Johnny

Butler Jr.'s biological son Jonathan James Butler.

### f. Jaylen Butler

Jaylen Butler is the biological son of Johnny Butler, Jr., and has been a United

States citizen ██████████. Ex. 11, ███████████████████, ¶¶ 1-2, Ex. A.

██████████████████████████████████████████████

████████████████████████████████      ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

Accordingly, Plaintiffs request a solatium award of $1,500,000 for Johnny Butler Jr.'s biological son Jaylen Butler.

### g. Jada Butler

Jada Butler is the biological daughter of Johnny Butler, Jr., and has been a U.S. citizen ████████████████████████. Ex. 8, ¶ 25 and Ex. H thereto. ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████ Accordingly, Plaintiffs request a solatium award of $1,500,000 for Johnny Butler Jr.'s biological daughter Jada Butler.

**9. Daniel Kernan Family Members**

**a. Lea Ann McCartney**

Lea Ann McCartney is the biological mother of Daniel Kernan, and has been a United States citizen ████████████████████████. Ex. 29, ███████████████ █████████, ¶¶ 1-3, Ex. A; Ex. 28, ███████████████████, Ex. A. ████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████ Accordingly, Plaintiffs request a solatium award of $2,500,000 for Daniel Kernan's biological mother Lea Ann McCartney.

**b. James Kernan**

James Kernan is the biological brother of Daniel Kernan, and has been a United States citizen ████████████████████. Ex. 30, ████████████████████, ¶ 1 and Ex. A thereto. █████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██  Accordingly, Plaintiffs request a solatium award of $1,250,000 for Daniel Kernan's

biological brother James Kernan.

### 10. Donald McDaniel, II Family Members

### a. Donald McDaniel, Sr.

Donald McDaniel, Sr. is a United States citizen, and the biological father of Donald

McDaniel, II.  Ex. 32, ████████████████████████ . ¶ 1 and Ex. A. ███████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

Accordingly, Plaintiffs request a solatium award of $2,500,000 for Donald McDaniel II's

biological father Donald McDaniel, Sr.

### b. Shelby McDaniel

Shelby McDaniel is the biological daughter of Donald McDaniel, II, and has been

a United States citizen ████████████ .  Ex. 36, ████████████████████ , ¶ 1.

█████████████████████████████████████████████

█████████████████████████████████████████████

[REDACTED]

[REDACTED] Accordingly, Plaintiffs request a solatium award of $1,500,000 for Donald McDaniel II's biological daughter, Shelby McDaniel.

**c. James McDaniel**

James McDaniel is the biological son of Donald McDaniel, II, and has been a United States citizen [REDACTED]. Ex. 34, [REDACTED], ¶ 1 and Ex. A. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]. Accordingly, Plaintiffs request a solatium award of $1,500,000 for Donald McDaniel II's biological son, James McDaniel.

84

### d.  Logan McDaniel

Logan McDaniel is the biological son of Donald McDaniel, II, and has been a

United States citizen ████████████. Ex. 35, ████████████████, ¶ 1. █

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████  Accordingly, Plaintiffs request a solatium award of $1,500,000 for Donald

McDaniel II's biological son, Logan McDaniel.

### e.  Terasa Defusto

Terasa Defusto is the biological sister of Donald McDaniel, II, and has been a

United States citizen ████████████████████. Ex. 33, ████████████████

██████, ¶ 1 and Ex. A thereto. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

"completely different" because Donald is "not the same person." *Id.* at ¶ 9. He "yell[s] and become[s] verbally abusive" to Terasa. *Id.* He is "distant from [Terasa], stand-offish." *Id.* Accordingly, Plaintiffs request a solatium award of $1,250,000 for Donald McDaniel II's biological sister Terasa Defusto.

### 11. Arik Miller Family Members

#### a. A.M.

A.M. is the biological daughter of Arik Miller, and has been a United States citizen



. Ex. 39, ▓▓▓▓▓▓▓▓▓▓▓▓▓, ¶ 39 and Ex. H thereto.

Accordingly, Plaintiffs request a solatium award of $1,500,000 for Arik Miller's biological daughter, A.M.

#### b. Calandra Bailey

Calandra Bailey is the biological mother of Arik Miller, and has been a United States citizen since birth. Ex. 40, ▓▓▓▓▓▓▓▓▓▓▓▓▓, ¶¶ 1-2 and Ex. A thereto; Ex. 39, ▓▓▓▓▓▓▓▓▓▓▓, Ex. A thereto.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████    Accordingly, Plaintiffs request a solatium award

of $2,500,000 for Arik Miller's biological mother Calandra Bailey.

### c.  Tyresha Williams

Tyresha Williams is the biological sister of Arik Miller, and has been a United

States citizen ██████████████████████████. Ex. 41, ██████████████████████████,

¶¶ 1-2 and Ex. A thereto. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████    Accordingly, Plaintiffs request a

solatium award of $1,250,000 for Arik Miller's biological sister Tyresha Williams.

### 12.  Brandon Paredes Family Members

### a.  Julie Paredes

Julie Paredes is a United States citizen, and has been since birth.   Ex.  53,

██████████████████████████, ¶ 2, Ex. A.  She is the spouse of Brandon Paredes, and has

been ██████████.  *Id.* at ¶ 3, Ex. B.  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████    Accordingly, Plaintiffs request a solatium award of $4,000,000 for Brandon Paredes' wife, Julie Paredes.

### b. Gary Paredes

Gary Paredes is a United States citizen, and has been since birth.   Ex. 52, ██████████████████████, ¶ 2, Ex. A.  He is the biological, older brother of Brandon Paredes.  *Id.* at ¶ 1.  ██████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Accordingly, Plaintiffs request a solatium award of $1,250,000 for Brandon Paredes' biological brother Gary Paredes.

### c. Jesse Paredes

Jesse Paredes is a United States citizen, and has been since birth.   Ex. 83, ██████████████████████, ¶ 2, Ex. A.  He is the biological brother of Brandon Paredes. *Id.* at ¶ 1.  ██████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ Accordingly,

Plaintiffs request a solatium award of $1,250,000 for Brandon Paredes' biological brother

Jesse Paredes.

### d.  Adam Paredes

Adam Paredes is a United States citizen, and has been since birth, and is the

biological brother of Brandon Paredes.  Ex. 51, ████████████████████, ¶¶ 1-2, Ex.

A. █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████  Accordingly, Plaintiffs request a solatium award of $1,250,000 for

Brandon Paredes' biological brother Adam Paredes.

### e.  Estate of Nevaeh Paredes

Nevaeh Paredes was a United States citizen, and the biological daughter of Brandon

Paredes.  Ex. 50, ¶ 49 and Ex. I thereto. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ Accordingly, Plaintiffs request a solatium award

of $1,500,000 for Brandon Paredes' biological daughter, Nevaeh Paredes.

### 13. Grady Horner Family Members

#### a. Cameron Horner

Cameron Horner is the biological daughter of Grady Horner, and has been a United

States citizen ██████████████████████. Ex. 24, ████████████████████,

¶ 12 and Ex. G. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ ████████████████████████████████████████

██ ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████. Accordingly, Plaintiffs request a

solatium award of $1,500,000 for Grady Horner's biological daughter, Cameron Horner.

### C. PUNITIVE DAMAGES

---

██ ██████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████

Plaintiffs have expressly requested an award of punitive damages in their Complaint. *See* ECF 1, ¶ 253.c.

The private right of action in 28 U.S.C. 1605A(c) authorizes "punitive damages," which "serve to punish and deter the actions for which they are awarded." *Valore*, 700 F. Supp. 2d at 87. Courts balance four factors to determine the appropriate amount of punitive damages: "(1) the character of the defendants' act; (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56 (D.D.C. 2012) (quoting *Acosta*, 574 F. Supp. 2d at 30).

These factors all weigh strongly in favor of awarding significant punitive damages. Iran provided material support and resources to the Taliban-led Syndicate, which enabled it to conduct the attacks that injured the *Baker* service personnel Plaintiffs, and caused anguish and grief for their immediate family members. Further, Iran has a "demonstrated policy" of funding similar terrorist campaigns, *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 278 (D.D.C. 2003), and intentionally caused the *Baker* Plaintiffs to suffer significant and continuing physical and psychological trauma as a result of these attacks, *see supra* Sections IV.A and IV.B; *see also Acosta*, 574 F. Supp. 2d at 31 ("[T]his Court has no doubt that Iran's intention, in supporting terrorist groups such as the one involved here, is to create maximum harm through terrorist acts."). Accordingly, there is a real and urgent need to deter Iran from supporting terrorist attacks against American victims. Finally, Iran "is a sovereign nation that can be presumed to possess significant wealth." *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 251 (D.D.C. 2020). The

four-factor test outlined in *Oveissi* and elsewhere thus supports awarding substantial punitive damages in this case.

Courts in this District have used two methodologies to calculate punitive damages awards in terrorism cases brought under the FSIA. Using the first method, the court calculates "the amount of Iran's annual expenditures on terrorist activities" and multiplies it by a factor to "yield the desired deterrent effect." *Valore*, 700 F. Supp. 2d at 88; *accord Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 80-81 (D.D.C. 2010) (applying this method). Using the second method, courts award "punitive damages in an amount equal to the total compensatory damages awarded." *Sheikh*, 485 F. Supp. 3d at 273 (quoting *Opati*, 60 F. Supp. 3d at 82). Under the second method, punitive damages are calculated "by reference to the entire compensatory award," including prejudgment interest. *Wamai*, 60 F. Supp. 3d at 98; *see Ewan*, 466 F. Supp. 3d at 252 & n.4 (calculating punitive damages based on the amount of compensatory damages including interest).

In *Selig v. Islamic Republic of Iran*, which like this case and *Cabrera* is also based on Iran's provision of material support and resources to the Taliban, the court determined that awarding punitive damages equal to compensatory damages to victims of Kabul hotel attacks "is commensurate with the character of [Iran's] [terroristic] acts and the nature and extent of the harm caused." 573 F. Supp. 3d 40, 77 (D.D.C. 2021). The *Cabrera* court also seems to favor the second methodology. *Cabrera*, 2022 U.S. Dist. LEXIS 127290 at *198. Accordingly, Plaintiffs request an award of punitive damages in this case consistent with *Selig* and *Cabrera* calculated using the second methodology.

## D. PREJUDGMENT INTEREST

Plaintiffs have expressly requested an award of pre-judgment interest in their Complaint. *See* ECF 1, ¶ 253.d.

Whether to award prejudgment interest "is a question that rests within this Court's discretion, subject to equitable considerations." *Oveissi*, 879 F. Supp. 2d at 58. Some courts "in this District have previously awarded prejudgment interest on similarly situated plaintiffs' awards, including pain and suffering and solatium." *Ewan*, 466 F. Supp. 3d at 250 (collecting cases). Other courts in this District, including this Court, have concluded that awards under the *Heiser* or *Peterson II* frameworks already "represent the appropriate level of compensation, regardless of the timing of the attack." *Oveissi*, 879 F. Supp. 2d at 59 (quoting *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 30 n.12 (D.D.C. 2011)) (collecting cases).

The *Cabrera* court concluded that an award of prejudgment interest is appropriate, since "[a]wards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks." *Cabrera*, 2022 U.S. Dist. LEXIS 127290 at *194, quoting *Ewan*, 466 F. Supp. 3d at 250. "'A solatium award is therefore best viewed as fixed at the time of the loss,' so plaintiffs 'were theoretically entitled to the full amount of their solatium awards' at the time of the attacks that caused their damages." *Id.* at *194-195, quoting *Fritz*, 324 F. Supp. 3d at 64. Further, "[f]ailure to award prejudgment interest 'would also allow the Iranian defendants to profit from the use of the money' in the intervening time." *Id.* at 195, quoting *Ewan*, 466 F. Supp. 3d at 250.

Accordingly, Plaintiffs request that the Court award prejudgment interest on their pain and suffering and solatium awards using the methodology for calculating interest set forth in *Cabrera*. The *Cabrera* court used the "prime rate" rather than the Treasury rate

since the prime rate is a "market based estimate" of what the victim would have paid to borrow the funds at the time of the attack, and therefore "more appropriate". *Id.* (quoting *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450-451 (D.C. Cir. 1996)). In calculating interest with respect to a particular attack, the court used the average annual prime rate published by the Federal Reserve[18] in each year from the date of the attack to the date of judgment, in order to derive a multiplier. *Id.*, inclusive of fns. 45 and 46 (citing *Ewan*, 466 F.Supp. 3d at 250-251).

## E. POSTJUDGMENT INTEREST

Plaintiffs have expressly requested an award of post-judgment interest in their Prayer for Relief. *See* ECF 1, Complaint, ¶ 253.d.

Federal law requires that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court[,]" and "[s]uch interest shall be calculated from the date of the entry of judgment." 28 U.S.C. § 1961(a). Courts must apply § 1961(a). *See Cont'l Transfer Technique Ltd. v. Fed. Gov't Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012). Accordingly, Plaintiffs request that the Court award postjudgment interest at the statutory rate calculated in accordance with the instructions set forth in § 1961(a).

## V. CONCLUSION

WHEREFORE, for the reasons set forth above, Plaintiffs respectfully request that pursuant to 28 U.S.C. § 1608(e), this Court enter default judgment in their favor and find the Defendant liable for the terrorist attacks that injured the direct victim military member Plaintiffs and their respective family members, and award to each of the Plaintiffs damages

---

[18] Available here: https://www.federalreserve.gov/datadownload/Download. aspx?rel=H15&series=8193c94824192497563a23e3787878ec&filetype=spreadsheetml& label=include&layout=seriescolumn&lastObs=50.

for their injuries pursuant to 28 U.S.C. § 1605A(c), in such amounts as the Court deems

appropriate and just; and, in addition thereto, that the Court assess punitive damages against

Iran for its continued and unrelenting support of acts of international terror; and thereby

award the Plaintiffs the highest possible dollar amount to the maximum extent allowed by

applicable law, including pre-judgment and post-judgment interest and assessment of costs,

for all of which attachment may be had, against the Defendant.


DATED:  October 3, 2024.                    Respectfully Submitted,

                                            */s/ Peter Cameron*
                                            Peter Cameron, Esq. (#CA00088)

                                            CAMERON FIRM, PC
                                            4003 Wabash Avenue
                                            San Diego, CA 92104
                                            Tel. (619) 819-5021
                                            Email: peter@veteranappeal.com

                                            *Attorney for Plaintiffs*

                                            *Of Counsel for Plaintiffs:*
                                            F. R. Jenkins, Esq. (D. C. Bar No. 1615786)
                                            MERIDIAN 361 INTERNATIONAL LAW
                                            GROUP, PLLC
                                            400 Congress Street, No. 7040
                                            Portland, ME 04101
                                            Tel. (202) 361-4944
                                            Email: Jenkins@meridian361.com